IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

PEOPLES BANK OF THE SOUTH                                    PLAINTIFF

V.                                              CAUSE NO. 3:09CV217-TSL-JCS

BANCINSURE, INC.                                             DEFENDANT

### MEMORANDUM IN SUPPORT OF BANCINSURE, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

BancInsure, Inc. ("BancInsure") submits this memorandum in support of its Motion for Partial Summary Judgment as follows:

## I.    SUMMARY OF THE ARGUMENT

This bona fide coverage dispute arises out of a claim asserted by Peoples Bank of the South ("the Bank") against BancInsure under a Financial Institution Bond for losses allegedly resulting from a loan extended in reliance on a dishonest title opinion.

About $500,000 of the Bank's current claim for $833,893.40 in damages is either clearly not covered by the Bond or expressly excluded from coverage. BancInsure is seeking summary judgment as to all such damages. Because the Bank claims that its loss was the result of an employee (Deer), Exclusion (h) applies and excludes coverage for the Bank's claim under both Insuring Agreement (E) and Insuring Agreement (Q). The Bank's claim for interest income is not compensable under the Bond because interest income is not a "loss" under the Bond. Further, potential income (including interest income) is expressly excluded under exclusion (s) of the Bond. Most, if not all, of the Bank's damage claim consists of loss that is both indirect and speculative in nature, and which is excluded by exclusion (v), which applies to "indirect or

1

consequential loss of any nature." Additionally, because the Bond is a contract, the Bank's claim for the return of its Bond premiums under an unjust enrichment theory fails as a matter of law.

BancInsure also seeks summary judgment as to the Bank's claims for bad faith breach of contract and breach of its duty to investigate the Bank's claim. It is the Bank's burden to show that it suffered a loss covered by the Bond. The Bank has not shown that Deer received an improper financial benefit in connection with the Loan. BancInsure investigated the Bank's claim in good faith and rested on solid coverage defenses. The Bank cannot point to a genuine issue of material fact sufficient to defeat summary judgment on its claims for punitive damages.

## II.   FACTS

**The Financial Institution Bond:** In general, a Financial Institution  Bond is a specialized form of insurance policy. Here, BancInsure issued a Financial Institution Bond with a single loss limit of $2,000,000 and a Single Loss Deductible of $10,000, to the Bank for the period of June 1, 2005 to June 1, 2008 ("the Bond").[1] The Bond requires that the Bank notify BancInsure at the "earliest practicable moment" after discovery of a loss and that the Bank supply BancInsure with proof of its loss "with full particulars."[2] The Bond contains several insuring agreements, three of which are relevant to this lawsuit: Insuring Agreement (A), which relates to dishonesty; Insuring Agreement (E), which relates to securities; and Insuring Agreement (Q), which relates to fraudulent real property mortgages.

Under Insuring Agreement (A), BancInsure agreed to indemnify the Bank only for:

> **Loss resulting directly from dishonest or fraudulent acts committed by an Employee** acting alone or in collusion with others.

---

[1]   Bond, attached at Tab "1" to the Affidavit of Van Butler, Exhibit "A."
[2]   *Id.*, Section 5(a)-(b).

2

Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(a)    to cause the Insured to sustain such a loss, or
(b)    to obtain improper financial benefit for the Employee or another person or entity.

However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions **and has received, in connection with these transactions, an improper financial benefit.**

As used throughout this Insuring Agreement, **financial benefit does not include any employee benefits earned in the normal course of employment, including** salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.[3]

The term "Loan" is defined by the Bond to mean "all extensions of credit by the Insured and all transactions creating a creditor relationship in favor of the Insured . . . ."[4] The term "Employee" is defined, in pertinent part, as "an attorney retained by the Insured and an employee of such attorney while either is performing legal services for the Insured."[5]

Insuring Agreement (E) of the Bond provides, in pertinent part, indemnity for:

**Loss resulting directly from** the Insured having, in good faith, for its own account or for the account of others,

(I)    acquired, sold or delivered, given value, extended credit or assumed liability on the faith of any original
      (a)    Certificated Security,
      (b)    Document of Title
      (c)    Deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,
      (d)    Certificate of Origin or Title,
      (e)    Evidence of Debt,
      (f)    Corporate, partnership or personal Guarantee,

---

[3]    *Id.*, Insuring Agreement (A) Dishonesty.
[4]    *Id.*, Section 1, Definition (t).
[5]    *Id.*, Definition (m)(2).

3

(g)  Security Agreement,
(h)  Instruction to a Federal Reserve Bank of the United States, or
(i)  Statement of Uncertificated Security, which
    (i)  bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a forgery,
    (ii)  is altered, or
    (iii)  is lost or stolen…[6]

Key terms listed in Insuring Agreement (E) are defined in the Bond. Relevant here are the terms "Evidence of Debt," which is defined as "an instrument, including a Negotiable Instrument, executed by a customer of the Insured and held by the Insured which in the regular course of business is treated as evidencing the customer's debt to the Insured,"[7] and the term "Security Agreement," which means "an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation."[8]

Insuring Agreement (Q) of the Bond provides the Bank with indemnity for:

Loss resulting directly from the Insured's having, in good faith and in the ordinary course of business in connection with any loan, accepted or received or acted upon the faith of any real property mortgages, real property deeds of trust or like instruments pertaining to realty or assignments of such mortgages, deeds of trust or instruments which prove to have been defective by reason of the signature on such document of any person having been obtained through trick, artifice, fraud, duress or false pretenses or the signature on the recorded deed conveying such real property to the mortgagor or grantor of such mortgage or deed of trust having been obtained by or on behalf of such mortgagor or grantor through trick, artifice, fraud, duress or false pretenses.[9]

---

[6]    *Id.*, Insuring Agreement (E) Securities.
[7]    *Id.*, Definition (n).
[8]    *Id.*, Definition (x).
[9]    *Id.*, Insuring Agreement (Q) Fraudulent Real Property Mortgages.

The Bond contains several exclusions relevant here.  In particular, the Bond expressly excludes coverage for:

(e)  **loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any Loan** or transaction involving the Insured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreement (A), (D), (E), (P) or (Q).

(h)  **loss caused by an Employee,** except when covered under Insuring Agreement (A) or when covered under Insuring Agreement (B), (C) or (R) and resulting directly from misplacement, mysterious unexplainable disappearance or destruction of or damage to Property.

(s)  **potential income,** including but not limited to interest and dividends, not realized by the Insured (including for purposes of this exclusion portions of outstanding promissory notes payable to the Insured which represent payments of interest, fees and penalties in connection with prior promissory notes payable to the Insured.

(u)  **all fees, costs and expenses incurred by the Insured in establishing the existence of or amount of loss** covered under this bond except when covered under Insuring Agreement (T).

(v)  **indirect or consequential loss of any nature.**[10]

**The Claim**: Mr. Larry B. Hill, president of the Bank ("Hill"), first advised BancInsure of a possible claim on the Bond by telephone on March 28, 2006, followed by a letter later that same day attaching a "history of the events leading up to this possible claim."[11]  Hill's letter explained that in November 2004, the Bank's loan committee had approved a loan ("the Loan") to Todd Phillips ("Phillips"), president of Todd Phillips Investments, Inc. ("TPI"), for $500,000

---

[10]    *Id.*, Section 2, Exclusions (e), (h), (s), (u), (v).
[11]    March 28, 2006 letter from Larry B. Hill to Van Butler, attached at Tab "2" to the Affidavit of Van Butler, Exhibit "A."

to be "secured by a first lien on approximately 5 acres of commercial property in Pike County, Mississippi," with an appraised value of $1,235,000 ("the Pike County Property" or "the Property").[12] According to Hill, the Bank received a preliminary title opinion from Dwayne G. Deer, Attorney at Law ("Deer"), dated December 8, 2004, which indicated "a clear title to the subject property and no existing liens."[13] The Loan closed on December 23, 2004 and was funded that same week.[14] On April 14, 2005, the Bank received a final title certificate from Deer "disclosing [the Bank's] deed of trust with no other liens recorded."[15]

Hill explained that, in the course of discussions with the president of a neighboring bank, the Bank of Franklin, he discovered that Phillips had also used the Pike County Property as collateral for a separate loan with the Bank of Franklin.[16] Hill then learned that, on December 8, 2004, Deer had also supplied a title opinion to the Bank of Franklin regarding the Pike County Property and that, similar to the title opinion supplied to the Bank, Deer's title opinion to the Bank of Franklin disclosed no prior liens on the Pike County Property.[17] Hill determined that the Bank's deed of trust had been recorded a week after the Bank of Franklin recorded its deed of trust on the Pike County Property and neither bank's lien was disclosed on the final title certificate issued them by Deer.[18] In short, Hill explained that both banks "had each advanced

---

[12]     *Id.* p. 2.
[13]     *Id.*
[14]     *Id.*
[15]     *Id.*
[16]     *Id.*, p. 3.
[17]     *Id.*
[18]     *Id.*

$500,000 on the same property under the impression that they each were obtaining a first lien position on the Pike County [P]roperty."[19]

Hill also disclosed that the Bank had another title attorney, Gary Honea ("Honea"), to perform a title search on the Pike County Property in order to determine the Bank's lien position.[20]   In Honea's March 20, 2006 title opinion, Hill learned that Pike County National Bank recorded a deed of trust on the Property as security for an $800,000 loan in April 2004. Honea's title opinion also disclosed that an allegedly forged cancellation of the Bank's lien on the Pike County Property had been recorded on April 8, 2005, six days before Deer's final title certificate indicating that the Bank had the first lien on the Property and that there were no other deeds of trust.[21]   Further, Honea's title opinion indicated that TPI "borrowed another $700,000 on the same Pike County [P]roperty from American Bank & Trust Company...on April 11, 2005."[22]  Hill also detailed the Bank's efforts to recover funds disbursed on the Loan and to obtain alternate collateral to secure Phillips' debt.[23]

BancInsure responded to Hill's letter the following day, acknowledging receipt of the Bank's claim and informing the Bank that it had referred the matter to Kalchick, Pratt and Associates, L.L.C. ("KPA"), a consulting group that specializes in reviewing Financial Institution bond claims for insurers.[24] This claim was then reviewed by Judy Edwards, a senior

---

[19]     *Id.*
[20]     *Id.*
[21]     *Id.*
[22]     *Id.*
[23]     *Id.* Oddly, however, the Bank to this day has done nothing to seek recovery from Deer or any of his insurers.
[24]     Affidavit of Van Butler, ¶¶ 8-9, Exhibit "A"; March 29, 2006 letter from Van Butler to Larry Hill, attached at Tab "3" to the Affidavit of Van Butler; Affidavit of Judith W. Edwards, ¶ 3, Exhibit "B"; 30(b)(6) Deposition of BancInsure, 8:6-25, Exhibit "C."

claims attorney at KPA with over twenty-five years of experience in handling surety and fidelity claims.[25]

Upon her receipt of the claim, Ms. Edwards contacted the Bank, discussed the background of the claim with Hill, and requested copies of pertinent documents.[26] Upon receipt of the information requested from the Bank, Ms. Edwards evaluated potential coverage for the Bank's claim under the Bond and, concluding that, based on the information supplied, the Bank's claim was not covered, made a coverage recommendation to BancInsure and assisted with the drafting of BancInsure's position letter regarding coverage for the Bank's claim, which was sent to the Bank on May 3, 2006.[27]

In its letter, BancInsure first stated the facts as it understood them, cautioning the Bank that "[a]ny inaccuracies or mischaracterizations" therein could change BancInsure's coverage analysis.[28] BancInsure noted that because the Bank's claim was the result of an alleged loan loss, and that because loan losses are generally excluded from coverage unless the loss is covered under Insuring Agreement (A), (D), (E), (P) or (Q), BancInsure's analysis would be limited to those insuring agreements.[29] As to Insuring Agreement A, which deals with employee dishonesty, BancInsure noted that there was "no indication that an Employee of the Bank was in any way involved with the causation of the Loss."[30] BancInsure noted that Insuring Agreement (D), which deals with forgery and alteration, did not apply because there was "no indication that

---

[25]    30(b)(6) Deposition of BancInsure, 8:12-9:19; Affidavit of Judith W. Edwards, ¶ 3;
[26]    30(b)(6) Deposition of BancInsure, 66:7-21; Affidavit of Judith W. Edwards, ¶ 5.
[27]    30(b)(6) Deposition of BancInsure, 66:7-21; May 3, 2006 Letter from Van Butler to Larry Hill, attached at Tab "4" to the Affidavit of Van Butler.
[28]    May 3, 2006 Letter from Van Butler to Larry Hill, p. 2, Tab "4" to the Affidavit of Van Butler.
[29]    Id., p. 2.
[30]    Id.

any of the documents executed by Phillips or Deer relative to the loan application were forged or altered."[31] BancInsure also noted that Insuring Agreements (P), dealing with unauthorized signatures and endorsements, and (Q), dealing with fraudulent real property mortgages, did not appear to apply on the facts presented.[32] BancInsure then analyzed coverage under Insuring Agreement (E), stating that:

> It does not appear that the promissory notes or deeds of trusts were forged, altered or counterfeit. The loss was not caused by apparently forged releases. The loss appears to be the result of the Bank's reliance upon Deer's title opinions which contained inaccurate information as to lien status of the property involved. The signatures on the opinions have not been claimed to be forgeries. Title opinions are not considered Securities as defined by Insuring Agreement (E) as they do not transfer title of the property.[33]

BancInsure advised the Bank that it "must respectfully decline coverage" for the its alleged loan loss, but asked the Bank to supply any additional information that it believed would alter BancInsure's opinion to Ms. Edwards as soon as possible.[34] The Bank did not respond to BancInsure's May 3, 2006 position letter.[35] Having received no further information from the Bank for 90 days, BancInsure and KPA closed their claim files with respect to the Bank's claim.[36]

---

[31]    *Id.*, p. 3.

[32]    *Id.*

[33]    *Id.*, pp. 3-4. As will be discussed more fully *infra*, Ms. Edwards' analysis is correct. The Bank claims that its loss resulted from the Loan to Phillips, which it claims it would not have made if Deer's title opinion had not led them to believe that the Pike County Property was unencumbered. A title opinion is not one of the documents listed in Insuring Agreement (E) which provides for indemnity of loss resulting directly from the extension of credit on the faith of certain enumerated original documents.

[34]    *Id.*, p. 4.

[35]    Affidavit of Van Butler, ¶¶ 10-11; Affidavit of Judith W. Edwards, ¶¶ 7-8.

[36]    30(b)(6) Deposition of BancInsure, 63:5-9; Affidavit of Van Butler, ¶¶ 10-11; Affidavit of Judith W. Edwards, ¶¶ 7-8.

**The Reopened Claim**:  In December 2008, about 2 ½ years after BancInsure's May 3, 2006 position letter, Ms. Edwards received a letter from the Bank's attorney, April Reeves, in which Ms. Reeves advised that she had been retained to review BancInsure's denial of the Bank's claim under the Bond, asserted that the Bank's loan losses were covered under Insuring Agreement (A) of the Bond, and demanded that BancInsure reverse its previous coverage determination and pay the Bank's claim, including "attorneys' fees and expenses incurred by [the Bank] in connection with [its] claim."[37]  In support of her demand for payment, Ms. Reeves stated that Deer was a Bank Employee under the Bond, as he was an attorney "retained by [the Bank] to provide legal services, namely title opinions on which [the Bank] relied in making the loan to Todd Phillips," and that the Bank's loan loss was caused by "Deer's dishonest actions in connection with providing false title opinions to [the Bank]."[38]

Upon receipt of Ms. Reeves' letter, BancInsure and KPA reopened their claim files with respect to the Bank's claim, and Ms. Edwards further evaluated coverage based on the new information supplied by the Bank, analyzing the Bank's claim under Insuring Agreement (A).[39]  Ms. Edwards acknowledged receipt of Ms. Reeves' letter via letter dated January 12, 2009.[40]  Ms. Edwards advised that, under the terms of Insuring Agreement (A), because the Bank's alleged loss was "the result of the nonpayment of a loan advanced to Todd Phillips Investments, Inc.," in order to show coverage, the Bank would need to show that Deer received an improper

---

[37]     December 22, 2008 letter from April Reeves to Judy Edwards, attached at Tab "1" to the Affidavit of Judith W. Edwards.
[38]     *Id.*
[39]     30(b)(6) Deposition of BancInsure, 63:10-20, 89:1-13; Affidavit of Judith W. Edwards, ¶¶ 9-12; Affidavit of Van Butler, ¶¶ 12-13.
[40]     January 12, 2009 letter from Judy Edwards to April Reeves, attached at Tab "2" to the Affidavit of Judith W. Edwards.

financial benefit in connection with the Loan and noted that the Bank had provided no information that Deer had received an improper financial benefit.[41]

Ms. Reeves responded to Ms. Edwards' January 12, 2009 letter via letter dated February 9, 2009.  Ms. Reeves asserted that the fee paid to Deer by the Bank for his title opinion constituted the improper financial benefit required under Insuring Agreement (A).[42] Ms. Reeves also pointed to an opinion rendered by the judge presiding over Deer's bankruptcy wherein the judge found that Deer made "cash withdrawals from trust accounts used for transactions involving Mr. Phillips presumably for his own benefit."[43]

BancInsure responded with a position letter dated February 11, 2009, wherein it advised Ms. Reeves that BancInsure continued to respectfully decline coverage for the Bank's claim.[44] The fee paid to Deer for his title opinion could not constitute an improper financial benefit under Insuring Agreement (A) because the fee was earned "in the normal course of" Deer's employment with the Bank.[45] BancInsure further advised that the bankruptcy court opinion referenced by Ms. Reeves involved an action brought by Shelby Garner against Deer, that the mishandled trust account funds at issue in the referenced opinion had no apparent "bearing on [Deer's] preparation of a title opinion for the Bank on an unrelated loan transaction," and that "[a]ny financial benefit Deer obtained as a result of his misconduct relative to the Gardner matter

---

[41]    *Id.*
[42]    February 9, 2009 letter from April Reeves to Judy Edwards, attached at Tab "3" to the Affidavit of Judy Edwards.
[43]    *Id.*
[44]    February 11, 2009 letter from Van Butler to April Reeves, attached at Tab "5" to the Affidavit of Van Butler.
[45]    *Id.* As will be detailed more fully *infra*, the legal authority supporting Ms. Edwards' position is legion, including Fifth Circuit precedent on point. *See, e.g., Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.*, 322 F.3d 847 (5th Cir. 2003).

cannot be transferred to the Bank's claim."[46] In order for its claim to be covered under Insuring

Agreement (A), the Bank would need to show that the alleged financial benefit received by Deer

was "in connection with" the title opinion provided to the Bank. Ms. Reeves did not respond to

BancInsure's February 11, 2009 letter declining coverage prior to filing suit against BancInsure.

**The Lawsuit**: The Bank filed suit against BancInsure on March 9, 2009, seeking

recovery for the unpaid balance of the Loan, plus attorneys' fees and undisclosed expenses under

Insuring Agreement (A) of the Bond and claiming entitlement to reimbursement of the Bond

premiums it paid BancInsure under an unjust enrichment theory.[47] The Bank moved to amend its

Complaint on November 24, 2009.[48] In its Amended Complaint, the Bank added claims under

Insuring Agreements (E) and (Q), as well as bad faith claims against BancInsure for an alleged

breach of its duty to investigate the Bank's claim and an alleged bad faith denial of that claim.[49]

The facts relating to the Loan have changed little during this litigation, except that the

Bank, apparently having recognized that the fee it paid Deer for his title opinion is not an

"improper financial benefit" under Insuring Agreement (A), has advanced several additional

theories as to what improper financial benefit Deer might have received, including: alleged

payments made by Phillips to Deer that the Bank claims are evidenced by financial records; rent

free office space from 2001 through 2006; allegedly unpaid rental fees on a storage unit Deer

rented from Phillips through 2006; and, an alleged discount on the construction of two houses in

2003 (a year prior to the Loan); and time vacationing at Phillips' duck camp in Tallulah,

---

[46]   February 11, 2009 letter from Van Butler to April Reeves, Tab "5" to the Affidavit of Van Butler.
[47]   Complaint (Doc. 1).
[48]   Motion to Amend Complaint (Doc. No. 42).
[49]   Amended Complaint (Doc. No. 53).

Louisiana, from 2000 through 2006.[50] Despite these theories, the Bank has yet to show that any such benefit was received "in connection with" Deer's title opinion.  Although the Bank has generally pointed to money transfers between Phillips' and Deer's bank accounts, the two had a legitimate business relationship at one time.[51]  In his deposition, Phillips testified that in a given six month period, Deer would handle hundreds of closings for him.[52] These included closings for multiple other loans from the Bank funded prior to December 2004 and on which the Bank sustained no loss.[53]

In discovery, BancInsure learned new facts regarding the Bank's attempts to recover the Loan from Phillips. In addition to the payments made on the Loan by Phillips before his default and the money recovered from the sale of collateral on other Bank loans to Phillips, the Bank closed out the Loan and renewed it under a new loan number ("the Reworked Loan"). The Reworked Loan was secured by additional real property collateral and was subject to an increased interest rate (10% interest) based on the level of risk the Bank associated with that new loan.[54] Thus, the Bank's records now show the original Loan as having a zero balance, as the balance due on the Loan (then, $356,000) was transferred to the Reworked Loan on August 9, 2006.[55] The current balance of the Reworked Loan, less approximately $59,900 in additional

---

[50]      Responses to Defendant's Interrogatories, Exhibit "D"; Deposition of Todd Phillips, 36:1-37:7, 38:20-40:12 43:3-23, 45:11-47:25, Exhibit "E."
[51]      Deposition of Todd Phillips, 88:19-90:16.
[52]      *Id.*, 90:6-16.
[53]      30(b)(6) Deposition of the Bank, 10:15-11:3, 12:14-23, 36:6-18, Exhibit "F."
[54]      *Id.*, 51:16-52:5, 75:21-77:9, 117:12-118:10.
[55]      *Id.*, 51:16-52:12, 63:7-64:13.

Bank recoveries on the collateral securing the Reworked Loan, is $337,000.[56] However, it appears that this number includes some of the appraisal and legal fees incurred by the Bank.[57]

**The Bank's claim for damages:**   On August 27, 2009, BancInsure submitted interrogatories to the Bank. BancInsure's Interrogatory No. 18 requested a description of all damages claimed and an identification of facts supporting such damage claims. On September 29, 2009, the Bank responded to Interrogatory No. 18, by saying that it had "incurred losses in the amount of $419,195.47, plus attorneys' fees and costs incurred as a result of BancInsure's denial of its claim."[58]   With respect to the Bank's $419,195.47 damage claim, the Bank has explained that this number includes the approximately $337,000 balance of the Reworked Loan, plus 10% interest as well as certain attorneys; fees and appraisal costs incurred by the Bank.[59]

On July 8, 2010, the Bank supplemented its response to Interrogatory No. 18, and increased its damage claim from $419,195.47 to $833,893.40.[60] The Bank's increased damage claim includes claims for appraisal fees and attorneys' fees that the Bank says were "incurred in its various attempts to recover the losses incurred in connection with this loan and BancInsure's denial of this claim, including the fees and expenses incurred in accepting additional collateral for this loan, [the] Bank's attempts to recover the loss in Todd Phillips' bankruptcy action(s),

---

[56]      *Id.*, 67:8-17, 70:13-72:4, 72:25-73:4.
[57]      *Id.*, 67:8-17. For example, the Bank hired attorney Gary Honea to perform title work on the Pike County Property, and increased the balance due on the Loan by $8,400 in order to recover such fees. *Id.*, 60:5-10, 63:7-64:13.
[58]      Responses to Defendant's Interrogatories, Exhibit "D."
[59]      30(b)(6) Deposition of the Bank, 75:21-77:9, Exhibit "F" hereto.
[60]      First Supplemental Response to Defendant's Interrogatories, pp. 9-11, Exhibit "G"

[the] Bank's attempt to recover the loss by initiating litigation against Mr. Phillips, and [the]

Bank's attempts to recover the loss through this litigation."[61] This includes the following claims:

| | |
|---|---|
| $11,800.00 | Fees paid to Gary Honea for review of Deer's title work and legal work in connection with Peoples Bank v. Todd Phillips |
| $3,850.00 | Appraisal fees paid to Ridge Point Consultants on additional collateral pledged |
| $400.00 | Fees paid to Gary Honea for title work on additional collateral pledged in Madison Parish, LA |
| $650.00 | Fees paid to Gary Honea for title opinions on additional collateral and review of cancellations |
| $400.00 | Fees and expenses paid to Gwin, Lewis & Punches, LLP for title work on additional collateral pledged |
| $500.00 | Fees paid to Ferguson & Fike for title work on additional collateral pledges |
| $150.00 | Fees paid to Halford Law Firm for title work on additional collateral pledges |
| $2,500.00 | Appraisal fee to Gibson Appraisal for appraisal of property offered as substituted collateral on Pike County property |
| $9,810.10 | Fees and expenses paid to Holaday, Yoder, Morrehead & Eaton in connection with Peoples Bank's attempt to recover loss in Phillips' bankruptcy action |
| $87,787.83 | Watkins Ludlam Winter & Stennis P.A. fees and expenses incurred through 5/31/10 in connection with efforts to have claim paid and pending litigation.[62] |

The Bank also added costs incurred as a result of a regulatory action taken by the Federal

Deposit Insurance Corporation ("FDIC"), whereby the FDIC ordered the Bank to increase its

---

61    *Id.*
62    *Id.*

capital, which the Bank did by issuing approximately $1 million in debentures. These costs included:

| | |
|---|---|
| $14,771.25 | Fees paid to Gerald Taylor, CPA in relation to debenture offering to raise capital |
| $29,386.73 | Fees and expenses paid to Watkins Ludlam Winter & Stennis, P.A. in connection with debentures and regulatory matters |
| $8,487.40 | Interest accrued as of 5/10/10 on debentures.[63] |

The Bank's new damage claim also includes a claim for alleged increases in FDIC quarterly premiums, to the extent that such premiums exceed the average in 2007 and 2008 of $13,889.02, as follows:

| | |
|---|---|
| $6,254.85 | March 2009 ($20,143.87 — $13,889.02) |
| $19,048.93 | June 2009 ($32,937.95 — $13,889.02) |
| $69,575.64 | September 2009 ($83,464.66 — $13,889.02) |
| $30,521.21 | December 2009 ($44,410.23 — $13,889.02) |
| $38,844.09 | March 2010 ($52,733.11 — $13,889.02) |
| $44,671.50 | June 2010 ($58,560.52 — $13,889.02)[64] |

The Bank's new damage claim also includes $13,115.00 in Bond premiums paid to BancInsure for the period from June 1, 2005 through June 1, 2006.[65]  BancInsure repeatedly requested the information and documentation supporting the Bank's new damage claims. On July 26, 2010, BancInsure received some documentation from the Bank, although it is not clear

---

63    *Id.*
64    *Id.*
65    *Id.*

16

whether all requested information and documentation was produced.[66]  In the event that the Bank does comply with BancInsure's request to document its claim, BancInsure will supplement this memorandum appropriately.[67]

## III.    ARGUMENT

### A.    The Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and other evidence show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995).

Once the moving party supports its motion with affidavits or other evidence sufficient to show the absence of a genuine issue of material fact, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A party opposing summary judgment may not rest on mere allegations or denials in the pleadings, and the party's response, via affidavits or other competent evidence, must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U .S. 242, 256 (1986); *Celotex*, 477 U.S. at 322.  "[C]onclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence'" are insufficient to defeat summary judgment. *Turner v. Baylor Richardson Med. Ctr.*,

---

[66]    *See* Affidavit of Alec Taylor, Exhibit "H," and attachments thereto.
[67]    *Id.* BancInsure completed the Rule 30(b)(6) deposition of the Bank on July 28, 2010 but has not received the transcript in sufficient time to include references in this motion, but will supplement this motion, if necessary, upon receipt of the transcript.

476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)).

Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial" mandating the entry of summary judgment. *Matsushita,* 475 U.S. at 588. The substantive law determines the materiality of facts, and only facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson,* 477 U.S. at 248. There are no genuine issues of material fact pertaining to the issues raised in this motion.

**B.      Mississippi contract law**

This action was filed in federal court pursuant to the court's diversity jurisdiction under 28 U.S.C. § 1332. In a diversity case, the court is bound to apply the substantive law of the forum state. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 316 U.S. 685 (1942).

Under Mississippi law, the interpretation of a contract is a question of law, not one of fact. *Tarver v. Colonial Life & Accident Ins. Co.,* 294 Fed. Appx. 873, 875 (5th Cir. 2008); *Farmland Mut. Ins. Co. v. Scruggs,* 886 So. 2d 714, 717 (Miss. 2004); *Pate v. Conseco Life Ins. Co.,* 971 So.2d 593, 595 (Miss. 2008). Because insurance policies are contracts, if terms of an insurance policy are plain and unambiguous, they will be enforced as written. *Tarver,* 294 Fed. Appx. at 875; *Scruggs,* 886 So. 2d at 717. The Mississippi Supreme Court has stated that courts should "refrain from altering or changing a policy where the terms are unambiguous, even if there is a resulting hardship on the insured party." *Scruggs,* 886 So. 2d at 717 ; *Titan Indem. Co. v. Estes,* 825 So. 2d 651, 656 (Miss. 2002). Courts "should look at the policy as a whole,

18

consider all relevant portions together and, whenever possible, give operative effect to every provision in order to reach a reasonable overall result." *Corban v. United Servs. Auto. Ass'n*, 20 So. 3d 601, 609 (Miss. 2009); *J & W Foods Corp. v. State Farm Mut. Auto. Ins. Co.*, 723 So. 2d 550, 552 (Miss. 1998).

It is the plaintiff's burden to prove that he has the right to recover under an insurance policy, and "this basic burden never shifts from the plaintiff." *Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 625 (5th Cir. 2008); *Lunday v. Lititz Mut. Ins. Co.*, 276 So. 2d 696, 699 (Miss. 1973); *Corban*, 20 So. 3d at 618. Once the insured has satisfied its burden to show coverage, the insurer bears the burden to show that the covered loss is excluded. *Corban*, 20 So. 3d at 618.

Although Mississippi courts generally construe insurance policies "liberally in favor of the insured, especially when interpreting exceptions and limitations to coverage,"[68] the Fifth Circuit Court of Appeals has rejected this approach as applied to standard form financial institution bonds. *Citibank Tex., N.A. v. Progressive Cas. Ins. Co.*, 522 F.3d 591, 596 (5th Cir. 2008); *Calcasieu-Marine Nat'l Bank v. Am. Employers' Ins. Co.*, 533 F.2d 290, 295 n.6 (5th Cir. 1976). The standard form financial institution bond is an agreement whose basic terms have been negotiated and drafted over the years by the Surety Association of America and the American Bankers Association, two entities of relatively equal bargaining power. *FDIC v. Ins. Co. of N. Am.*, 105 F.3d 778, 786 (1st Cir. 1997). Because the standard form bond is an "arms length, negotiated contract between sophisticated business entities" the Fifth Circuit reasoned that the general principle that the terms of a contract be interpreted against its drafter is inapt as

---

[68]   *See J & W Foods Corp.* 723 So. 2d at 552.

applied to the financial institution bond, as both the banks and the insurers are equally responsible for the language contained therein. *Citibank Tex.*, 522 F.3d at 596 n. 12; *Calcasieu-Marine*, 533 F.2d at 295; *FDIC*, 105 F.3d at 786.

**C.    Exclusion (h) unambiguously excludes coverage for the Bank's alleged losses for claims under Insuring Agreement (E) and Insuring Agreement (Q)**

The Bank claims coverage for its alleged damages under Insuring Agreements (E) and (Q), in addition to Insuring Agreement (A). Exclusion (h) expressly excludes coverage for all losses caused "directly or indirectly" by an employee of the Bank.  The Bond defines the term "Employee" to include "an attorney retained by the Insured...while...performing legal services for the Insured."[69] Because the Bank claims that it sustained a loss on the Loan as a result of the dishonest actions of Deer (an attorney retained by the Bank), exclusion (h) applies and bars coverage for any losses resulting either directly or indirectly from Deer's actions. The Bank's claims under Insuring Agreements (E) and (Q) must be dismissed.

The Bank retained Deer to provide title opinions regarding the Pike County Property that was offered as collateral for the Loan.[70]  The Bank claims that Deer, "acting in collusion with Todd Phillips, provided false title opinions."[71] The Bank not only paid Deer a fee for his December 2004 title opinion, but it has repeatedly (and incorrectly) claimed that the fee paid constituted the improper financial benefit required to show coverage under Insuring Agreement

---

[69]    Bond, Section 1, Definition (m)(2), Tab "1" to the Affidavit of Van Butler, Exhibit "A."

[70]    The Bank's Response to Defendant's Interrogatories, p. 6, Exhibit "D."

[71]    Id., pp. 6-7, 11. In response to BancInsure's Interrogatory No. 19, the Bank responded that it "in good faith and in the ordinary course of business accepted a Deed of Trust from Todd Phillips Investments, Inc. which was signed by Todd Phillips as part of his and Dwayne Deer's scheme to defraud [the] Bank."

(A).[72] When he supplied the allegedly dishonest title opinion to the Bank, Deer was acting as an

employee of the Bank as defined by the Bond. The Bank has also claimed that its alleged loan

loss was the direct result of Deer's dishonest conduct, *i.e.*, that it would not have made the Loan

had it not received a title opinion that showed the Pike County Property used as collateral to be

unencumbered.[73]

     Courts have enforced exclusion (h) in the standard form 24 financial institution bond, as

well as similar employee exclusions in fidelity and commercial crime policies, finding them

unambiguous. *First Guar. Bank v. BancInsure, Inc.*, 2007 WL 1232212, *3 (E.D. La. 2007)

(holding that exclusion (h) of the standard form financial institution bond barred coverage under

insuring agreements D and Q where the plaintiff alleged that its loss was sustained as a result of

the dishonest acts of its employees); *The Stop & Shop Companies, Inc. v. Fed. Ins. Co.*, 136 F.3d

71 (1st Cir. 1998) (finding coverage excluded under a policy that excluded loss due to the "theft

or any other fraudulent, dishonest or criminal act by any employee...or authorized representative

of the Insured"); *Stanford Univ. Hosp. v. Fed. Ins. Co.*, 174 F.3d 1077, 1086-87 (9th Cir. 1999);

*Florists' Mut. Ins. Co. v. Lundy Greenhouse Mfg. Corp.*, 2007 WL 2902223, *11 (S.D. Ohio

---

[72]    *Id.*, pp. 6, 9; February 9, 2009 letter from April Reeves to Judy Edwards, Tab "3" to the Affidavit of Judith W. Edwards, Exhibit "B."

[73]    The Bank's Response to Defendant's Interrogatories, p. 6; Amended Complaint, ¶¶ 11, 22, 32 (Doc. No. 53); 30(b)(6) Deposition of the Bank, 143:25-144:8, Exhibit "F." Paragraph 32 of the Bank's Amended Complaint says that the Bank "incurred a loss as a result of the dishonest acts of Deer acting in collusion with Phillips." In response to BancInsure's Interrogatory No. 13, the Bank answered as follows:

> **Response:** Dwayne Deer was retained to provide title opinions to Peoples Bank on the property offered as security for the loan to Todd Phillips Investments. Dwayne Deer, acting in collusion with Todd Phillips, provided false title opinions to Peoples Bank. As a result, Peoples Bank did not have a first lien on the property and suffered a loss when Todd Phillips Investments defaulted on the loan from Peoples Bank. Dwayne Deer was retained to provide a valid title opinion to Peoples Bank and failed to provide such service.

2007). The employee's conduct is not required to be the sole or initiating cause of the insured's alleged loss in order for Exclusion (h) to apply. *See Empire Bank v. Fid. & Dep. Co. of Md.*, 828 F. Supp. 675 (W.D. Mo. 1993), *aff'd*, 27 F.3d 333, 333-34 (8th Cir. 1994).

Therefore, the Bank's claims under Insuring Agreement (E) and Insuring Agreement (Q) should be dismissed.

**D.    The Bank's claim for interest income is not recoverable.**

**1.    Interest income is not loss.**

Insuring Agreement (A) provides that BancInsure will indemnify the Bank only for "***Loss*** resulting from dishonest or fraudulent acts committed by an Employee."[74] *See U.S. Fid. & Guar. Co. v. Citizens' State Bank*, 150 Miss. 386, 412 (Miss. 1928) (noting that the banker's blanket bond is a contract in the nature of indemnity, where the insurer agrees to indemnify the bank for certain losses); *FDIC v. Ins. Co. of N. Am.*, 105 F.3d 778, 785 (1st Cir. 1997) ("a fidelity bond is...a two-party indemnity agreement through which the insurer reimburses the insured for losses actually suffered in accordance with the contract provisions"). Put simply, the Bond only covers actual losses of the Bank. The Bank claims entitlement to $441,368.87 in damages for "[p]rincipal and interest" on the Reworked Loan.[75] The interest income portion of the Bank's

---

[74]    Because all of the Bank's claimed damages are excluded from coverage under Insuring Agreements (E) and (Q) by exclusion (h), the employee exclusion, BancInsure has addressed the Bank's claim for interest income under Insuring Agreement (A). However, BancInsure notes that its arguments with respect to the Bank's claim for potential interest income are equally applicable to Insuring Agreements (E) and (Q), as both Insuring Agreements' (E) and (Q) cover only actual loss to the bank, meaning the actual depletion of Bank funds. *See* Bond, Insuring Agreements (A) and (Q), attached at Tab "1" to the Affidavit of Van Butler, Exhibit "A."

[75]    First Supplemental Responses to Defendant's Interrogatories, p. 9, Exhibit "G." The precise amount of the Bank's claimed loss attributable to interest income is somewhat unclear based on the Bank's current damage estimate. BancInsure will supplement this memorandum to state the precise amount of interest income claimed by the Bank when BancInsure receives that information.

claim is derived from the 10% interest the Bank decided to charge Phillips on the Reworked Loan.[76] Because interest income is not loss, this part of the Bank's claim is not recoverable and BancInsure is entitled to summary judgment on this issue.

In connection with a fidelity policy, the insured has the "burden of proving that it suffered an actual loss by a preponderance of the evidence." *F.D.I.C. v. United Pac. Ins. Co.*, 20 F.3d 1070, 1080 (10th Cir. 1994); *see also Continental Cas. Co. v. First Nat'l Bank of Temple*, 116 F.2d 885, 887-888 (5th Cir. 1941); *Fireman's Fund Ins. Co. v. Special Olympics Int'l, Inc.*, 249 F. Supp. 2d 19, 26-27 (D. Mass 2003). The term "loss" under the Bond means "the actual depletion of bank funds caused by the employee's dishonest acts." *Am. Trust & Sav. Bank v. U.S. Fid. & Guar. Co.*, 418 N.W.2d 853, 855 (Iowa 1988); *Special Olympics Int'l, Inc.*, 249 F. Supp. 2d at 27; *First State Bank v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 569 (7th Cir. 2009). "Bookkeeping or theoretical losses, not accompanied by actual withdrawals of cash or other such pecuniary loss [are] not recoverable." *FDIC*, 20 F.3d at 1080; *First State Bank*, 555 F.3d at 569. With respect to alleged loan losses, the measure of actual damage is the "outstanding balance due on the loan." *FDIC.*, 20 F.3d at 1080. Interest income simply does not "represent a depletion of funds," or "a direct loss resulting from a dishonest act." *First Am. State Bank v. Continental Ins. Co.*, 897 F.2d 319, 329 (8th Cir. 1990). The 10% interest the Bank charged on the Rework Loan since August 9, 2006 is not an actual depletion of the Bank's funds and is not recoverable under the Bond. *Id.* (finding that the loss of a banks' future interest income forfeited in settlement was not covered loss).

---

[76]      30(b)(6) Deposition of the Bank, 75:21-77:9, 117:12-118:10, Exhibit "F."

### 2.   The Bank's claim for potential income is unambiguously excluded under exclusion (s) of the Bond.

Even if the Bank's interest income were a loss under the Bond, the Bank's claim for 10% interest on the Rework Loan is excluded by exclusion (s) of the Bond, which excludes all "potential income, "including but not limited to income and dividends, not realized by the insured."[77]

The Fifth Circuit has considered an income exclusion virtually identical to exclusion (s) of the Bond and found it unambiguous. *Diversified Group, Inc. v. Van Tassel*, 806 F.2d 1275, 1278 (5th Cir. 1987); *accord First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.*, 2010 U.S. Dist. LEXIS 64963 *5 (N.D. Ohio June 30, 2010) ("The exclusion is straightforward. It applies to income lost by the insured."). In *Van Tassel* the plaintiff claimed coverage for the loss of profits that it might have earned had its employees not subverted the bid process for a government contract and submitted a successful competing bid. 806 F.2d at 1277. The Fifth Circuit found no coverage for the income the plaintiff might have received absent the conduct of its dishonest employees, holding that the income exclusion unambiguously "excludes coverage for the loss of future profits, or future income flow, resulting from the fraudulent or dishonest acts of employees." *Id.* The *Van Tassel* court concluded that to hold otherwise "would be to distort the plain meaning of the words" of the income exclusion. *Id.* at 1278; *accord U.S. Gypsum Co. v. Ins. Co. Of N. Am.*, 813 F.2d 856 (7th Cir. 1987) (holding that coverage for loss of income as a result of employee's leak of a trade secret was excluded); *FDIC v. Fid. & Dep. Co.*, 827 F. Supp. 385, 390 (M.D. La. 1993) (holding that because the "'potential income

---

[77]   BancInsure notes that exclusion (s) applies to all of the Bond's insuring agreements.

exclusion' excludes interest payments from coverage under the Bond" interest is not a "loss" under a financial institution bond).

Potential income is not loss. Further, potential income is expressly excluded from coverage. Exclusion (s) is clear and unambiguous and BancInsure is entitled to have it enforced as written. *Estes*, 825 So. 2d at 656. The Bank's claim for interest income on the Reworked Loan must fail.

**E.     The Bank's claims for allegedly incurred costs, fees, and increased regulatory assessments are not "loss resulting directly from" employee dishonesty and are excluded under exclusion (v) of the Bond.**

The Bank bears the burden of showing that its alleged damages are covered by the Bond. *Lunday*, 276 So. 2d at 699; *Corban*, 20 So. 3d at 618. To satisfy that burden, it must show that each component of its alleged damage claim is covered by Insuring Agreement (A), which "provides that BancInsure will indemnify the Bank only for "[l]oss *resulting directly from* dishonest or fraudulent acts committed by an Employee."[78] Much of the Bank's newly increased claim for damages consists of various claimed costs, appraisal fees, attorneys fees, and regulatory assessments which, at best, are only *indirectly* related to Deer's December 2004 title opinion. All such damages fall within exclusion (v) of the Bond, which excludes coverage for "indirect or consequential loss of any nature."

---

[78]     Because all of the Bank's claimed damages are excluded from coverage under Insuring Agreements (E) and (Q) by exclusion (h), the employee exclusion, BancInsure has addressed the Bank's claims for various costs, appraisal fees, attorneys' fees, and regulatory assessments under Insuring Agreement (A). However, BancInsure notes that its arguments with respect to these components of Bank's claim are equally applicable to Insuring Agreements (E) and (Q), as both Insuring Agreements' (E) and (Q) cover only loss "resulting directly from" the covered cause of loss. Similarly, exclusion (v) applies to all of the Bond's insuring agreements and so is equally applicable to Insuring Agreements (E) and (Q).

The first component of the Bank's alleged damages falls into the category of expenses and attorneys fees incurred by the Bank in attempting to recover the unpaid balance of the Loan, and later the Reworked Loan. This includes: $2,100 paid for title opinions on the additional real property collateral pledged by Phillips to the Bank in connection with the Reworked Loan; $6,350 paid for appraisals of the additional collateral pledged to the Bank in connection with the Rework Loan; $11,800 in fees paid to Honea in connection with the Bank's lawsuit against Phillips to recover the balance of the Reworked Loan; $9,810.10 in attorneys fees incurred in connection with the Bank's attempt to recover money from Phillips' bankruptcy.[79] These costs were incurred only as an indirect consequence of Deer's December 2004 title opinion and the subsequent Loan to Phillips and are thus not covered by Insuring Agreement (A) of the Bond. *Fireman's Fund*, 249 F. Supp. 2d at 28 (finding that the indirect loss exclusion reinforces the conclusion that the policy meant to insure only "against immediate harm from employee dishonesty" but not for any obligations the insured might have to others as a result of that dishonesty); *see also RBC Mortgage Co. v. Nat'l Union Fire Ins. Co.*, 812 N.E.2d 728, 733 (Ill. App. 1 Dist. 2004) (finding the phrase "loss resulting directly from" unambiguous); *Tri City Nat'l Bank v. Fed. Ins. Co.*, 674 N.W.2d 617 (Wisc. App. 2003); *Aetna Cas. & Surety Co. v. Kidder, Peabody & Co.*, 246 A.D.2d 202, 210 (N.Y. App. Div.1998); *The Vons Cos., Inc., v. Federal Ins. Co.*, 212 F.3d 489, 490-92 (9th Cir. 2000); *City of Burlington v. Western Sur. Co.*, 599 N.W.2d 469, 472 (Iowa 1999). In its pleadings and discovery responses, the Bank has implicitly, if not explicitly, recognized the indirect nature of these damages because it has

---

[79] First Supplemental Responses to Defendant's Interrogatories, pp. 9-11, Exhibit "G."

claimed that they resulted from BancInsure's denial of the Bank's claims and not from Deer's dishonest actions.[80]

The Bank also claims attorneys' fees and expenses incurred in the Bank's efforts to have its claim paid by BancInsure and in prosecuting the instant lawsuit against BancInsure. These are similarly unrecoverable, indirect loss. *Fireman's Fund Ins. Co. v. Special Olympics Int'l, Inc.*, 249 F. Supp. 2d 19, 28 (D. Mass. 2003); *see also RBC Mortgage,* 812 N.E.2d at 733 (finding that "[f]or losses to be 'direct,' they must be immediate, definite and ascertainable"); *Tri City Nat'l Bank*, 674 N.W.2d 617; *Kidder, Peabody & Co.,* 246 A.D.2d at 210; *The Vons Cos.,* 212 F.3d at 490-92; *City of Burlington,* 599 N.W.2d at 472. Again, the Bank has implicitly, if not explicitly recognized the indirect nature of these damages by claiming that they resulted from BancInsure's denial of the Bank's claims and not from Deer's dishonest actions.[81]

The third component of the Bank's alleged damages relates to claims for fees and expenses incurred as a result of regulatory action and for an alleged increase in the FDIC's quarterly assessments. Essentially, the Bank claims that as a result of its loss on the Loan, it was required by the FDIC to raise additional capital in the amount of $800,000.[82] In order to comply with the FDIC's order, the Bank sold $1 million in debentures at an interest rate of 6 ½%.[83] The Bank's newly amended damage claim includes $14,771.25 in fees paid to their CPA and $29,386.73 in attorneys' fees and expenses related to the debenture offering and other regulatory

---

[80]    *Id.*; 30(b)(6) Deposition of the Bank, 158:17-159:6; Amended Complaint (Doc. No. 53).
[81]    First Supplemental Responses to Defendant's Interrogatories, pp. 9-11; Amended Complaint (Doc. No. 53).
[82]    30(b)(6) Deposition of the Bank, 123:16-124:5, 132:1-23;First Supplemental Responses to Defendant's Interrogatories, p. 9.
[83]    30(b)(6) Deposition of the Bank, 123:16-124:5, 132:1-23;First Supplemental Responses to Defendant's Interrogatories, pp. 9-11.

matters.[84] With respect to the interest on the debentures sold, because Hill testified that it would be unfair to charge BancInsure for interest on the entire $1 million offering, it seems that the Bank's $8,487.40 claim for interest on the debentures represents 6 ½% interest on $600,000 of the total debenture offering.[85]

Additionally, the Bank claims that the FDIC raised its insurance premiums, at least in part due to the Bank's loss on the Loan, although it has offered absolutely no evidence to support this assertion.[86] This component of the Bank's claim is entirely speculative. The Bank simply deducted the quarterly average charged by the FDIC in 2007 and 2008 ($13,899.02) from the quarterly amounts the FDIC charged from March 2009 to June 2010 and claimed that BancInsure was responsible for the difference ($208,916.22) without showing that the increase in FDIC assessments were either caused by or in any way tied to Deer's title opinion.[87] The Bank cannot address the numerous intervening causes that may have contributed to the increase in FDIC premiums, including the $5.7 million of the Bank's nonperforming loans that were wholly unrelated to the Phillips Loan,[88] the global financial crisis and the numerous bank failures of FDIC insured banks that occurred over the past two years. In fact, in the Bank's Rule 30(b)(6) deposition, Hill admitted that the Bank's FDIC assessments would have increased *regardless of whether the Bank's alleged loss had been incurred and regardless of whether BancInsure had paid the Bank's claim.*[89] The tenuous causation link and speculative nature of the Bank's claims

---

[84]   First Supplemental Responses to Defendant's Interrogatories, pp. 9-11.
[85]   30(b)(6) Deposition of the Bank, 127:19-128:23.
[86]   *Id.*, 124:5-126:10.
[87]   First Supplemental Responses to Defendant's Interrogatories, pp. 9-11.
[88]   30(b)(6) Deposition of the Bank, 138:4-139:9.  Hill testified that approximately $6 million in loans made by the Bank were nonperforming. *Id.*
[89]   Id., 129:25-131:1.

for costs related to its debenture offering and FDIC premiums underscore why these damages cannot be considered direct loss. *See United Gen. Title Ins. Co. v. Am. Int'l Group, Inc.*, 51 Fed. Appx. 224, 226 (9th Cir. 2002) (finding that payments made pursuant to statutory obligation were not direct losses covered by fidelity bond); *Manson Growers Coop. v. Mut. Serv. Cas. Ins. Co.*, 229 F.3d 1158 (9th Cir. 2000).

The fees and costs claimed by the Bank in its newly increased damage claim are the very definition of indirect loss. From the information currently provided to BancInsure, it appears that at least $379,409.30 of the Bank's current damage claim consists of indirect loss and is thereby excluded under exclusion (v).[90]

**F.    The Bank's fees and costs incurred in establishing its claim against BancInsure are excluded under exclusion (u) of the Bond.**

All of the Bank's fees and costs incurred in establishing its claim under the Bond are indirect and consequential loss excluded under Exclusion (v) of the Bond. Even if exclusion (v) did not apply, these fees and costs would still be excluded from coverage under exclusion (u) of the Bond, which excludes coverage for "all fees, costs and expenses incurred" by the Bank in "establishing the existence of or amount of loss" covered under the Bond. The amounts excluded under exclusion (u) include the costs of any "investigations necessary to establish a loss so that a claim can be made under the bond." Based on the information thus far supplied by the Bank, a portion of the Bank's claim for attorneys' fees and fees for title opinions would therefore be excluded under this provision. *Cambridge Trust Co. v. Commercial Union Ins. Co.*, 32 Mass. App. Ct. 561, 568 (Mass. App. Ct. 1992).

---

[90]    First Supplemental Responses to Defendant's Interrogatories, pp. 9-11.

**G.     The Bank cannot recover its Bond premiums under an unjust enrichment theory.**

In Count II of its Amended Complaint the Bank claims entitlement to recover Bond premiums it paid to BancInsure under an unjust enrichment theory.[91]   Because BancInsure denied its claim, the Bank reasons that BancInsure has been unjustly enriched by the amount of the Bond premiums it paid and that it is thus entitled to have those premiums returned. Unjust enrichment is an equitable doctrine that only "applies to situations where there is no legal contract" between the parties. *Hans v. Hans*, 482 So. 2d 1117, 1122 (Miss. 1986) (quoting 66 AM.JUR.2D RESTITUTION AND IMPLIED CONTRACTS, § 11 (1973)); *Omnibank of Mantee v. United Southern Bank*, 607 So. 2d 76, 92 (Miss. 1992). Here, there is a contract between the Bank and BancInsure—the Bond. The Bank's remedy for any alleged wrongful denial of its claim under the Bond lies in contract, not in quasi-contract. *Litton Systems, Inc. v. Frigitemp Corp.*, 613 F. Supp. 1377, 1385 (S.D. Miss. 1985); *Cherry Bark Builders v. Wagner*, 781 So. 2d 919, 922 (Miss. Ct. App. 2001). Count II of the Bank's Amended Complaint should be dismissed, and the $13,115.00 for Bond premiums paid for the period of 6/1/05 through 6/11/06 included in the Bank's damage claim[92] should be disallowed.

**H.     The Bank cannot recover punitive damages.**

In its Amended Complaint, the Bank included claims that BancInsure breached its duty of good faith and fair dealing by denying coverage for the Bank's claim (Count IV of the Amended Complaint) and that BancInsure breached its duty to investigate the Bank's claim (Count III of the Amended Complaint). Under Mississippi law, punitive damages are considered an

---

[91]     Amended Complaint, Count II, ¶¶ 36 to 39 (Doc. No. 53).
[92]     Plaintiffs' First Supplemental Responses to Defendant's Interrogatories, pp. 9-11, Exhibit "G."

extraordinary remedy allowed only with great caution and within narrow limits. *Wilson v. State Farm Fire & Cas. Co.*, 761 So. 2d 913, 921 (Miss. App. 2000) (citing *Standard Life Ins. Co. v. Veal*, 354 So. 2d 239, 247 (Miss. 1977); *Dowdy v. Palmer*, 2006 WL 149063, *4 (S.D. Miss. 2006). The Bank has not and cannot make the extraordinary showing required to support a claim for bad faith damages. BancInsure is thus entitled to judgment as a matter of law on Counts III and IV of the Bank's Amended Complaint.

1.  **Mississippi law imposes a heavy burden of proof on a party seeking punitive damages.**

In order to recover punitive damages, a plaintiff must "prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." *Tarver*, 294 Fed. Appx. at 877, n.1 (quoting MISS. CODE ANN. § 11-1-65(1)(a)). Thus, in order to recover punitive damages, the Bank will be required to prove that BancInsure "lacked an arguable or legitimate basis for denying [its] claim," and that BancInsure "committed a willful or malicious wrong, or acted with gross and reckless disregard for the [Bank's] rights." *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 533 (Miss. 2003); *Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 628 (5th Cir. 2008); BancInsure, on the other hand, "need only show that it had reasonable justifications, either in fact or in law, to deny payment." *Broussard*, 523 F.3d at 628; *McKneely*, 862 So. 2d at 533.

The fact that an insurer's decision to deny a claim "may ultimately turn out to be incorrect does not in and of itself warrant an award of punitive damages if the decision was reached in good faith." *McKneely*, 862 So. 2d at 533; *Dauro v. Allstate Ins. Co.*, 114 Fed. Appx. 130, 135

(5th Cir. 2004). Even where an insurer lacks an "arguable basis" for its denial of a claim, the issue of punitive damages should not be automatically submitted to the jury. *Murphree v. Fed. Ins. Co.*, 707 So. 2d 523, 530 (Miss. 1997); *Stewart v. Gulf Guar. Life Ins. Co.*, 846 So. 2d 192, 201 (Miss. 2002). Bad faith has been characterized as "conduct which violates standards of decency, fairness or reasonableness." *Tarver*, 294 Fed. Appx. at 876; *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992). In order to recover for bad faith, the insured must show "more than bad judgment or negligence; indeed, bad faith 'implies the conscious doing of a wrong because of dishonest purpose or moral obliquity.'" *Id.* (quoting *Bailey v. Bailey*, 724 So. 2d 335, 338 (Miss. 1998)).

Where the insurer had an arguable basis for denial of a claim, Mississippi courts have permitted recovery only in limited circumstances where "the insurer's behavior in writing the insurance policy or handling the insurance claim breaches 'an implied covenant of good faith and fair dealing' and rises to the level of an independent tort." *Broussard*, 523 F.3d at 629. Although Mississippi courts have found that an insurer's grossly negligent investigation of a claim can rise to the level of an independent tort sufficient to impose bad faith liability, the insured must prove more than "mere negligence in performing the investigation." *McKneely*, 862 So. 2d at 534. "The level of negligence in conducting the investigation must be such that a proper investigation by the insurer 'would easily adduce evidence showing its defenses to be without merit.'" *Id.* (quoting *Murphree v. Fed. Ins. Co.*, 707 So. 2d 523, 531 (Miss. 1997)). The insurer is "not required to disprove all possible allegations made by a claimant," the burden of proving the compensability of any alleged injury remains with the insured. *Id.* at 535; *Broussard*, 523 F.3d at

32

625. "The insurer's only obligation is to perform a prompt and adequate investigation of the claim and to deal with the claimant in good faith." *McKneely*, 862 So. 2d at 535.

### 2. BancInsure's denial of the Bank's claim is reasonable and in good faith.

The Bank's claim for damages currently stands at $833,893.40, of which approximately $500,000 is either clearly not covered by the Bond or expressly excluded from coverage under exclusions (e), (h), (s), (u) and (v) of the Bond (see above). An award of punitive damages cannot be based on damages that are not recoverable under the Bond. With respect to the remainder of the Bank's damage claim, consisting of the unpaid balance of the Loan, and later the Reworked Loan (approximately $337,000), BancInsure's denial of coverage has been, and continues to be, reasonable. It is the Bank's responsibility to show coverage for its claim under the Bond. It has failed to do so.

The reasonableness of BancInsure's coverage denials is apparent when taken in context with the information supplied by the Bank. With respect to the Bank's original claim, for which BancInsure declined coverage on May 3, 2006, the Bank failed to show coverage. It was clear at that time (and remains so) that because the Bank's loss was the result of its loan to Phillips, exclusion (e) applied and excluded coverage under the Bond unless the Bank's claim was covered under Insuring Agreement (A), (D), (E), (P) or (Q). On the information submitted at that time, Ms. Edwards concluded that Insuring Agreement (E) was most applicable to the Bank's claim, and BancInsure declined coverage because the Bank extended the Loan in reliance on a defective title opinion and title opinions are not included within the specific list of documents to which Insuring Agreement (E) applies. The Bank neither claimed nor submitted evidence to show that Deer's December 2004 title opinion was fraudulent or otherwise

dishonest.[93] It was merely claimed that Deer's title opinion failed to disclose prior and subsequent liens on the Pike County Property. The Bank did not claim that it had retained Deer or that Deer had acted as its employee in supplying his December 2004 title opinion, so Insuring Agreement (A) was deemed inapplicable.[94] Most notably, BancInsure expressly requested that the Bank supply any additional information that might change its coverage opinion as soon as possible, yet did not hear from the Bank until Ms. Reeves' December 22, 2008 letter—two and a half years after its original coverage denial.[95]

Upon receipt of Ms. Reeves' December 22, 2008 letter, BancInsure and KPA promptly reopened their files and reevaluated the Bank's claim in light of the new information supplied therein.[96] The Bank submitted sufficient information to show that Deer fit the definition of an "Employee" under definition (m)(2) of the Bond and further claimed that Deer's December 2004 title opinion (and his subsequent actions) was not simply defective, it was fraudulent. This meant that exclusion (h) of the Bond, which excludes "loss caused by an Employee," applied to exclude coverage for the Bank's claim under the Bond unless the claim was covered under Insuring Agreement (A). Ms. Edwards promptly wrote to the Bank and requested documentation of the "improper financial benefit" required to show coverage under Insuring Agreement (A). In response, the Bank claimed that the fee it paid Deer for his December 2004 title opinion satisfied

---

[93]   March 28, 2006 letter from Larry B. Hill to Van Butler, Tab "2" to the Affidavit of Van Butler, Exhibit "A."
[94]   May 3, 2006 Letter from Van Butler to Larry Hill, p. 2, Tab "4" to the Affidavit of Van Butler.
[95]   *Id.*; 30(b)(6) Deposition of BancInsure, 63:5-9; Affidavit of Van Butler, ¶¶ 10-11; Affidavit of Judith W. Edwards, ¶¶ 7-8.
[96]   30(b)(6) Deposition of BancInsure, 63:10-20, 89:1-13; Affidavit of Judith W. Edwards, ¶¶ 9-12; Affidavit of Van Butler, ¶¶ 12-13.

34

the requirements of Insuring Agreement (A).[97] This assertion is contrary to the express language

of Insuring Agreement (A), which clearly provides that the term "financial benefit does not

include any employee benefits earned in the normal course of employment, including...fees,"

and the overwhelming weight of legal authority, including Fifth Circuit precedent, on point. *See,*

*e.g., Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.,* 322 F. 3d 847, 850, 852 (5th Cir.

2003); *Hudson United Bank v. Progressive Cas. Ins. Co.,* 112 Fed. Appx. 170 (3d Cir. 2004);

*Mun. Sec., Inc. v. Ins. Co. of N. Am.,* 829 F.2d 7, 9-10 (6th Cir. 1987) (*per curiam*); *Mortell v.*

*Ins. Co. of N. Am.,* 458 N.E.2d 922, 929 (Ill. App. 1983); *Benchmark Crafters, Inc. v. Nw. Nat'l*

*Ins. Co.,* 363 N.W. 2d 89, 91 (Minn. Ct. App. 1985); *Dickson v. State Farm Lloyds,* 944 S.W. 2d

666, 668 (Tex. App. 1997); *Auburn Ford-Lincoln-Mercury, Inc. v. Univ. Underwriters Ins.,* 967

F. Supp. 475, 479 (M.D. Ala. 1997).

   Although the Bank has recently pointed to financial benefits received by Deer, it has

neglected to show that any specific benefit was received "in connection with" the Loan or even

that certain claimed financial benefits were improper. It is particularly important to remember

that Deer and Phillips were friends who had an ongoing business relationship for over six

years.[98]  In light of that ongoing friendship and business relationship, Deer's use of Phillips'

duck camp or receipt of free office space is less than suspect.  The Bank pointed to houses that

Phillips claims to have constructed for Deer at a discount, both of which were constructed well

before the Loan in December of 2004.[99]  Although the Bank pointed to monetary transfers

between Phillips and Deer over the years, they too could have been explained by the six year

---

[97]     February 9, 2009 letter from April Reeves to Judy Edwards, Tab "3" to the Affidavit of Judith W.
Edwards.
[98]     Deposition of Todd Phillips, 36:1-37:7, 38:20-40:12 43:3-23, 45:11-47:25, Exhibit "E."
[99]     *Id.* at 38:20-40:12 Exhibit "E."

business relationship and friendship between Phillips and Deer. Even when the Bank took Phillips' deposition he was unable to attribute any specific monetary transaction to the Loan. Thus, even if Phillips' recent deposition (taken on June 1, 2010) established that some of these monetary transfers were improper, it did not show that any transfer constituted an improper financial benefit *in connection with* the Loan.

It is the Bank's burden to show that it suffered a covered loss, not BancInsure's burden to disprove all possible theories of coverage. *McKneely*, 862 So. 2d at 534. *Broussard*, 523 F.3d at 625. The Bank has not shown coverage for its claimed damages. As a matter of law BancInsure cannot be subjected to punitive damages for its nonpayment of the Bank's claim.

### 3. The Bank cannot show that BancInsure "committed a willful or malicious wrong, or acted with gross and reckless disregard for the [Bank's] rights."

Even if the Bank ultimately prevailed on its claim with respect to its loan loss at trial, the Bank cannot show that BancInsure has committed the type of "willful or malicious wrong" or exhibited the type of "gross and reckless disregard" for its rights required to recover punitive damages. The Bank's bad faith claim against BancInsure stems solely from the Bank's belief that BancInsure should have paid its claim.[100] Although the Bank's Amended Complaint alleges that BancInsure's denial of its claim was "tortious and malicious in nature," the Bank has supplied absolutely no evidence to support that allegation. As a result, its claim for punitive damages must fail. *Broussard*, 523 F.3d at 628; *McKneely*, 862 So. 2d at 533.

---

[100]   30(b)(6) Deposition of the Bank, 139:13-141:12.

36

4.    **BancInsure fulfilled its duty to promptly and adequately investigate the Bank's claim.**

Upon receipt of the Bank's claim, BancInsure assigned its investigation to an outside consulting firm that specializes in the investigation and adjustment of claims under Financial Institution Bonds, and specifically to Ms. Edwards who has twenty-five years of experience investigating and adjusting insurance claims.[101] Ms. Edwards determined (and correctly so) that, based on the information supplied by the Bank, there was no coverage for the Bank's claim under the Bond. BancInsure requested that the Bank supply it with any additional information that might show coverage. Even after a two and a half year drought in communication, BancInsure reopened its claim file and reevaluated the Bank's claim based upon the additional information supplied.[102] Again, the Bank failed to submit sufficient information or documentation to show coverage for its claim. BancInsure fulfilled its "obligation [] to perform a prompt and adequate investigation of the [Bank's] claim" and it performed that investigation in good faith. It remains the Bank's burden to show that it suffered a covered loss. *McKneely,* 862 So. 2d at 535; *Broussard,* 523 F.3d at 625. Its failure to do so cannot be blamed on BancInsure's investigation. The Bank cannot show any breach of the implied covenant of good faith and fair dealing, much less a breach that "rises to the level of an independent tort" sufficient to impose liability for punitive damages on BancInsure. *Broussard,* 523 F.3d at 629.

---

[101]    Affidavit of Van Butler, ¶¶ 7-8, Exhibit "A"; Affidavit of Judith W. Edwards, ¶ 3, Exhibit "B."
[102]    30(b)(6) Deposition of BancInsure, 63:10-20, 89:1-13; Affidavit of Judith W. Edwards, ¶¶ 9-12; Affidavit of Van Butler, ¶¶ 12-13.

37

## IV.   CONCLUSION

Based on the foregoing arguments, BancInsure, Inc., requests that this Court grant its motion for partial summary judgment and enter judgment in its favor with respect to the Bank's damage claims under Count I of its Amended Complaint for interest income, various attorneys' fees and expenses, appraisal fees, costs associated with the Bank's debenture offering, and other costs incurred as a result of federal regulatory action.  BancInsure further requests that this Court dismiss Counts II (Unjust Enrichment), III (Breach of Duty to Investigate) and IV (Breach of Duty of Good Faith and Fair Dealing) and all damages associated therewith.

KREBS, FARLEY & PELLETERI, PLLC


 /s/ Ellie B. Word
DAVID J. KREBS, Special Bar
MATT J. FARELY, Special Bar
ELLIE B. WORD, MSB#100408
ALEC M. TAYLOR, MSB#102874
One Jackson Place, Suite 900
188 East Capitol Street
Jackson, Mississippi 39201
601/ 968-6710 (telephone)
601/ 968-6708 (facsimile)
*Attorneys for BancInsure, Inc.*

## CERTIFICATE OF SERVICE

I, Ellie B. Word, do hereby certify that a copy of the foregoing Motion for Partial Summary Judgment has been served via the ECF System to the following:

Mr. W. Whitaker Rayner
Ms. April D. Reeves
Watkins Ludlam Winter & Stennis, P.A.
P.O. Box 427
190 East Capitol Street, Suite 800
Jackson MS 39205-0427

This the 30th day of July, 2010.

/s/ Ellie B. Word
Ellie B. Word