IN THE UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

PEOPLES BANK OF THE SOUTH                                    PLAINTIFF

V.                                            CAUSE NO. 3:09CV217-TSL-FKB

BANCINSURE, INC.                                            DEFENDANT

**BANCINSURE, INC.'S MEMORANDUM IN OPPOSITION TO PEOPLES BANK OF
THE SOUTH'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

BancInsure, Inc. ("BancInsure") opposes the Motion for Partial Summary Judgment filed

by Peoples Bank of the South f/k/a Peoples Bank of Franklin County ("the Bank").

The Court should deny the Bank's motion because:

1- BancInsure's denial of the claim was and is correct. To this date, the Bank has not

demonstrated a claim covered under the Bond. Coverage for the loan to Phillips does

not exist because the Bank has not shown the required "improper financial benefit" in

connection with the loan to Phillips.

2- The Bank's claim has been expanded to include consequential claims that are plainly

barred by the exclusions in the Bond.  These include the Bank's claim for indirect

loss, the Bank's claim for loss on interest, and the Bank's claim for amounts spent

trying to prove its claim.

3- The Bank effectively abandoned its claim for a period of two and a half years. It takes

some nerve for the Bank *now* to accuse BancInsure of bad faith in  claims  handling.

The Bank creates that claim only by disregarding the positive and professional efforts

made to evaluate the claim by Judy Edwards, the experienced and qualified senior

claims attorney who reviewed the Bank's claim for BancInsure.

## I.    STATEMENT OF FACTS

BancInsure does not dispute that the Bank extended a loan ("the Loan") to Todd Phillips Investments, Inc. ("TPI"), wholly owned by Todd Phillips ("Phillips"), in reliance on an allegedly dishonest title opinion supplied by Dwayne Deer ("Deer"), an attorney retained by the Bank who incorrectly represented that the real property collateral securing the Loan ("the Property") was unencumbered when in fact it was not.  But BancInsure is in sharp disagreement with the Bank's statement of facts as to (1) BancInsure's handling and investigation of the Bank's claim and (2) Deer's alleged receipt of the "improper financial benefit" required for coverage under Insuring Agreement (A) of the Bond.  BancInsure's Statement of Facts focuses on addressing the Bank's misstatements and omissions in these areas.[1]

### A.    The Bond.

In its Memorandum, the Bank omits any reference to the following relevant exclusions in Financial Institution Bond No. 23FIB00109-2A ("the Bond"), which exclude coverage for:

(e)    **loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any Loan** or transaction involving the Insured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreement (A), (D), (E), (P) or (Q).

(h)    **loss caused by an Employee**, except when covered under Insuring Agreement (A) or when covered under Insuring Agreement (B), (C) or (R) and resulting directly from misplacement, mysterious unexplainable disappearance or destruction of or damage to Property.

(s)    **potential income**, including but not limited to interest and dividends, not realized by the Insured (including for purposes of this exclusion portions

---

[1]    The Bank includes a general description of its alleged losses in Section II(D) of its Memorandum, but fails to properly support its claims for consequential damages with admissible evidence. BancInsure nonetheless will address those claims in the context of Bond exclusions in Section III(A)(2) of this Memorandum.

of outstanding promissory notes payable to the Insured which represent payments of interest, fees and penalties in connection with prior promissory notes payable to the Insured.

(u)   **all fees, costs and expenses incurred by the Insured in establishing the existence of or amount of loss** covered under this bond except when covered under Insuring Agreement (T).

(v)   **indirect or consequential loss of any nature.**[2]

Additionally, with respect to Insuring Agreement (A), which provides employee dishonesty coverage for loan losses only if the allegedly dishonest employee "was acting in collusion with one or more parties to the transactions and has received, in connection with these transactions, an improper financial benefit," the Bank omits the following Bond language clarifying the "improper financial benefit" required for coverage:

> As used throughout this Insuring Agreement, **financial benefit does not include any employee benefits earned in the normal course of employment, including** salaries, commissions, **fees,** bonuses, promotions, awards, profit sharing or pensions.[3]

**B.   BancInsure's good faith investigation of the Bank's claim.**

The Bank omits discussion of the actions taken by BancInsure to evaluate the Bank's claim. The Bank's claim that BancInsure denied coverage "without taking any actions to investigate the claim" is untrue. For the Court's reference, BancInsure has attached a timeline of relevant claims handling events as Exhibit "1" hereto.

To begin with, the Bank excludes from its recitation of facts BancInsure's March 29, 2006 letter, promptly responding to the Bank's notice of its potential claim. In that letter, BancInsure informed the Bank that it had referred the matter to Kalchick, Pratt and Associates, L.L.C. ("KPA"), a consulting group that specializes in handling the investigation of fidelity and

---

[2]       Bond, Section 2, Exclusions (e), (h), (s), (u), (v), attached as Exhibit "A" to the Bank's Motion for Partial Summary Judgment.

[3]       *Id.*, Insuring Agreement (A) Dishonesty.

surety bond claims for insurers.[4] The claim was then handled by Judy Edwards, a senior claims

attorney at KPA with over twenty-five years of experience handling surety and fidelity claims.[5]

The actions taken by Ms. Edwards to investigate and obtain documentation for the

Bank's claim are also absent from the Bank's Memorandum. Upon receipt of the Bank's claim,

Ms. Edwards contacted the Bank and discussed the background of its claim with the Bank's

president, Larry Hill.[6] Ms. Edwards also requested that Mr. Hill supply BancInsure with copies

of pertinent documents.[7] Upon receipt of the requested information, Ms. Edwards evaluated

potential coverage for the Bank's claim under the Bond.[8] The Bank had not asserted coverage

under any specific insuring agreement of the Bond, so Ms. Edwards evaluated the claim under all

potentially applicable insuring agreements, taking into account that, because the Bank's claim

involved loan loss, exclusion (e) would apply and bar coverage unless the Bank could show

coverage under Insuring Agreements (A), (D), (E), (P) or (Q).[9] After concluding that, based on

the information supplied, the Bank's claim was not covered, Ms. Edwards made a coverage

recommendation to BancInsure and assisted with the drafting of BancInsure's position letter

regarding coverage for the Bank's claim, which was sent to the Bank on May 3, 2006.[10]

BancInsure's May 3, 2006 letter set forth the facts underlying the Bank's claim as

BancInsure understood them at that time, cautioning the Bank that "[a]ny inaccuracies or

---

[4]     March 29, 2006 letter from Van Butler to Larry Hill, Exhibit "2" hereto; 30(b)(6) Depo. of BancInsure, 8:6-25, Exhibit "3" hereto.

[5]     30(b)(6) Depo. of BancInsure, 8:12-9:19. Ms. Edwards has been employed by KPA for 10 years. *Id*. Prior to that time she was employed by Fidelity and Deposit Company of Maryland for 15 years, first as a claims attorney, then as a managing claims attorney. *Id*.

[6]     *Id*., 66:7-21.

[7]     *Id*., 66:7-21. The Bank included discussion of documents faxed to BancInsure but omitted any mention of the fact that Ms. Edwards specifically requested those documents in furtherance of her investigation of the Bank's claim.

[8]     *Id*., 66:7-21; May 3, 2006 Letter from Van Butler to Larry Hill, Exhibit "V" to the Bank's Motion.

[9]     30(b)(6) Deposition of BancInsure, 69:12-72:1, 130:17-132:18.

[10]    *Id*., 66:7-21; May 3, 2006 Letter...., Exhibit "V" to the Bank's Motion.

mischaracterizations" therein could change BancInsure's coverage analysis.[11] As to Insuring Agreement (A) (Employee Dishonesty), BancInsure noted that there was "no indication that an Employee of the Bank was in any way involved with the causation of the Loss," an assessment which, on the information then provided by the Bank, was correct.[12] Finding no basis for coverage under Insuring Agreements (D), (P) and (Q) on the facts presented, BancInsure then analyzed coverage under Insuring Agreement (E), noting that because the Bank's loss was apparently "the result of the Bank's reliance upon Deer's title opinions which contained inaccurate information as to lien status of the property involved," Insuring Agreement (E) did not cover the loan loss as title opinions do not "transfer title of the property" and thus "are not considered Securities as defined by Insuring Agreement (E)."[13]

The Bank in its motion does not disclose that BancInsure's May 3, 2006 letter ended with the following request for the Bank to promptly provide BancInsure with any pertinent information:

> If you have any additional information or documentation which you believe would alter the opinions expressed herein, please forward that information to our claims consultant, Judy Edwards of KPA, as soon as possible. If you would like to discuss the content of this letter, please contact me or Judy Edwards.[14]

The Bank neither corrected BancInsure's factual recitation nor submitted additional information in response to BancInsure's May 3, 2006 coverage opinion, although KPA and BancInsure kept their claim files open pending receipt of such information.[15] After receiving nothing further from the Bank for 90 days, KPA and BancInsure closed their files on the Bank's

---

[11]    May 3, 2006 Letter…, Exhibit "V" to the Bank's Motion.
[12]    *Id.*
[13]    *Id.*, pp. 3-4.
[14]    *Id.*, p. 4.
[15]    30(b)(6) Depo. of BancInsure, 63:5-9, Exhibit "3."

claim.[16] *The Bank did not respond to BancInsure's May 3, 2006 coverage position letter for over 2 ½ years—an undisputed fact not stated in the Bank's motion.*

On December 22, 2008, Ms. Edwards received a letter from the Bank's counsel demanding payment for the Bank's claim.[17] In that letter, counsel asserted for the first time that the Bank's loan losses were covered under Insuring Agreement (A) of the Bond, informing BancInsure that Deer was a Bank Employee under the Bond, because he was an attorney "retained by [the Bank] to provide legal services, namely title opinions on which [the Bank] relied in making the loan to Todd Phillips," and that the Bank's loan loss was caused by "Deer's dishonest actions in connection with providing false title opinions to [the Bank]."[18]

In its motion, the Bank omits any discussion of the actions taken by Ms. Edwards to investigate and analyze the Bank's back-from-the-dead claim. Both BancInsure and KPA promptly reopened their claims files, and Ms. Edwards further evaluated coverage based on the new information supplied by the Bank, analyzing the Bank's claim under Insuring Agreement (A).[19] (Obviously, Ms. Edwards did not speak directly to Mr. Hill because the Bank was represented by counsel.[20]) In its motion, the Bank omits any reference to Ms. Edwards' January 12, 2009 letter acknowledging receipt of the Bank's counsel's letter, in which Ms. Edwards advised counsel that, because the Bank's alleged loss resulted from a loan, in order to show coverage under Insuring Agreement (A) the Bank would need to show that Deer received an

---

[16]     *Id.*, 63:5-9. In her deposition, Ms. Edwards testified that, after a coverage opinion is sent to an insured, "you give them time to absorb it, to review it, and you would hope that they would get back to you within a certain amount of time," and that a claim file can always be reopened if the insured submits additional information after the file has been closed. *Id.*, 243:20-244:5, 246:9-247:5.
[17]     Dec. 22, 2008 Letter from April Reeves to Judy Edwards, Exhibit "X" to the Bank's Motion.
[18]     *Id.*
[19]     30(b)(6) Depo. of BancInsure, 63:10-20, 89:1-13.
[20]     *Id.*, 92:6-8.

improper financial benefit in connection with the Loan.[21] Ms. Edwards further noted that the Bank had not provided such information.[22] In response, the Bank's counsel asserted that the fee paid to Deer by the Bank for his title opinion was an improper financial benefit and further pointed to an opinion rendered by the judge presiding over Deer's bankruptcy wherein the judge found that Deer made cash withdrawals from Deer's trust accounts.[23]

After reviewing the documentation supplied by the Bank's counsel, BancInsure responded with a position letter dated February 11, 2009, advising that BancInsure continued to respectfully decline coverage for the Bank's claim.[24] The fee paid to Deer for his title opinion could not constitute an improper financial benefit under Insuring Agreement (A) because the fee was earned "in the normal course of" Deer's employment with the Bank.[25] Further, the bankruptcy court opinion referenced by Ms. Reeves involved a separate action brought by a third party against Deer, and the mishandled trust account funds at issue in the referenced opinion had no apparent "bearing on [Deer's] preparation of a title opinion for the Bank on an unrelated loan transaction," as "[a]ny financial benefit Deer obtained as a result of his misconduct relative to [that] matter cannot be transferred to the Bank's claim."[26] BancInsure told the Bank that, in order for its claim to be covered under Insuring Agreement (A), it would need to show that the alleged financial benefit received by Deer was "in connection with" the title opinion he supplied the Bank.

The Bank did not respond to BancInsure's February 11, 2009 letter but instead filed this lawsuit against BancInsure. In other words, having sat on its claim for 2 ½ years (from May 2006

---

[21]    Jan. 12, 2009 letter from Judy Edwards to April Reeves, Exhibit "4" hereto.
[22]    Id.
[23]    Feb. 9, 2009 letter from April Reeves to Judy Edwards, Exhibit "Y" to the Bank's Motion.
[24]    Feb.11, 2009 letter from Van Butler to April Reeves, Exhibit "Z" to the Bank's Motion.
[25]    Id.
[26]    Id.

to December 2008) the Bank moved from a new theory of its claim to litigation in about seventy days (from late December 2008 to early March 2009.). Good faith is a two-way street: just imagine what the Bank would be saying if BancInsure had sat on the claim for 2 ½ years.

After the Bank filed suit, BancInsure has continued to investigate and analyze the Bank's claim in good faith.[27] BancInsure has sent written discovery to the Bank, attended related criminal proceedings, reviewed court records, taken the Bank's Rule 30(b)(6) deposition, attended the Bank's deposition of Phillips, and reviewed all documents received from the Bank or pursuant to subpoena.[28] Thus, the Bank's assertion that BancInsure conducted "no investigation" of its claim after the Bank filed this lawsuit is also clearly false as it entirely omits all actions taken by BancInsure in the litigation. A fact is a fact whether it is learned through an informal claims review process or through the formalities of litigation.

**B.    The improper financial benefits claimed by the Bank.**

The Bank's Statement of Facts is also at best incomplete in discussing the alleged financial benefits the Bank now claims that Deer received from Phillips. The Bank omits background factual information as to Phillips and his business relationship with Deer that is necessary to understanding the reasonableness of BancInsure's continued denial of coverage. The Bank further glosses over the timing of discovery of information it cites in support of its claim, including the fact that the Bank incorrectly claimed that the fee it paid Deer supplied the requisite "improper financial benefit" until very recently. Furthermore, the Bank failed to state the fact that the bulk of the "evidence" cited in support of its claim comes from Phillips' June 1, 2010 deposition testimony coupled with records it obtained from the FDIC in April 2010.

---

[27]    30(b)(6) Depo. of BancInsure, 244:6-20, Exhibit "3."
[28]    *See* Defendant's First Set of Requests for Production of Documents, Exhibit "5" hereto; Defendant's First Set of Interrogatories, Exhibit "6" hereto; Part I, 30(b)(6) Depo. of the Bank, pp. 1-2, Exhibit "7" hereto; Part II, 30(b)(6) Depo. of the Bank, pp. 1-2, Exhibit "8" hereto; Phillips Depo., pp. 1-2, Exhibit "9" hereto.

In considering the value of Phillips' testimony, it is worth keeping in mind that Phillips gave that testimony while sitting in prison as a convicted felon. Mr. Hill, the president of the Bank, himself has testified that "he wouldn't bet anything on Todd Phillips" and, in response to a question from counsel, would go look out the window if Phillips told him it was daylight.[29]

But there was a time when Phillips was the Golden Boy of area bankers. When the Bank made the Loan to TPI, Phillips was well known throughout the area because of his successful business ventures, had a banking relationship with numerous Banks in the area, and was believed to be a very rich man.[30] The Bank saw Phillips as a valuable client and, by the time Phillips applied for the Loan in December 2004, the Bank had at least three other outstanding loans to Phillips on which the Bank suffered no loss.[31]

Phillips' and Deer's business relationship both pre-dated and post-dated the Loan. Phillips testified that his business relationship with Deer began in 1999 or early 2000, and that Deer handled the title opinions and closings for most of Phillips' loan transactions from approximately 2000 through 2006.[32] In an average year at the height of their business relationship, Deer handled hundreds of closings on properties bought and sold by Phillips.[33] The bulk of those closings were related to legitimate business transactions as Phillips testified that, of his multi-million dollar loan portfolio, only approximately 2% was fraudulent.[34]

---

[29]     Part I, 30(b)(6) Depo. of the Bank, 145:3-7.
[30]     *Id.*, 9:24-10:9, 105:18-25; Phillips Depo., 69:21-74:14. Phillips testified that he had accounts with the following banks: State Bank & Trust, Citizens Bank, Priority One Bank, Bank Corps South, American Bank & Trust, Wachovia, Pike County Bank, Bank Plus, Bank of Franklin, Bank of the South, Citizens Savings Bank, Community Bank of Mississippi, First Bank, Parish National Bank, Peoples Bank of Franklin County, Trustmark, Union Planters, Concordia Bank & Trust, and Central Progressive Bank. Phillips Depo., 69:21-74:14.
[31]     Part I, 30(b)(6) Depo. of the Bank, 11:12-14, 12:14-23, 23:1-8, 58:17-23. One of these loans was secured by stock and two were secured by liens on different real properties. *Id.*
[32]     Phillips Depo., 88:4-18, 89:24-90:5.
[33]     *Id.*, 90:6-16.
[34]     *Id.*, 88:25-89:1, 89:20-23.

The Bank points to several alleged improper benefits but omits pertinent information in an effort to make the alleged benefits seem more improper and to mask the fact that there is no apparent connection to the Loan.  As to the Bank's claim that "Deer was using office space [owned] by Phillips with a fair market value of $750 per month for no charge" at the time the Loan was made, the Bank neglected to mention that Deer had used that office space since 2001 and continued using it through 2006.[35] The Bank also omitted Phillips' testimony undermining its assertion that the alleged free office space was in any way connected to Deer's faulty title opinion:

> Q.  At any point did you and Mr. Deer have a conversation where you said, "Mr. Deer, I'll forgo the rent you have on office space for you to write me this fraudulent loan"?
> A.  No.[36]

As to the allegedly free notarial services provided to Deer by Dawn Stinson, an employee of Phillips, the Bank failed to note that Ms. Stinson began working for Phillips and Deer well before the Loan and continued such work after the Loan was made.[37] Further, Phillips' testimony was less than conclusive as to the alleged benefit received. Phillips merely testified that he did not know of any compensation paid by Deer, but that Ms. Stinson would be the one to ask.[38] Even if Ms. Stinson did supply free notarial services, Phillips could not tie Ms. Stinson's provision of such services to the Loan:

---

35    *Id.*, 36:10-37:7.
36    *Id.*, 101:9-14. Phillips' testimony as to the alleged free office space was far from convincing:
    Q.    Did Mr. Deer provide you with rent on that office space at any point in time?
    A.    Not that I'm aware of.
    Q.    Did he pay you office…Did he pay you rent on that office space in December
           2004 when he provided the preliminary title opinion to Peoples Bank?
    A.    I doubt it…I don't recall specifically.
    Q.    But at no point in time did he ever provide you with rent on that office space?
    A.    No.
*Id.*, 36:13-24.
37    *Id.*, 37:21-38:19.
38    *Id.*

Q.      Did you and Mr. Deer ever have a conversation where you said, "I will pay Miss Stinson's salary for the fraudulent loan that we have been talking about here? Did you ever have a conversation to that effect?

A.      No.[39]

Q.      Did Mr. Deer agree to assist you in obtaining loans from banks in exchange for the cash loans and paying his employees and the free rent?

A.      No.

Q.      Not specifically?

A.      No. It was just a – it was an understanding, but it was never written down or agreed to specifically. But it was an understanding between him and I that I help him; he helps me.[40]

With respect to Phillips' storage unit that the Bank claims Deer utilized "at no charge" the Bank fails to mention that Phillips' use also pre-dated and post-dated the Loan, although Phillips was unable to pinpoint the exact period of usage.[41] Phillips testified that, to his knowledge, Deer had not paid the $50 monthly rent, but he could not connect that to the Loan:

Q.      Did you ever have a conversation with Mr. Deer that said that "I will give you free storage if you write this fraudulent title opinion for this loan" that we're talking about in question in April of 2005?

A.      No, sir.[42]

As to the two houses the Bank claims that Phillips built for Deer "much cheaper than appraisal," the Bank fails to mention that both of these house sales took place well prior to the Loan, as one house was sold on July 3, 2000 and the other on September 23, 2003.[43] Phillips could not specifically remember "exactly how much" cheaper than appraisal the houses were sold and his testimony showed that neither sale had any connection to the Loan:

Q.      So there were two different houses that we talked about. I think one was 2000 and one was 2003?

A.      Yes, sir.

---

[39]     *Id.*, 101:21-102:1.
[40]     *Id.*, 44:14-23.
[41]     *Id.*, 45:8-17.
[42]     *Id.*, 45: 8-17, 106:18-107:1.
[43]     *Id.*, 40:2-41:20.

> Q.   And the loan we're talking about is in the end of '04, beginning of '05. Would there have been any reason—or did you know about this loan in 2000, this loan for $500,000 you were going to make in 2005?
> A.   No, sir.
> ....
> Q.   Was there any way for you—did you and Dwayne know that you would be—you would get Dwayne to issue a fraudulent title opinion in April of 2005 in 2003?
> A.   No. [44]

As to the allegedly discounted apartment rented by Deer's daughter, the Bank neglects to mention that even according to Phillips' testimony (the Bank's sole source of proof for this "fact"), Deer's daughter did not rent that apartment until well after the Loan was made. [45] As to the time Deer and his family spent at Phillips' duck camp, the Bank fails to note that this occurred sporadically over the course of Phillips' ownership of the property, from 1999 to 2006 and that Phillips himself could not tie this alleged benefit to the Loan:

> Q.   And you said that [Deer] spent a lot of time at your duck camp in Tallulah?
> A.   Correct.
> Q.   Did you ever have a conversation with Mr. Deer that said, "You can spend as much time at my duck camp as you want if you write me a fraudulent title opinion in April of 2005" for this loan that we're talking about here today?
> A.   No, sir. [46]

Missing from the Bank's discussion of the monetary transfers between Deer and Phillips is any reference to Phillips' testimony that the money was expected to be repaid [47] or to Phillips' attempt to recover money owed him by foreclosing on a piece of property Deer owned. [48] Indeed, when pressed to identify a financial benefit Deer received in connection with the Loan, Phillips could not do so, instead repeatedly asserting that no such connection could be made:

---

[44]   *Id.*, 38:20-39:8, 40:2-41:20, 102:2-103:9.
[45]   *Id.*, 82:10-18.
[46]   *Id.*, 43:3-23, 104:3-12.
[47]   *Id.*, 67:21-68:4, 113:21-114:1.
[48]   *Id.*, 63:19-64:2.

Q.    What did Mr. Deer receive in exchange for providing these false title opinions?

A.    **Nothing specifically within connection to any one of them**. But he rented an office of mine, and he never paid me rent, you know, was never on time. There were numerous, numerous, numerous times that I loaned him large sums of money to the tune of a couple hundred thousand dollars here and there, you know.

       **So I can't say that none of them were tied specifically to any one deed of trust.** But I can also say that he received value from me through the years.

Q.    Let me make sure I understand your testimony. Is it your testimony that Mr. Deer received items of value which you've described for activities that he engaged in to defraud various banks, including this December 23, 2004 loan to Peoples Bank?

A.    We never specifically said, "We're going to" - - "This is connected to this deal."[49]

Q.    And one of these fraudulent loans that he would have received value for is the loan at Peoples Bank?

A.    Correct.

Q.    Excuse me, the loan from Peoples Bank to Todd Phillips Investments?

A.    **But its not specifically tied.** I think it was just kind of an open understanding that was never talked about or agreed to or anything, you know. I want to be clear about that.[50]

Interestingly, the Bank first noticed the deposition of Deer and then withdrew that notice.[51] Further, the Bank has taken no steps to attempt to collect its loss from Deer or any insurer or surety of Deer.

## II.    SUMMARY JUDGMENT STANDARD

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069,

---

[49]    *Id.*, 30:22-31:17.
[50]    *Id.*, 32:9-18.
[51]    *See* Withdrawal of Notice of Deposition (Doc. No. 70).

1075 (5th Cir. 1994). The moving party's failure to meet this initial burden mandates denial of its motion, regardless of the nonmoving party's response. *Little*, 37 F.3d at 1075. When fact questions are raised, the court "must review the facts drawing all inferences most favorable to the party opposing the motion." *Brooks, Tarlton, Gilbert, Douglas & Kressler v. U.S. Fire Ins. Co.*, 832 F.2d 1358, 1364 (5th Cir. 1987); *Lynch Props. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998). Summary judgment may be entered only when, "viewing the evidence in the light most favorable to the nonmovant, 'there is no genuine issue of any material fact' and the moving party is 'entitled to judgment as a matter of law.'" *Carter v. RMH Teleservices, Inc.*, 205 Fed. Appx. 214, 217 (5th Cir. 2006); *Brooks...*, 832 F.2d at 1364.

## III.    ARGUMENT

**A.    BancInsure has not breached the Bond.**

    **1.    Coverage under Insuring Agreements (E) and (Q) is excluded.**

The Bank has claimed throughout this litigation that its loss was the direct result of employee dishonesty—yet, in asserting coverage under Insuring Agreements (E) and (Q) has inexplicably ignored exclusion (h) of the Bond, which expressly excludes coverage for all losses caused "directly or indirectly" by an Employee of the Bank, unless such losses are covered under Insuring Agreement (A) or are covered under Insuring Agreements (B), (C) or (R) and satisfy certain other additional conditions. [52]

The Bond defines the term "Employee" to include "an attorney retained by the Insured...while...performing legal services for the Insured."[53] The Bank retained Deer to provide title opinions regarding the Property that was offered as collateral for the Loan and

---

[52]    The Bank's Response to Defendant's Interrogatories, p. 6, Exhibit "10" hereto; Amended Complaint, ¶¶ 11, 22, 32 (Doc. No. 53); Part I, 30(b)(6) Depo. of the Bank, 143:25-144:8.

[53]    Bond, Section 1, Definition (m)(2), Exhibit "A" to the Bank's Motion.

freely admits that Deer "constitutes an 'Employee' under the Bond."[54]   It claims that Deer, in

collusion with Phillips, supplied it with a dishonest title opinion with respect to the Property that

failed to identify existing liens on the property, and that it would not have made the Loan if it

had known that it would not have a first position lien on the Property.[55] It specifically claims that

its loan loss is due to Deer's actions, which left it "wholly unsecured on [TPI's] debt.[56]

Exclusion (h) is both enforceable and unambiguous. *First Guar. Bank v. BancInsure,*

*Inc.*, 2007 WL 1232212, *3 (E.D. La. 2007) (holding that exclusion (h) of the standard form

financial institution bond barred coverage under insuring agreements D and Q where the plaintiff

alleged that its loss was sustained as a result of the dishonest acts of its employees); *The Stop &*

*Shop Companies, Inc. v. Fed. Ins. Co.*, 136 F.3d 71 (1st Cir. 1998); *Stanford Univ. Hosp. v. Fed.*

*Ins. Co.*, 174 F.3d 1077, 1086-87 (9th Cir. 1999); *Florists' Mut. Ins. Co. v. Lundy Greenhouse*

*Mfg. Corp.*, 2007 WL 2902223, *11 (S.D. Ohio 2007). Further, the employee's conduct is not

required to be the sole or initiating cause of the insured's alleged loss in order for exclusion (h)

to apply, as it also applies to loss indirectly caused by employee dishonesty. *See Empire Bank v.*

*Fid. & Dep. Co. of Md.*, 828 F. Supp. 675 (W.D. Mo. 1993), *aff'd*, 27 F.3d 333, 333-34 (8th Cir.

1994).

Exclusion (h) unambiguously bars coverage under Insuring Agreements (E) and (Q) for

any losses resulting either directly or indirectly from Deer's actions. The Bank cannot satisfy its

summary judgment burden with respect to Insuring Agreements (E) and (Q). Further, as more

fully explained in BancInsure's Memorandum in Support of its Motion for Partial Summary

---

[54]      Bank's Memorandum of Authorities…, p. 15 (Doc. 90); The Bank's Response to Defendant's
Interrogatories, p. 6, Exhibit "10"; Dec.1, 2004 letter from Alex Corban to Dwayne Deer, Exhibit "C" to
the Bank's Motion.
[55]      The Bank's Response to Defendant's Interrogatories, pp. 6-7, 11; Bank's Memorandum of
Authorities…, p. 16 (Doc. 90); Part II, 30(b)(6) Depo. of the Bank, 66:6-67:18, 81:17-82:1.
[56]      Bank's Memorandum of Authorities…, p. 7, (Doc. 90).

Judgment, all such claims should be dismissed as exclusion (h) clearly and unambiguously bars the Bank's claims under Insuring Agreements (E) and (Q).

### 2.    Over $500,000 of the Bank's claim is unambiguously excluded.

The Bank seeks coverage not just for the unpaid balance of the Loan, less recoveries, but for various categories of other alleged losses including: attorneys' fees and expenses incurred in its attempts to recover the loan balance; attorneys' fees and expenses incurred in connection with this lawsuit; "uncompensated loss of loan proceeds"; increased Federal Deposit Insurance Corporation ("FDIC") premiums; expenses resulting from the FDIC's regulatory action in "ordering Peoples Bank to increase its capital which the Bank did by the issuance of debentures resulting in additional attorneys' fees, expenses as well as interest paid in connection with the sale of these debentures"; and unquantified "damage to [the Bank's] reputation." In the Bank's supplemental response to BancInsure's Interrogatories, the Bank supplied a monetary breakdown of its damages claim.[57] As is more fully explained in BancInsure's Memorandum in Support of its Motion for Partial Summary Judgment, incorporated by reference herein, approximately $520,000 of the Bank's damage claim is either not a "loss" under the Bond or is expressly excluded from coverage by exclusions (s), (u) or (v).

### i.    Interest income is not recoverable.

With respect to the Bank's claim for "uncompensated loss of loan proceeds, this is apparently a claim for interest income the Bank did not earn due to Phillips' default on the Loan. The Bank's sole support for this claim is derived from BancInsure's Rule 30(b)(6) deposition of the Bank, wherein Mr. Hill testified that the interest portion of the Bank's claim included 10% interest charged by the Bank on the $337,000 outstanding balance of the Loan.[58]   Mr. Hill

---

[57]    First Supplemental Response to Defendant's Interrogatories, Exhibit "11" hereto.
[58]    Part I, 30(b)(6) Depo. of the Bank, 117:15-118:7, Exhibit "7."

expained that although the interest rate on the original Loan had been the prevailing market rate on real estate secured loans in the area (6.75%), the Bank had closed out the original Loan and opened a new loan file in order to take additional collateral ("the Reworked Loan") at which time it unilaterally increased the interest rate charged to 10% based on the "risk [the Bank] associated with the loan."[59]

It is apparent both from Mr. Hill's deposition testimony and from the commonly prevailing meaning of the words that interest income is simply not "loss" within the meaning of any of the Bond's insuring agreements because it does not involve the actual depletion of bank funds; rather, it is income not realized by the Bank. *F.D.I.C. v. United Pac. Ins. Co.*, 20 F.3d 1070, 1080 (10th Cir. 1994); *First State Bank v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 569 (7th Cir. 2009); *First Am. State Bank v. Continental Ins. Co.*, 897 F.2d 319, 329 (8th Cir. 1990). Further, exclusion (s) which bars recovery for "potential income, including...interest," unambiguously excludes coverage for this component of the Bank's alleged damages because interest income is, by definition, "potential income" that the Bank seeks to recover. *Diversified Group, Inc. v. Van Tassel*, 806 F. 2d 1275, 1278 (5th Cir. 1987); *accord First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.*, 2010 U.S. Dist. LEXIS 64963 (N.D. Ohio June 30, 2010); *U.S. Gypsum Co. v. Ins. Co. Of N. Am.*, 813 F.2d 856 (7th Cir. 1987); *FDIC v. Fid. & Dep. Co.*, 827 F. Supp. 385, 390 (M.D. La. 1993). The Bank cannot simply determine the interest it would like to earn from a loan then, in the event of nonpayment, charge that amount to BancInsure.

### ii.    Indirect loss is not recoverable.

Insuring Agreement (A) covers only "loss resulting directly from" employee dishonesty. With respect to the Bank's various claims for attorneys' fees and increased regulatory costs due to FDIC decisions as well as the Bank's unquantified claim for "damage to its reputation," the

---

[59]     *Id.*, 47:3-7, 75:21-77:9, 117:12-118:10.

Bank simply has not met its burden to show the required causal link between Deer's dishonest actions and these claims for damages, all of which are, at best, indirectly related to the Loan.[60] Further, any and all indirect or consequential loss is unambiguously excluded from coverage under exclusion (v) of the Bond. *Fireman's Fund Ins. Co. v. Special Olympics Int'l, Inc.*, 249 F. Supp. 2d 19, 28 (D. Mass. 2003) (the indirect loss exclusion reinforces the policy's intent to insure only "against immediate harm from employee dishonesty," not for any obligations the insured might have to others as a result of that dishonesty); *see also RBC Mortgage Co. v. Nat'l Union Fire Ins. Co.*, 812 N.E.2d 728, 733 (Ill. App. 1 Dist. 2004); *Tri City Nat'l Bank v. Fed. Ins. Co.*, 674 N.W.2d 617 (Wisc. App. 2003); *Aetna Cas. & Surety Co. v. Kidder, Peabody & Co.*, 246 A.D.2d 202, 210 (N.Y. App. Div.1998); *The Vons Cos., Inc., v. Fed. Ins. Co.*, 212 F.3d 489, 490-92 (9th Cir. 2000); *Burlington v. W. Sur. Co.*, 599 N.W.2d 469, 472 (Iowa 1999).[61]

With respect to the various attorneys' fees and appraisal fees claimed by the Bank, the indirect nature of these alleged losses is evident in the Bank's own description of its damage claim in the Bank's Supplemental Responses to BancInsure's Interrogatories. There, the Bank lists the fees and costs paid to the various title attorneys and appraisers as a result of the Bank's decision to take additional collateral pursuant to the Reworked Loan. The Bank also included claims for attorneys fees incurred pursuant to its decision to pursue a lawsuit against Phillips, which it then dismissed as part of a deal to take additional collateral as well as a claim for attorneys' fees paid to the Bank's bankruptcy attorneys as a result of the Bank's decision to

---

[60]     In its Memorandum, the Bank appears to recognize the indirect nature of its damage claims—it failed to claim that the bulk of its damage claim was "loss resulting directly from" employee dishonesty or the Loan, instead claiming that it incurred attorneys fees "in connection with" the loan and BancInsure's denial of its claim, and that the increased FDIC premium paid and costs associated with debentures resulted from "BancInsure's denial of this claim."

[61]     Both Insuring Agreements (E) and (Q) only indemnify "loss resulting directly from" the covered causes of loss under those insuring agreements and that exclusion (v) applies to all of the Bond's insuring agreements. Thus, even if coverage for these damage claims wasn't expressly excluded by exclusion (h), the analysis would be the same and these claims would not be recoverable.

pursue its claim against Phillips in bankruptcy court. These attorneys' fees are plainly the consequence of intervening decisions made by the Bank and are simply not the type of direct loss for which indemnity is available under the Bond.

The Bank also complains of costs and expenses as the result of two recent regulatory decisions made by the FDIC. The first regulatory decision complained of is the FDIC's finding that the Bank was undercapitalized, which resulted in an FDIC order requiring the Bank to raise $800,000 in capital.[62] The Bank decided to raise this capital by issuing debentures at a 6 ½% interest rate because that was "a rate that [the Bank] felt would entice investors to step up and buy debentures."[63] This debenture offering has been successful and, to date, the Bank has sold approximately one million and thirty thousand debentures and continues to market them.[64] As to why the debentures sold exceeded the Bank's $400,000 claim, Mr. Hill responded: "While we were doing it, since the people were interested in trying it, we felt like we'd just buy some – or not buy, but offer more to the public just to give a cushion."[65]

The Bank's rationale for charging the costs associated with this debenture offering is Mr. Hill's opinion that the Bank's unpaid $400,000 claim was the "trigger," without which the FDIC may not have ordered it to raise capital.[66] The Bank's claim for $29,386.73 in legal fees and expenses and $14,771.25 in accountants' fees paid in connection with its debenture offering as well as its claim for interest accrued are thus based entirely on Mr. Hill's unverified speculation as to what the FDIC would or would not have done if BancInsure had paid the Bank's claim as well as on intervening decisions by the FDIC and the Bank. The indirect and speculative nature

---

[62]     Part II, 30(b)(6) Depo. of the Bank, 30:17-22, 36:17-40:2, Exhibit "8"; Part I, 30(b)(6) Depo. of the Bank, 131:24-132:13, Exhibit "7."
[63]     Part II, 30(b)(6) Depo. of the Bank, 36:20-37:11.
[64]     *Id.*, 37:24-40:2.
[65]     *Id.*, 38:2-21.
[66]     *Id.*

of this claim is evident from the fact that the FDIC ordered the Bank to raise $800,000 in capital–double the amount of its loan loss claim against BancInsure.[67] Further, the Bank's attempt to recover such costs from BancInsure ignores any benefit to the Bank of increased capitalization, as evidenced by the fact that the Bank continued offering debentures after it had satisfied the FDIC's order. Although the Bank is paying 6½% interest on the debentures issued, it has the beneficial use of increased capital.

The second regulatory decision the Bank complains of is the increase in the premiums charged by the FDIC. This claim is similarly based solely on the unverified speculation of Mr. Hill who opined that, had BancInsure paid the Bank's claim, there was a "very real possibility" that the FDIC would not have downgraded the Bank's risk classification.[68] Despite his desire to charge BancInsure with the Bank's FDIC premiums, Mr. Hill admitted that there were many other factors that influenced FDIC premiums besides the unpaid balance of the Loan.[69] FDIC premiums, Mr. Hill explained, were similar to insurance premiums in that banks were allocated a risk group and charged a premium based on their membership in that group.[70] Premiums were affected by bank failures nationally, which generally result in the FDIC raising the premium charged the remaining members of the failed bank's risk group to cover the FDIC's expenses associated with the bank failure.[71] Mr. Hill has also admitted that the Bank's approximately $5.7 million in non-performing loans, which were wholly unrelated to the Loan, would also affect the FDIC's risk assessment.[72] In fact, Mr. Hill could not give a precise estimate of the amount of increased premium he thought resulted from BancInsure's denial of the Bank's claim, instead

---

[67]   The $400,000 figure used by Mr. Hill in his testimony is inaccurate as it includes interest income and excluded indirect costs.
[68]   Part II, 30(b)(6) Depo. of the Bank, 27:24-28:25.
[69]   *Id.*, 14:17-15:7.
[70]   *Id.*, 16:13-17:22.
[71]   *Id.*, 16:13-17:22, 19:5-21:8.
[72]   Part I, 30(b)(6) Depo. of the Bank, 138:1-139:9; Part II of 30(b)(6) Depo. of the Bank, 70:3-18.

stating, "Our contention is if this claim had been paid on time, we—our risk rating may have remained the same."[73]  Mr. Hill further recognized that FDIC's decisions are also, at least in some measure, subjective.[74] *United Gen. Title Ins. Co. v. Am. Int'l Group, Inc.,* 51 Fed. Appx. 224, 226 (9th Cir. 2002) (finding that payments made pursuant to statutory obligation were not direct losses covered by fidelity bond); *Manson Growers Coop. v. Mut. Serv. Cas. Ins. Co.,* 229 F.3d 1158 (9th Cir. 2000). That the Bank may subjectively blame BancInsure for the increase in its premiums years after the Loan is wholly irrelevant. The Bank has wholly failed to show any direct causal link between the Loan and the increased FDIC assessments. Further the multiple concurrent and intervening causes of the premium increase unquestionably brings this component of the Bank's claimed damages within the ambit of exclusion (v). At best, it is indirect and consequential loss, and is thus excluded. The same analysis supplies to the Bank's wholly unsupported and unquantified claim for damage to its reputation.

iii.    **Costs incurred in establishing the existence or amount of the Bank's claim are excluded.**

Exclusion (u) of the Bond expressly and unambiguously excludes coverage for "all fees, costs and expenses incurred" by the Bank in "establishing the existence of or amount of loss" covered under the Bond. The amounts excluded under exclusion (u) include the costs of any "investigations necessary to establish a loss so that a claim can be made under the bond" and, based on the information thus far supplied by the Bank, would include a portion of the Bank's claim for attorneys' fees and fees for title opinions. *Cambridge Trust Co. v. Commercial Union Ins. Co.,* 32 Mass. App. Ct. 561, 568 (Mass. App. Ct. 1992). BancInsure has been unable to

---

[73]     Part I, 30(b)(6) Depo. of the Bank, 130:4-131:1; Part II, 30(b)(6) Depo. of the Bank, 19:5-21:8. Mr. Hill also stated that "if we had that 400,000 it's a very real possibility that when [the FDIC] came in and did their examination last year our risk classification that we talked about a while ago may not have gone down to what it did go down to." Part II, 30(b)(6) Depo. of the Bank, 28:4-25.

[74]     Part I, 30(b)(6) Depo. of the Bank, 138:1-139:9.

quantify the exact amount of the Bank's claim that falls under exclusion (u). However, it appears that an $8,400 charge for attorneys' fees and updated appraisals on the Pike County Property (included in the Loan's payment history) would be excluded[75] and that inasmuch as the Bank incurred attorneys' fees to establish the existence or amount of its claim, those too would be excluded.

iv.     **The unpaid balance of the Reworked Loan.**

The amount of the Bank's damage claim not subject to exclusions is $313,743.22. BancInsure reaches this number by starting with Mr. Hill's testimony identifying unpaid balance of the Reworked Loan as approximately $337,000.[76] Of the $337,000 Loan balance, Mr. Hill's testimony also showed that an additional $23,256.78 is excluded indirect loss, or costs incurred in establishing the Bank's claim on the Bond. Specifically, Mr. Hill testified that a charge for $8,400 included in the Loan's payment history for attorneys' fees and updated appraisals on the Pike County Property was added to the Loan's balance.[77] Mr. Hill further testified that separate charges for $3,000 and $11,85.78 included in the Reworked Loan's payment history were for attorneys' fees and appraisal fees related to additional collateral taken by the Bank and were added to the balance of the Reworked Loan.[78]

3.     **There remains a genuine issue of material fact as to whether Deer received an improper financial benefit *in connection with* the Loan.**

The Bank, not BancInsure, bears the burden to prove that the Bank's alleged losses are covered under the Bond. *Performance Autoplex II. Ltd. v. Mid-Continent Cas. Co.*, 322 F.3d 847,

---

[75]     *Id.,* 60:3-10; *See also* Payment History, Exhibit "Q" to the Bank's Motion.
[76]     Part I, 30(b)(6) Depo. of the Bank, 125:8-12.  Mr. Hill was unable to give a precise amount because he was unable to recall the exact amount of money that the Bank recovered from the Phillips' bankruptcy. *Id.*
[77]     Part I, 30(b)(6) Depo. of the Bank, 60:3-10; *See also* Payment History, Exhibit "Q" to the Bank's Motion.
[78]     Part I, 30(b)(6) Depo. of the Bank, 67:8-68:3,

856 (5th Cir. 2003); *Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 625 (5th Cir. 2008). Under the plain and unambiguous terms of Insuring Agreement (A), the Bank must prove: (1) that it sustained a loss resulting directly from dishonest or fraudulent acts committed by an Employee; (2) the Employee committed the dishonest or fraudulent acts in question with the manifest intent to cause the Bank to sustain a loss or to obtain an improper financial benefit for the Employee or for another person or entity; (3) that the Employee was in collusion with one or more parties to the transaction; and (4) that the Employee has received an improper financial benefit "in connection with the transaction." Even if the Bank could satisfy its burden to show the first three elements of Insuring Agreement (A), there remains a genuine issue of material fact as to whether the Bank has shown that Deer received an improper financial benefit *in connection with* the Loan. Summary judgment must be denied.

Although the Bank has pointed to several alleged financial benefits it has recently claimed were received by Deer, it has neglected to show that any specific benefit was received *in connection with* the Loan or even that certain claimed financial benefits were improper. It is particularly important to remember that Deer and Phillips had an ongoing business relationship from at least 2000 through 2006, during which time Deer handled hundreds of real estate transactions for Phillips and or his various real estate development companies.[79]  In light of this ongoing business relationship, Deer's use of Phillips' office space for the six year duration of his business relationship with Phillips is not tinged with impropriety and has no apparent specific connection to the Loan. Phillips deposition testimony failed to identify such a connection.[80] This is similarly true of Deer's use of Phillips' storage space and the alleged free notarial services

---

[79]     Depo. of Phillips, 36:1-37:7, 38:20-40:12 43:3-23, 45:11-47:25, Exhibit "E."
[80]     *Id.*, 36:10-37:7, 44:14-23.

supplied Deer, both of which pre-dated and post-dated the Loan.[81] The Bank's sole source of evidence in support of these claimed benefits is Phillips' deposition testimony, wherein he repeatedly testified that he could not specifically tie them to the Loan.[82]

As to the two houses Deer bought from Phillips allegedly "cheaper than appraisal," this claim is likewise founded solely on Phillips' testimony that the houses had been sold at a discount to Deer, although he could not remember the amount of the claimed discount.[83]   Of these two houses, one was sold in 2000 and the other in 2003—both well before the Loan.[84]  Not only did Phillips' testimony show that neither house was sold in connection with the Loan, he testified that the Loan had not even been contemplated at the time either house was sold.[85]  The Bank has similarly been unable to tie Deer's family's use of Phillips' duck camp to the Loan.[86] Additionally, the claimed discounted rent received by Deer's daughter (to the extent that this could even be considered an improper financial benefit received by Deer) is founded solely on Phillips' testimony and the Bank has wholly neglected to show that it was in any way linked to the Loan, especially considering that (according to Phillips' testimony) Deer's daughter did not rent the apartment until well after the Loan was made.[87]

Although the Bank points to monetary transfers between Phillips and Deer over the years, they too are consistent with the six-year business relationship and friendship between Phillips and Deer. The Bank's sole source of evidence as to any impropriety is Phillips' deposition

---

[81]      *Id.*, 44:14-23, 45:8-17. Phillips' testimony on the issue of Ms. Stinson's salary is wholly insufficient to show the actual receipt of a financial benefit as Phillips' testimony showed only that he did not know whether Deer had paid Ms. Stinson for notarial services. *Id.*

[82]      *Id.*, 44:14-23, 45: 8-17, 101:9-14. 106:18-107:1.

[83]      *Id.*, 38:20-39:8, 40:2-41:20, 102:2-103:9.

[84]      *Id.*, 38:20-39:8, 40:2-41:20, 102:2-103:9.

[85]      *Id.*, 38:20-39:8, 40:2-41:20, 102:2-103:9.

[86]      *Id.*, 43:3-23, 104:3-12.

[87]      *Id.*, 82:10-18.

wherein Phillips was unable to attribute any specific monetary transaction to the Loan.[88] The Bank neglects to mention that Phillips testified that this money was expected to be repaid[89] or that Phillips attempted to recover money owed him by Deer by convincing Deer to grant him a deed of trust on one of Deer's properties, on which Phillips subsequently foreclosed and sold.[90] The Bank has not proven that Deer received any improper financial benefit *in connection with the Loan.* BancInsure believes that this failure is fatal to the Bank's claim but it at a minimum creates a genuine issue of material fact as to this required element for coverage.

**B.    The Bank cannot recover punitive damages.**

Under Mississippi law, any party seeking punitive damages bears a heavy burden of proof, as such damages are "considered an extraordinary remedy and are allowed with caution and within narrow limits." *Life & Cas. Ins. Co. of Tenn. v. Bristow,* 529 So. 2d 620, 622 (Miss.1988); *Broussard v. State Farm Fire & Cas. Co.,* 523 F.3d 618, 628 (5th Cir. 2008); *U.S. Fid. & Guar. Co. v. Martin,* 998 So. 2d 956, 970 (Miss. 2008); *GuideOne Ins. Co. v. Bridges,* 2009 U.S. Dist. LEXIS 16035, 3-5 (S.D. Miss. Mar. 2, 2009) ("It is well settled in Mississippi that punitive damages are to be assessed only in extreme cases."). Under Section 11-1-65(1)(a) of the Mississippi Code Annotated "[p]unitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the  safety of others, or committed actual fraud." *Broussard,* 523 F.3d at 628 (citing MISS. CODE ANN. § 11-1-65(1)(b)-(c)). Additionally, punitive damages are only available to those parties that have proved entitlement to compensatory damages. *Id.* (citing *Sobley v. S. Nat. Gas Co.,* 302 F.3d 325, 330 (5th Cir. Miss. 2002). As BancInsure investigated

---

[88]    *Id.,* 30:22-31:17, 32:9-18.
[89]    *Id.,* 67:21-68:4, 113:21-114:1.
[90]    *Id.,* 63:19-64:2.

the Bank's claim in good faith and continues to have a good faith basis for its denial thereof, the Bank is wholly unable to satisfy its heavy burden to show entitlement to punitive damages and its motion for partial summary judgment on this issue must be denied. Further, as is more fully explained in BancInsure's memorandum in support of its motion for partial summary judgment, the Bank's claim for punitive damages fails as a matter of law and BancInsure is entitled to summary judgment on this issue.

### 1.    BancInsure has an arguable basis for its denial of the Bank's claim.

In order to recover punitive damages, the Bank first bears the burden of proving that BancInsure had no arguable basis for denying its claim. *State Farm Mut. Auto. Ins. Co. v. Grimes*, 722 So. 2d 637 (Miss. 1998). As defined by Mississippi law, an "arguable basis" is "a reason 'sufficiently supported by credible evidence as to lead a reasonable insurer to deny the claim.'" *Sobley*, 302 F.3d at 341 (quoting *Grimes*, 722 So. 2d at 642). Courts have found that an insurer had an arguable basis for denying a claim, even if the insurer's argument is ultimately found to be incorrect. *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 533 (Miss. 2003); *Dauro v. Allstate Ins. Co.*, 114 Fed. Appx. 130, 135 (5th Cir. 2004); *GuideOne Mut. Ins. Co. v. Rock*, 2009 U.S. Dist. LEXIS 65354 (N.D. Miss. July 28, 2009). As is more fully explained above, most of the Bank's damage estimate consists of claims that are either not "loss" under the Bond or are unambiguously excluded from coverage. As to the remainder of the Bank's claim, the Bank has consistently failed to point to an improper financial benefit received *in connection with* the Loan. BancInsure clearly had an arguable basis for its denial of the Bank's claim and continues to have an arguable basis for its nonpayment of the balance of the Reworked Loan.

In determining whether an arguable basis existed for the denial of the Bank's claim, the court should consider the facts available to BancInsure "at the time the claim was denied."

*Grimes*, 722 So. 2d 637. The reasonableness of BancInsure's coverage denials is apparent when taken in context with the information supplied by the Bank. With respect to the Bank's original claim, for which BancInsure declined coverage on May 3, 2006, the Bank wholly failed to show coverage. It was clear at that time (and remains so) that because the Bank's loss was the result of its loan to Phillips, exclusion (e) applied and excluded coverage under the Bond unless the Bank's claim was covered under Insuring Agreement (A), (D), (E), (P) or (Q). On the information submitted at that time, Ms. Edwards concluded that Insuring Agreement (E) was most applicable to the Bank's claim, and BancInsure declined coverage because the Bank extended the Loan in reliance on a defective title opinion and title opinions are not included within the specific list of documents to which Insuring Agreement (E) applies. The Bank neither claimed nor submitted evidence to show that Deer's December 2004 title opinion was fraudulent or otherwise dishonest.[91] It was merely claimed that Deer's title opinion failed to disclose prior and subsequent liens on the Pike County Property. The Bank did not claim that it had retained Deer or that Deer had acted as its employee in supplying his December 2004 title opinion, so Insuring Agreement (A) was deemed inapplicable.[92] Even though BancInsure expressly requested that the Bank supply any additional information that might change its coverage opinion, it did not hear from the Bank until Ms. Reeves' December 22, 2008 letter—**2½ years after its original coverage denial.**[93] *See Sobley,* 302 F.3d at 339.

Upon receipt of Ms. Reeves' December 22, 2008 letter, BancInsure and KPA promptly reopened their files and reevaluated the Bank's claim in light of the new information supplied.[94] The Bank submitted sufficient information to show that Deer fit the definition of an "Employee"

---

[91]   March 28, 2006 letter from Larry B. Hill to Van Butler, Exhibit "T" to the Bank's Motion.
[92]   May 3, 2006 Letter..., p. 2, Exhibit "V" to the Bank's Motion
[93]   *Id.*; 30(b)(6) Deposition of BancInsure, 63:5-9, Exhibit "3."
[94]   30(b)(6) Deposition of BancInsure, 63:10-20, 89:1-13.

under definition (m)(2) of the Bond and further claimed that Deer's December 2004 title opinion (and his subsequent actions) was not simply defective, it was fraudulent. This meant that exclusion (h) of the Bond, which excludes "loss caused by an Employee," applied to exclude coverage for the Bank's claim under the Bond unless the claim was covered under Insuring Agreement (A). Ms. Edwards promptly wrote to the Bank and requested documentation of the "improper financial benefit" required to show coverage under Insuring Agreement (A).   In response, the Bank claimed that the fee it paid Deer for his December 2004 title opinion satisfied the requirements of Insuring Agreement (A).[95] This assertion is contrary to the express language of Insuring Agreement (A), which clearly provides that the term "financial benefit does not include any employee benefits earned in the normal course of employment, including...fees," and the overwhelming weight of legal authority, including Fifth Circuit precedent on point.[96] The Bank failed to respond to BancInsure's coverage denial letter and supplied no additional information to BancInsure that might trigger any duty to reevaluate its claim prior to filing suit. *Sobley*, 302 F.3d at 339.

It appears that the Bank has finally realized that the fee Deer received does not satisfy the Bond's requirement of actual receipt of an improper financial benefit, since the Bank failed to include it as an alleged financial benefit in its Memorandum of Authorities. Indeed, Deer's fee

---

[95]     February 9, 2009 letter..., Exhibit "Y" to the Bank's Motion. As to the bankruptcy court opinion pointed to by the Bank in Ms. Reeves' February 9, 2009 letter, it is clear that Ms. Edwards' analysis of that document was correct—it showed that Deer made improper use of his trust account but did not show any connection to Phillips (other than the fact that Phillips was one of Deer's clients) or the Loan.

[96]     *See, e.g., Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.*, 322 F. 3d 847, 850, 852 (5th Cir. 2003); *Resolution Trust Corp. v. Fid. & Dep. Co. of Md.*, 205 F.3d 615, 648 (3d Cir. 2000) (finding that "the term 'earned' encompasses financial benefits both fraudulently obtained and honestly earned from the employer"); *Hudson United Bank v. Progressive Cas. Ins. Co.*, 112 Fed. Appx. 170 (3d Cir. 2004); *Mun. Sec., Inc. v. Ins. Co. of N. Am.*, 829 F.2d 7, 9-10 (6th Cir. 1987) (*per curiam*); *Mortell v. Ins. Co. of N. Am.*, 458 N.E.2d 922, 929 (Ill. App. 1983); *Benchmark Crafters, Inc. v. Nw. Nat'l Ins. Co.*, 363 N.W. 2d 89, 91 (Minn. Ct. App. 1985); *Dickson v. State Farm Lloyds*, 944 S.W. 2d 666, 668 (Tex. App. 1997); *Auburn Ford-Lincoln-Mercury, Inc. v. Univ. Underwriters Ins.*, 967 F. Supp. 475, 479 (M.D. Ala. 1997).

was the only financial benefit cited by the Bank for several months after it filed suit against BancInsure. It was not until November 2009 that the Bank pointed to any other alleged financial benefit received by Deer, at which time it supplied BancInsure with checks made payable to Deer with no reference to specific title opinions or services rendered—in short, nothing to tie them to the Loan except that they were dated during the time period between January 28, 2004 through May 2, 2005.[97] Neither did the Bank supply BancInsure with any information indicating that these monetary transfers were improper—*i.e.,* that they were not payments for legal fees that would fall outside the definition of an "improper financial benefit." Similarly, the records supplied by the Bank on May 7, 2010, showed only financial transfers without any accompanying tie to the Loan or showing of impropriety (*i.e.,* that they were not legal fees "earned in the normal course of employment").

Finally, on June 1, 2010, only two months ago, the Bank deposed Phillips himself, which testimony is detailed more fully above. While the Bank is correct that Phillips testified that many of the financial transactions it now points to were either loans or kites, it neglected to mention that Phillips also testified that they were made with the expectation of repayment and that Phillips himself took legal action to collect money from Deer. Most importantly, Phillips could not specifically tie any financial transfer to Deer's 2004 title opinion or the Loan. In light of Phillips' testimony, the Bank continues to be unable to show coverage under Insuring Agreement (A) of the Bond. Even if the court found that Phillips' testimony was sufficient to trigger coverage for the non-excluded portion of the Bank's damages claim, Phillips' failure to tie any financial transfer to the Loan is at minimum, an arguable basis, asserted in good faith, sufficient to preclude any assessment of punitive damages for the past two months. *See Broussard*, 523

---

[97]    *See* 11/12/09 Letter, Exhibit "CC" to the Bank's Motion.

F.3d at 628 (the insurer "need only show that it had reasonable justifications, either in fact or in law, to deny payment"). The Bank's motion for summary judgment must be denied.

**B.      BancInsure handled the Bank's claim in good faith.**

BancInsure had and continues to have an arguable, good faith basis for denying the Bank's claim, which precludes any award for punitive damages. Even if the Bank could show that BancInsure lacked an arguable basis for denial of its claim (which it cannot), the Bank's claim for punitive damages would fail because the Bank has wholly failed to allege, much less prove, the type of malice, gross negligence or reckless disregard sufficient to support an award for punitive damages. *See Broussard,* 523 F.3d at 628; *McKneely,* 862 So. 2d at 533.

The Bank's chief complaint against BancInsure is simply that BancInsure has not paid its claim and Mr. Hill could recall no tortious conduct by BancInsure:

> Q.    Your basic complaint about BancInsure is that they didn't pay the claim, correct?
> A.    Yes.
> Q.    In your dealings we [sic] BancInsure, has anybody insulted you, lied to you, or done something of that nature?
> A.    They haven't insulted me, other than –
> Q.    Not paying the claim?
> A.    Not paying their claim.
> Q.    Have you had any contact with anybody representing BancInsure, other than my law firm?
> A.    I've had, you know, letters from Judy Edwards, Van Butler. I can't think of any others.[98]

Having utterly failed to make the requisite showing of malice or gross negligence, the Bank urges the Court to abandon Mississippi law, adopt Pennsylvania law, and hold BancInsure liable for punitive damages based solely on the lone opinion of a Pennsylvania state court judge wherein he found that an insurer's refusal to defend its insured under a comprehensive general liability policy amounted to bad faith under 42 Pa. Cons. Stat. § 8371 due to, *inter alia,* "a lack

---

[98]     Part I, 30(b)(6) Depo. of the Bank, 140:11-25, Exhibit "7."

of guidelines for claim investigations and determination of claims." *See Upright Material Handling, Inc. v. Ohio Cas. Group*, 2005 Pa. Dist. & Cnty. Dec. LEXIS 131 (Pa. County Ct. 2005). Not only is this case not binding, it is wholly inapplicable as Pennsylvania law imposes a lower standard on the insured seeking to recover bad faith damages against an insurer than the showing required under Mississippi law. *See id.* The Bank has cited to no requirement under Mississippi law that BancInsure have written policies, procedures or guidelines, much less to any Mississippi court decision holding that BancInsure's unwritten policy that KPA "investigate each claim as a separate individual claim," is legally insufficient.[99]

Under Mississippi law, the law applicable to this case, the Bank's punitive damages claim fails as a matter of law. *See Martin,* 998 So. 2d at 970 (affirming grant of summary judgment to the insurer where the insurer "merely received a claim from the Plaintiff, investigated the cause of the loss, interpreted its policy and denied coverage" and finding no evidence that the insurer "conducted itself in such a way as to call for the imposition of punitive damages"); *Dueringer v. Gen. Am. Life Ins. Co.*, 853 F.2d 283, 287 (5th Cir. 1988) (reversing trial court's punitive damages award where the insurer negligently applied a stricter definition of a policy term than required under the policy, but the insured failed to contest the insurer's interpretation of the policy term prior to filing suit).

3.      **BancInsure investigated the Bank's claim in good faith.**

As evidenced by BancInsure's Statement of Facts (Section II, *infra*) the Bank's bad faith claim relies primarily on a strategic omission of any and all of BancInsure's actions to investigate and adjust the Bank's claim in good faith, including interviews with the insured, requests for information and review of information received. The Bank's allegation that

---

[99]     30(b)(6) Depo. of BancInsure, 10:1-12:24, Exhibit "3.".

BancInsure denied its claim "without taking any actions to investigate the claim" is untrue and has no basis in fact or law. This alone should defeat summary judgment. The Bank's claim that BancInsure should have gone beyond the information submitted by the Bank (which clearly failed to show coverage) and conduct an independent investigation designed to satisfy the Bank's burden to show coverage is similarly without merit.

In order to recover against an insurer for an alleged bad faith failure to investigate its claim, the insured must show that "the insurer's behavior in writing the policy or handling the claim 'breaches an implied covenant of good faith and fair dealing and rises to the level of an independent tort.'" *GuideOne*, 2009 U.S. Dist. LEXIS 65354; *Broussard,* 523 F.3d at 628. The insured's burden of proof "goes beyond proving mere negligence in performing the investigation"; rather, "[t]he level of negligence in conducting the investigation must be such that a proper investigation by the insurer would easily adduce evidence showing its defenses to be without merit." *McKneely*, 862 So. 2d at 534; *Windmon v. Marshall*, 926 So. 2d 867, 873 (Miss. 2006). The Bank simply has not met this burden of proof. This is especially evident given the fact that despite its unfettered access to the Loan documents, subpoenas issued to several Banks, documents received by the FDIC and its recent deposition of Phillips, the Bank has failed to identify an improper financial benefit received by Deer *in connection with* the Loan. The Bank has supplied no evidence that suggests that BancInsure could have succeeded where it failed, much less that it could have done so "easily."

The Bank's argument is also undercut by its abject failure to submit sufficient information to show coverage under the Bond prior to filing suit and *by the 2½ year gap in communication after BancInsure's initial denial of its claim.* As the Fifth Circuit stated in *Sobley v. Southern Natural Gas Co.*, "although an insured may argue there should have been a

more complete investigation, 'there simply was no bad-faith breach of any duty to the insured who passively accepted the fact finding of the insurer's investigation.'" 302 F.3d at 339. The *Sobely* court held that, under the facts of that case, which involved a two-year silence on the part of the insured, absent the insured's submission of additional information to the insurer, that insurer's duty to reevaluate its position is not triggered. *Id.* Further, as is evidenced by *Sobely*, while BancInsure retains a duty to evaluate the Bank's claim, the Bank has pointed to no post-litigation conduct on the part of BancInsure sufficient to breach its duty of good faith to the Bank or sufficient to rise to the level of an independent tort. *Id.* (dismissing the insured's allegation that the insurer's litigation tactics breached its duty of good faith).

That the Bank, in hindsight, chooses to nitpick BancInsure's investigation, does not render BancInsure's investigation insufficient especially as it is the Bank's burden, not BancInsure's, to show the existence of a covered claim. The Bank complains that BancInsure did not request its own title opinion or conduct an independent inspection of the Pike County property records, yet ignores the fact that BancInsure has not disputed the validity of the independent title opinion supplied by the Bank, rendering another title opinion wholly unnecessary. Similarly, the Bank complains that BancInsure has not interviewed Mr. Deer or Ms. Stinson, yet supplies no explanation as to why it failed to do so.

The cases relied on by the Bank, *Stewart v. Gulf Guar. Life Ins. Co.*, and *Spansel v. State Farm Fire & Cas. Co.*, are inapposite. In both cases the insured first showed a covered claim and the insurer then applied a policy exclusion to deny coverage without reviewing a single document. *Stewart,* So. 846 2d 192, 199 (Miss. 2002); *Spansel*, 683 F. Supp. 2d 444, 449 (S.D. Miss. 2010).[100] In *Spansel*, the insurer applied a water exclusion to wind damage solely on the

---

[100]   The facts of *Stewart* wer e particularly egregious and were largely the basis for the court's determination that the jury verdict awarding punitive damages should be reinstated. *See* 846 2d at 199.

basis of the homeowner's proximity to the Gulf of Mexico after Hurricane Katrina without reviewing a single photograph of the damage. 683 F. Supp. 2d at 449. Here, in contrast to *Spansel* and *Stewart*, the Bank is a sophisticated insured from which BancInsure requested and reviewed documentation.[101] Unlike in *Spansel* and *Stewart*, BancInsure's denial resulted from the Bank's failure to submit documentation showing a covered claim. Further, because of the procedural posture of *Spansel* and *Stewart*, the courts in both cases were viewing the evidence in the light most favorable to the insured—a benefit to which the Bank is not entitled on its Motion.

The Bank's claim for bad faith failure to investigate is without a basis in fact or in law. The Bank's sole support for this claim is its self-serving omission of all claims handling activities undertaken by BancInsure.

## IV.   CONCLUSION

Therefore, BancInsure, Inc., requests that the Court deny the Motion for Partial Summary Judgment filed by Peoples Bank of the South f/k/a Peoples Bank of Franklin County.

---

Mr. Stewart was an illiterate man who purchased insurance he was told would cover his loan payments if he became sick but was not supplied with copies of the applicable policy and was not asked relevant health questions. *Id.* When he became sick the insurance company denied coverage based on a preexisting condition exclusion unknown to Stewart without even requesting a copy of his medical file. *Id.*

[101]   The Standard Form 24 Bond is an agreement whose basic terms have been negotiated and drafted over the years by the Surety Association of America and the American Bankers Association, two entities of relatively equal bargaining power who are equally responsible for its text. *FDIC v. Ins. Co. of N. Am.,* 105 F.3d 778, 786 (1st Cir. 1997); *Citibank Tex., N.A. v. Progressive Cas. Ins. Co.,* 522 F.3d 591, 596 (5th Cir. 2008); *Calcasieu-Marine Nat'l Bank v. Am. Employers' Ins. Co.,* 533 F.2d 290, 295 n.6 (5th Cir. 1976).

Respectfully submitted,

KREBS, FARLEY & PELLETERI, PLLC


_/s/  Ellie B. Word_
DAVID J. KREBS, Special Bar
MATT J. FARLEY, Special Bar
ELLIE B. WORD, MSB#100408
ALEC M. TAYLOR, MSB#102874
One Jackson Pl,ace, Suite 900
188 East Capitol Street
Jackson, Mississippi 39201
601/ 968-6710 (telephone)
601/ 968-6708 (facsimile)
_Attorneys for BancInsure, Inc._


## CERTIFICATE OF SERVICE

I, Ellie B. Word, do hereby certify that a copy of the foregoing Memorandum in Opposition to Peoples Bank of the South's Motion for Partial Summary Judgment has been served via the ECF System to the following:

Mr. W. Whitaker Rayner
Ms. April D. Reeves
Watkins Ludlam Winter & Stennis, P.A.
P.O. Box 427
190 East Capitol Street, Suite 800
Jackson MS 39205-0427

This the 13th day of August, 2010.

_/s/ Ellie B. Word_
Ellie B. Word