**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

**PEOPLES BANK OF THE SOUTH**
**f/k/a PEOPLES BANK OF FRANKLIN COUNTY**                                       **PLAINTIFF**

**V.**                                                            **CAUSE NO. 3:09-cv-217-TSL-FKB**

**BANCINSURE, INC.**                                                              **DEFENDANT**

**PEOPLES BANK OF THE SOUTH'S REPLY BRIEF**
**IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Peoples Bank of the South f/k/a Peoples Bank of Franklin County ("Peoples Bank")

submits this its Reply Brief in Support of its Motion for Partial Summary Judgment and states

the following:

**I.**
**INTRODUCTION**

This Motion for Partial Summary Judgment boils down to whether the responsibility for

payment under a Financial Institution Bond ("Bond") issued by BancInsure, ostensibly to protect

Peoples Bank for damages arising out of fraud by its employees (and attorneys), may be ignored

because of an inability to identify to a specific dollar amount, the vast benefits received by

Peoples Bank's attorney Dwayne Deer ("Deer") in connection with the fraudulent scheme.  Such

issue is raised by BancInsure despite the fact that both Deer, and his accomplice, Todd Phillips

("Phillips"), have both plead guilty to fraud arising out of a grand scheme of illegal transactions,

despite the fact that Phillips admits he gave improper financial benefits to Deer for his part in

defrauding Peoples Bank in the transaction giving rise to the claim, and despite the fact that the

Bond only requires Peoples Bank to show that the improper financial benefit was received "in

connection with" the loan to Todd Phillips Investments ("TPI") (hereinafter "the Loan").   If

coverage does not exist in this set of circumstances, coverage on the Bond can never exist. If BancInsure's abject denial of coverage does not constitute bad faith, bad faith can never exist.

Peoples Bank has moved for partial summary judgment as to liability and not as to damages. In its Response, BancInsure argues several specific issues as to damages, all of which fall outside the limited scope of Peoples Bank's Motion for Partial Summary Judgment regarding **liability**. Thus, it appears that BancInsure is simply attempting to re-argue its own Motion for Partial Summary Judgment. Therefore, to the extent that BancInsure's Response addresses specific damage issues, it should be stricken and not considered by this Court. The amount of damages to which Peoples Bank is entitled is a question for the jury. To the extent that the Court chooses to consider the damages arguments in BancInsure's Response, Peoples Bank incorporates its Memorandum in Opposition to BancInsure's Motion for Partial Summary Judgment [Doc. No. 90].

This Court should grant Peoples Bank's Motion for Partial Summary Judgment for two reasons. First, Peoples Bank has demonstrated a covered loss under the Bond issued by BancInsure to Peoples Bank. Secondly, Peoples Bank has demonstrated bad faith in BancInsure's investigation and denial of Peoples Bank's claim. Peoples Bank has further shown that BancInsure's actions warrant punitive damages. In its Response, BancInsure has failed to show a meritorious defense to the claims alleged by Peoples Bank. Thus, Peoples Bank is entitled to summary judgment regarding BancInsure's liability.

## II.
## ARGUMENT

### A.    Peoples Bank's Claim Is Covered By the Bond.

Under Mississippi law, a burden shifting approach applies in coverage cases. *Corban v. United States Auto. Assoc.*, 20 So.3d 601, 618 (Miss. 2008). "The insured [plaintiff] has the

initial burden [at trial] to prove that the loss occurred." *Id.*  Once an insured has satisfied its burden, the burden of proof then shifts to the insurer to show that an exclusion applies. *Id.* at 18-19.

BancInsure frequently conflates Peoples Bank's burden of proof at trial with its obligations when making a claim on the Bond.  *See* BancInsure Resp. at p. 22.  BancInsure frequently states that Peoples Bank bore the burden of ***proving*** a covered loss during the investigation.  However, following a loss, an insured is obligated only to provide notice of the loss and to cooperate with the investigation.  "Following a loss covered by an insurance policy, an insurer is entitled to notice of the loss, to proof thereof, and an opportunity to investigate the loss." Jeffery Jackson, Miss. Ins. Law & Prac. § 8:1 (2010) (citing *Aetna Life Ins. Co. v. Walley*, 164 So. 16, 19 (Miss. 1935)).  The insured has various duties including "to provide a notice of loss, to file a proof of loss, to cooperate with the insurer's investigation and to respond to the insurer's request for information." *Id.*; *see also* Couch on Insurance 3d Ed. § 186:4 (the insured must provide the "core facts of the claim to the insurer").  In contrast, "[t]he occurrence of a covered loss triggers obligations of the insurer under the insurance contract.  Those post-loss obligations include the duty to investigate and evaluate first party claims. . . ."  Jeffery Jackson, Miss. Ins. Law & Prac., § 10:1.

Despite BancInsure's argument to the contrary, Peoples Bank met its duty in making a claim on the Bond and has now satisfied its burden before the Court by proving a covered loss under the policy.  BancInsure has failed to demonstrate that an exclusion bars coverage.  Thus, Peoples Bank is entitled to summary judgment as to coverage on the Bond.

1.      **Peoples Bank Has Proven Coverage Under Insuring Agreement (A).**

BancInsure argues that a genuine issue of material fact remains regarding whether Deer received an improper financial benefit in connection with the Loan.  BancInsure Resp. at

pp. 22-25.  Specifically, BancInsure argues that Peoples Bank has merely demonstrated that Deer received financial benefits, but that Peoples Bank has "neglected to show that any *specific benefit* was received in connection with the Loan or even that certain financial benefits were improper." *Id.* at p. 23 (emphasis added).  However, the language of the Bond only requires that the improper financial benefit be "in connection with" the Loan.  *See* Bond at p.1, ¶ A (attached hereto as Ex. A).  In Phillips' deposition, he directly stated that Deer benefitted as a direct result of his rendering fraudulent title opinions, which included the Peoples Bank Loan:

> Q.    You described the relationship between you and Mr. Deer as two piles where he would give you things and you would give him things.  Would an example of the type of things that Mr. Deer gave to you be providing false title opinions?
> A.    Yes.
> Q.    And would an example of the type of things that you gave to Mr. Deer be loans, kiting of checks, office space, storage units, an apartment to his daughter?  Would those be an example?
> A.    All of those would be an example.
> Q.    And that relationship that you had with Deer where you provided services to one another, that was in connection to a multitude of loan transactions, correct?
> A.    Yes, ma'am.
> Q.    And the loan to Todd Phillips Investments in December of 2004 was one of those loan transactions?
> A.    Yes, ma'am.  . . .

Phillips Dep. at 122-23 (relevant portions attached hereto as Ex. B).  Phillips further testified:

> Q.    … Mr. Deer provided false title opinion to you—excuse me, to banks for several different loans that you obtained?
> A.    Correct.
> Q.    And one of those loans is this loan to Peoples Bank?
> A.    That's correct.
> Q.    And in exchange for providing false title opinions on all of these various loans, he received items of value from you, including rent and loans?
> A.    Correct.
> Q.    And one of those fraudulent loans that he would have received value for is the loan at Peoples Bank.
> A.    Correct.

*Id.* at 31-32.  Phillips plainly admitted that Deer received an improper financial benefit in connection with the Loan at issue:

> Q.    There was an ongoing scheme, an agreement between you and Mr. Deer to take actions to defraud various banks?
> A.    Correct.
> Q.    And in connection with the actions that Mr. Deer performed in order to defraud those banks, he received items of value?
> A.    Correct.
> Q.    And included in those loans is the loan to Peoples Bank?
> A.    Correct.

*Id.* at 33-34.

BancInsure attempts to recharacterize the bond language with a standard not appearing on the face of the document.  BancInsure repeatedly uses the words "***specifically tied***" and "***tied specifically***" in its brief, when the plain language of the Bond only requires an improper financial benefit "in connection with" the Loan.  BancInsure Resp. at p. 13; *compare with*, Bond at p. 1, ¶ A.  The plain meaning of "connection" is "a relationship in which a person, thing or idea is linked or associated with something else."  *www.oxforddictionaries.com* (attached hereto as Ex. C).  Whereas, the plain meaning of "specific" is "clearly defined or identified."  *Id.*  The two words have distinctly different meanings with "specifically tied" being a much higher threshold than is required by the Bond.  BancInsure cannot be allowed to artificially elevate the standard prescribed by the Bond language.  The facts as demonstrated herein clearly demonstrate that Deer received an improper financial benefit "in connection with" the Loan.

Next, BancInsure argues that due to Phillips' and Deer's "ongoing business relationship," all of the financial benefits Phillips gave Deer were not "improper."  BancInsure Resp. at p. 23.  Deer's initial title opinion was dated December 8, 2004; the Loan closed on December 23, 2004; and Deer's final title opinion was issued on April 8, 2005.  Phillips testified specifically that

during this timeframe that ***none*** of the payments made to Deer were legitimate payments or were legitimate loan transactions:

> Q.    Exhibits 23 through 35 are a series of payments to Dwayne Deer by Todd Phillips and Todd Phillips Investments and payments by Dwayne Deer back to Todd Phillips.  And the date range of those is from October of '04 to June of '05.  When we asked you questions about payments that were made to Deer during that period, your response was that it would either be a check kiting or a loan.
>          Are all payments that were made to Deer during that time period of October of '04 to June of '05-was every payment made to Deer during that time period have been either check kiting or a loan?
> A.    To my knowledge, yes, ma'am.
> Q.    None of those would have been legitimate payments and legitimate loan transactions?
> A.    No, ma'am, not to my knowledge.

Phillips' Dep. at 123-124.  Phillips also specifically testified that loans he obtained with Deer's assistance during this timeframe were fraudulent:

> Q.    So, in '04 and '05, a hundred percent of the loans you did with Dwayne Deer were fraudulent?
> A.    That's my recollection.

*Id.* at 118.

Finally, BancInsure argues that Phillips attempted to recoup the money loaned to Deer by "convincing Deer to grant him a deed of trust on one of Deer's properties, on which Phillips subsequently foreclosed and sold."  BancInsure Resp. at p. 25.  BancInsure contends that this somehow makes the financial benefit no longer improper.  *Id.*  At his deposition, Phillips testified:

> Q.    You said you gave him multiple cash loans?
> A.    Yes, sir.
> Q.    Did those loans—were they true loans that you expect to be repaid?
> A.    Yes.
> Q.    And that would be why—
> A.    But I didn't care if he paid me.
> Q.    You didn't care if he paid you?
> A.    No.

> Q.     Then why did you seek a legal action against Mr. Deer, Exhibit 36?
>
> A.     To get that money—to get that land.  I had land joining that land.
>
> BY MR. TAYLOR:
>
> Q.     Okay.  Okay.  So you personally did not care if he repaid you?
>
> A.     No, because he paid me in other ways.

Phillips Dep. at pp. 104-05.  Further, it was only a portion of the funds that Phillips gave to Deer that he recouped.  *Id.* at pp. 125-26.  Moreover, even if Phillips had recouped all of the funds given to Deer, Deer financially benefitted from the interest-free use of those funds.  *Id.* at 124-26.

BancInsure has the burden to come forward with specific evidence that shows the existence of disputed issues of material fact as coverage under Insuring Agreement (A).  However, BancInsure points only to Phillips' credibility, which is insufficient to survive summary judgment.  *Gerhardt v. Hayes*, 317 F.3d 320, 322 (5th Cir. 2000)(On summary judgment "[a party] may not respond simply with general attacks upon [a witness'] credibility, but rather must identify affirmative evidence from which a jury could find that the [party] has carried his or her burden. . . .").  Although, BancInsure argues to the contrary, there are no disputed facts regarding whether Deer obtained an improper financial benefit *in connection with* the Loan and BancInsure has failed to point to the existence of any evidence which establishes a genuine issue of material fact.  Therefore, Insuring Agreement (A) clearly provides coverage under the Bond and Peoples Bank is entitled to summary judgment in this regard.

### 2.     Exclusion (h) Does Not Bar Coverage Under Insuring Agreements (E) and (Q).

Insuring Agreement E of the Bond also provides coverage for:

> Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,
>
> > (1)     acquired, sold or delivered, given value, extended credit or assumed liability on the faith of any original,

      (a)      Certificated Security,

      (b)      Document of Title,

      (c)      Deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,

      (d)      Certificate of Origin or Title,

      (e)      Evidence of Debt,[1]

      (f)      Corporate, partnership or personal Guarantee,

      (g)      Security Agreement,

      (h)      Instruction to a Federal Reserve Bank of the United States, or

      (i)      Statement of Uncertificated Security, which

            (i)      bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a Forgery,

            (ii)    is altered, or

            (iii)   is lost or stolen,

(2)      guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, endorsement or any items listed in (1)(a) through (h) above.  This includes loss resulting directly from a registered transfer agent accepting or instructions concerning transfer of securities by means of a medallion seal, stamp, or other equipment apparatus which identifies the Insured as guarantor, as used in connection with a Signature Guarantee Program, but such use or alleged use of said medallion seal, stamp, or other equipment apparatus was committed without the knowledge or consent of the Insured, and the Insured is legally liable for such loss,

(3)      acquired, sold or delivered, given value, extended credit or assumed liability on the faith of any item listed in (1)(a) through (d) above which is a Counterfeit.

Actual physical possession of the items listed in (1)(a) through (i) above by the Insured, its

---

[1] "Evidence of Debt" is defined as an instrument, including a Negotiable Instrument, executed by a customer of [Peoples Bank] and held by [Peoples Bank] which in the regular course of business is treated as evidencing the customer's debt to [Peoples Bank]."  Bond at p.14, ¶ (n).

> correspondent bank or other authorized representative is a condition precedent to the Insured's having relied on the faith of such items.
> A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

Bond at pp. 2-3, ¶ E (emphasis added). Insuring Agreement (Q) of the Bond also provides coverage for

> loss resulting directly from [the Bank] having, in good faith and in the ordinary course of business in connection with any loan, accepted or received or acted upon the faith of any real property mortgages, real property deeds of trust or like instruments pertaining to realty…which prove to have been defective by reason of the signature on such document of any person having been obtained through trick, artifice, fraud,…false pretenses or the signature on the…deed of trust having been obtained by or on behalf of such mortgagor or grantor through trick, artifice, fraud,…or false pretenses or the signature on the…deed of trust having been obtained by or on behalf of such mortgagor or grantor through trick, artifice, fraud,…or false pretenses.

*Id.* at p. 7, ¶ Q.

With regard to Insuring Agreements (E) and (Q), BancInsure does not dispute that Peoples Bank has shown a covered loss under these Agreements. Rather, BancInsure contends that coverage under Insuring Agreements (E) and (Q) is excluded by Exclusion (h) of the Bond, and that "the Bank has claimed throughout this litigation that its loss was the direct result of employee dishonesty. . . ." BancInsure Resp. at p. 14.

Exclusion (h) excludes coverage for "loss caused by an Employee, except when covered under Insuring Agreement (A) or [other provisions not applicable in this matter]." Bond at p. 17. Despite now relying on this "loss caused by an Employee" exclusion, when questioned regarding the cause of Peoples Bank's loss, BancInsure earlier took the position that the loss is partially caused by Phillips' failure to pay the loan:

> Q.    And would you agree that Peoples Bank's loss was caused by the dishonest acts of Dwayne Deer?

> A.   That was part of…part of the basis of their loss.
> Q.   What is the other basis for their loss?
> A.   Todd Phillips didn't pay off his loan.

BancInsure Dep. at 204 (ellipses in original) (relevant portions attached hereto as Ex. D).  Thus, BancInsure, in its deposition, took the position that the loss was caused by something other than an Employee but now seeks to have the loss excluded under exclusion (h) as a loss caused by an Employee.  BancInsure wants to argue the loss was not caused by Deer for purposes of Insuring Agreement (A) and that it was for Insuring Agreements (E) and (Q).  BancInsure cannot have it both ways.

**B.    Peoples Bank Has Proven That BancInsure Breached Its Duty to Investigate Peoples Bank's Claim and Handled Peoples Bank's in Bad Faith.**

A review of the information that Peoples Bank submitted to BancInsure and BancInsure's actions taken in response demonstrate that BancInsure breached its duty to adequately investigate, and denied Peoples Bank's claim in bad faith.  On March 28, 2006, Larry Hill submitted to BancInsure a history of the loan to TPI (hereinafter "History of Events"); BancInsure Dep. at 186, Ex. 8 thereto.  In response, BancInsure assigned the claim to Judy Edwards who called Peoples Bank's President, Larry Hill, and requested documents from the Bank.  *Id.* at 186-187.  BancInsure took no further steps to follow up on the information provided.  *Id.* at 111-117.  On March 30, 2008, Peoples Bank faxed copies of Deer's title opinions and Honea's title opinion to BancInsure.  *Id.* at 187, Ex. 9 thereto.  BancInsure simply read the information submitted but took no steps to follow up on the information provided.  BancInsure Dep. at 187-88.

On December 22, 2008, Peoples Bank requested a review of BancInsure's denial of Peoples Bank's claim pointing out that BancInsure has misinterpreted the language of its own Bond in light of the information provided by Peoples Bank.  *Id.* at 188, Ex. 10 thereto.  In

response to Peoples Bank's letter dated December 22, 2008, BancInsure merely reopened the file, reviewed the December 22, 2008 letter and sent a response.  *Id.*

On February 9, 2009, Peoples Bank sent to BancInsure a Memorandum Opinion from Deer's bankruptcy action evidencing that Deer was receiving cash benefits from transactions with Phillips.  *Id.* at 189, Ex. 11 thereto.  After receipt of the February 9, 2009 letter, BancInsure did not conduct any interviews or review any documents.  *Id.* at 156-57.  On September 29, 2009, Peoples Bank sent BancInsure copies of Deer and Phillips' guilty pleas.  *Id.* at 197-98, Ex. 14 thereto.  BancInsure simply reviewed this information with its counsel and took no further actions other than through counsel.[2]  *Id.* at 198.  On October 19, 2009, Peoples Bank sent BancInsure a letter from Deer identifying where his and Phillips' financial records were located.  *Id.* at 190, Ex. 12 thereto.  After receiving the October 19, 2009 letter, BancInsure reviewed the letter, but conducted no other investigation. *Id.* at 191-92.

On November 12, 2009, Peoples Bank sent another letter to BancInsure enclosing Deer's guilty plea to bank fraud and twenty-three checks dated January 4, 2004 through May 2, 2005 reflecting the transfer of funds from Phillips to Deer.  *Id.* at 194-95 Ex. 13 thereto.  These documents are significant as they demonstrate coverage under the Bond since an Employee committed a fraudulent act and received a financial benefit in connection with the transaction. Specifically, the promissory note establishes that Peoples Bank made a Loan to Phillips.  Both the December 8, 2004 Initial Title Opinion and the April 14, 2005 Final Title Opinion establish that Peoples Bank obtained title opinions from Deer regarding the property in connection with the Loan.  The Deed of Trust establishes that Peoples Bank funded the Loan to TPI and recorded its Deed of Trust on January 4, 2005 in reliance on Deer's title opinion.  The affidavits of Alex

---

[2] The actions taken by BancInsure counsel are set forth at pp. 21-22 herein.

Corban and Larry Hill establish that the signature on the Cancellation of Deed of Trust from TPI to Peoples Bank was not authorized by the Bank, but rather was forged. In the Change of Plea transcript, Deer admitted he acted in collusion with Phillips in providing false title opinions and that he received a financial benefit from these actions. Finally, the twenty-three checks establish the financial benefit from Phillips to Deer during the timeframe of the loan to Phillips. After receiving the November 12, 2009 letter and the documents enclosed, BancInsure reviewed the documents with counsel, but conducted no other investigation. *Id.* at 196-98.

On May 7, 2010, Peoples Bank sent BancInsure additional documents obtained from Phillips and Deer's records showing further financial benefit given by Phillips to Deer. *Id.* at pp. 198-199, Ex. 15 thereto. BancInsure simply reviewed these its counsel and took no further steps other than through counsel. *Id.* at 199.

### 1.    BancInsure did not have an arguable basis for denial.

BancInsure asserts that it had an arguable basis to deny the claim and asserts that the Court "consider the facts available to BancInsure 'at the time the claim was denied.'" BancInsure Resp. at p. 26.[3] BancInsure fails recognize, however, that it has repeatedly denied coverage -- initially in May 2006, again in January 2009, again in November 2009 and most recently at Phillips' deposition on June 1, 2010. *See* May 3, 2006 Ltr (attached hereto as Ex. E); January 12, 2009 Ltr (attached hereto as Ex. F); November 16, 2009 Ltr (attached hereto as Ex. G); Phillips Dep. at 34-35. BancInsure owed Peoples Bank a continuing duty to investigate its claim. *Anthony v. State Farm Fire & Cas. Co.*, 2009 WL 383406, *2 (S.D. Miss Nov. 16, 2009) (insurer has a duty to conduct a "full and thorough investigation, it is also under a continuing

---

[3] Of course, much of the problem stems from BancInsure's failure to properly investigate the claim. Had it done so, then the facts giving rise to coverage under the Bond (such as those adduced at Phillips' deposition) would have been discovered long before this suit was filed. *See infra* pp. 4-7.

duty to investigate loss, even after a lawsuit has been filed."). Therefore, the Court should consider all of the information that BancInsure had been presented to date to determine whether BancInsure's investigation was adequate or its denial had an arguable basis.  Looking to the plain language of the Bond and all of the evidence presented, especially Phillips testimony *supra* at pp. 4-7, BancInsure cannot support its claim that it has an arguable basis for the denial.

Peoples Bank has demonstrated coverage under the Bond.  *See supra* at pp. 4-9. However, BancInsure argues that "the Bank neither claimed nor submitted evidence to show that Deer's December 2004 title opinion was fraudulent or otherwise dishonest" nor did Peoples Bank present other evidence to show that the claim was covered by Insuring Agreement A. BancInsure Resp. at p. 27.  BancInsure fails to mention that on March 28, 2006 Hill submitted a History of Events which demonstrated that Deer, an Employee of the Bank as defined by the Bond, was involved in the fraudulent title opinion, thus triggering coverage under Insuring Agreement A.  *See* BancInsure Dep. Ex. 8.  In the History of Events, Larry Hill expressly stated that Deer had provided Peoples Bank with two title opinions.

> PBFC received a preliminary title certificate from Dwayne G. Deer, Attorney at Law, P.O. Box 1361, McComb, MS 39638 dated December 8, 2004 indicating a clear title to the subject property and no existing liens.  The loan was funded and closed by Alex Corban on December 23, 2004 and funded that same week.  A subsequent final title certificate was received from Mr. Deer dated April 14, 2005 disclosing PBFC's recorded deed of trust with no other liens recorded.

*Id.*  Hill's submission further explained that after closing the Loan, Peoples Bank learned that the title opinions provided by Deer were fraudulent and that Peoples Bank actually held a second lien on the Property while Bank of Franklin held the first lien.  *Id.* at 2.  Hill then stated that Peoples Bank engaged Gary Honea to perform a title search to ascertain Peoples Bank's lien on the Property and the additional findings regarding Deer and Phillips' collusion:

On Monday, March 20, 2006, I was notified by our attorney Gary Honea of more disturbing matters concerning the Bank's position regarding the Pike County property. A search of the land records indicated forged cancellations had been recorded in Pike County on Alex Corban's signature and on Charles Magee's signature representing PBFC and Bank of Franklin, respectively, on the Pike County deed of trust. Also, that these forged cancellations had been notarized by a Dawn M. Stinson whom I understand once worked for the afore-mentioned attorney, Dewayne Deer, but is now employed by Todd Phillips. The forged PBFC cancellation was notarized on March 31, 2005, and recorded on April 8, 2005. It is our understanding from the records of the Chancery Clerk's Office of Pike County that these forged cancellations were delivered to their office for recording by Todd Phillips or his agent. This cancellation was recorded six days prior to Dwayne Deer's final title certificate to PFBC in which Mr. Deer indicated our first position and no other deeds of trust. Furthermore the title search perform by our attorney, Gary Honea, indicates that Todd Phillips Investments, Inc. borrowed another $700,000 on the same Pike County Property from American Bank & Trust Company in Mandeville, Louisiana three days later, on April 11, 2005, after the forged cancellations had been recorded, and that Dwayne Deer is listed as Trustee on behalf of American Bank and Trust.

*Id.* at 3. BancInsure simply ignored the detailed facts submitted by Peoples Bank and summarily denied the claim under Insuring Agreement (E) which it now argues excludes coverage because the loss involved an Employee.

Next, BancInsure notes that in both November 2009 and May 7, 2010, Peoples Bank submitted additional information regarding financial transfers but argues that Peoples Bank failed to show any tie between the Loan and these financial benefits. BancInsure Resp. at p. 29. BancInsure completely ignores Phillips testimony as set forth *infra* pp. 4-7. In light of all of this evidence and in consideration of BancInsure's continued duty to investigate, it is clear that BancInsure repeatedly denied the claim without an arguable basis.

Finally, BancInsure attempts to distinguish *Upright Material Handling, Inc. v. Ohio Cas. Group*, 2005 Pa. Dist. & Cnty. Dec. LEXIS 131 (Pa. County Ct. 2005), which stands for the proposition that the failure of an insurer to have written policies or procedures constitutes bad

faith, on the grounds that the Court applied Pennsylvania law.  BancInsure Resp. at pp. 30-31.
The fact is that Mississippi courts have never addressed this issue and the Pennsylvania opinion
stands for a solid legal principal.  Additionally, BancInsure ignores the fact that it frequently
relies on the law from other jurisdictions in support of its positions.  *Id.* at pp. 15; 28 (citing
Missouri law to for the proposition that an employee does not have to be the sole cause of a loss
for exclusion (h) to apply and citing Texas and Third Circuit law for the proposition that money
earned through fraud may still be considered earned as a wage).  BancInsure should not be
allowed to have it both ways by in some instances relying on other jurisdictions to attempt to
advance its position and distinguishing other jurisdictions when it disagrees with the proposition.

> **2.    An adequate investigation would have easily adduced coverage.**

BancInsure claims to have engaged in a "good faith investigation" of Peoples Bank's
claim.  However, by stating "the Bank had not asserted coverage under any specific insuring
agreement of the Bond," BancInsure appears to place upon Peoples Bank the burden of ***proving***
which provision of the Bond provides coverage for its claim, and further to actually prove its
claim to BancInsure. As discussed *supra*, it is not Peoples Bank's burden to prove coverage
during the investigation stage.  Rather, Peoples Bank's obligation to BancInsure was to provide
notice of its claim and cooperate with the investigation.  BancInsure just simply refused to
consider the information provided by Peoples Bank and pay Peoples Bank for the losses it
incurred as a result of Deer and Phillips dishonest acts, or alternatively as a result of the non-
payment on the Loan.

BancInsure's purported "investigation" can be divided into three categories: (1) initial
investigation;  (2) re-investigation  and  (3)  post-litigation investigation.   BancInsure's
"investigation" at each stage was both inadequate and in bad faith.

### a.    Initial "Investigation."

During its initial investigation BancInsure engaged in a total of two activities.  First, upon receipt of Peoples Bank's claim, KPA claims attorney Judy Edwards interviewed Peoples Bank's President, Larry Hill, and during that conversation requested documents from Peoples Bank.  *See* BancInsure Resp. at p. 4.  Secondly, after receiving the documents from Peoples Bank, Ms. Edwards "evaluated" the claim and denied coverage.  *Id.*  However, at no point during this initial investigation did BancInsure follow up on any information provided by Peoples Bank, conduct any interviews of third parties or other Bank employees, or request any documents or financial records from other sources.[4]   BancInsure Dep. at 75-77; 111-17; 131-33.   Furthermore, BancInsure did not follow any procedures in investigating this claim.  *Id.* at 50, Ex. 3 thereto.  BancInsure simply failed to put forth any effort to investigate Peoples Bank's claim.   When asked about its investigation of Peoples Bank's claim, BancInsure testified:

Q.    Tell us for the record, what is Exhibit 5?
A.    It's my draft letter dated April 28th, 2006.
Q.    And this is your opinion with regard to whether there is coverage on Peoples Bank's claim,  correct?
A.    Yes.
Q.    And this evaluation is based solely upon the information provided to you by Peoples Bank?
A.    Yes.
Q.    And you did not attempt to obtain documents from any third parties prior to giving your opinion with regard to whether there was coverage?
A.    Correct.
Q.    You did not interview any third party witnesses before determining whether there was coverage on Peoples Bank's claim?
A.    Correct.

---

[4]    Instead, BancInsure relied on Peoples Bank to perform this investigation as a part of the litigation.  *See infra* p. 24.

BancInsure Dep. at 75-77, Ex. 5 thereto.  When specifically asked about what actions were taken

to follow up on the information provided by Peoples Bank at the time it made its claim,

BancInsure testified:

> Q. On what's Bates labeled as page 290, the first page of the history of Todd Phillips Investments, there's a reference to Todd Phillips being the president of Todd Phillips Investment, Inc.   Did BancInsure attempt to contact Mr. Phillips in the investigation of Peoples Bank's claim?
>
> A. No.
>
> Q. Did BancInsure attempt to contact anyone with Todd Phillips Investments, Inc. in connection with this investigation of Peoples Bank's claim?
>
> A. No, we wouldn't have any reason to contact Phillips.  No claim was being filed against the bank by Phillips or by the bank against Phillips.
>
> Q. The bank's loss was incurred in connection with a loan to Todd Phillips Investments, Inc., correct?
>
> A. That's what the bank is claiming, yes.
>
> Q. Do you have any reason to believe that the bank's loss was not incurred in connection with the loan to Todd Phillips Investments, Inc.?
>
> A. If the bank had a loss related to the loan of Todd Phillips, that's the question, correct?  Did the bank incur loss as a result of the loan?  The bank incurred a loan loss in that the loan may have not been paid off by Todd Phillips.
>
> Q. This also states that the loan application  was received by Al[e]x Corb[a]n. Did BancInsure attempt to contact Mr. Corb[a]n in investigation of its – of Peoples Bank's claim?
>
> A. I did not attempt to speak to Mr. Corb[a]n.
>
> Q. It further states that the loan was presented to PBFC's loan committee, which earlier refers to Peoples Bank of Franklin County.  Did you interview anyone on PBFC's or Peoples Bank's loan committee in investigation of Peoples Bank's claim?
>
> A. No.
>
> Q. Did BancInsure make any attempt to contact Dwayne Deer, the attorney that provided the title opinion in connection with the claim when it investigated Peoples Bank's claim?
>
> A. Are we talking the time period from --
>
> Q. At any point in time did BancInsure attempt to contact Dwayne Deer with regard to Peoples Bank's claim?
>
> A. There was no attempt to contact Mr. Deer regarding the bank's claim because the bank had not provided sufficient information as

far as financial benefit incurred by Mr. Deer in relation with the claim that they had filed.

Q. On the second page, page 291, in that second paragraph there's a reference to a title certificate addressed to Bank of Franklin during Peoples Bank's -- during BancInsure's investigation of Peoples Bank's claim. Was there any attempt to contact anyone at Bank of Franklin?

A. There was no attempt to contact anyone at the Bank of Franklin in connection with the Peoples Bank of Franklin County's claim.

Q. And no one at BancInsure attempted to contact Mr. James Phillips, Todd Phillips' father, in connection with its investigation of Peoples Bank's claim?

A. No. James Phillips had nothing to do with Peoples Bank of Franklin County's claim.

Q. Further down that page there's a reference to Peoples Bank having engaged the services of Gary Honea, an attorney from Pike County, to perform a thorough title search on the Pike County property on March 14th, 2006. During its investigation of Peoples Bank's claim, did anyone at BancInsure attempt to contact Mr. Honea?

A. I had talked to Mr. Larry Hill about some questions I had about the title report that Mr. Honea had prepared for the bank in order to see if he could clarify some questions that I had. And Mr. Hill was able to clarify those questions, so I did not contact Mr. Honea directly.

Q. At no point in time during BancInsure's investigation of Peoples Bank's claim, did anyone at BancInsure contact Mr. Honea?

A. No.

Q. At any point in time during BancInsure's investigation of Peoples Bank's claim, did BancInsure request that a title search be done on the property that was offered as collateral for the loan to Todd Phillips Investments?

A. I'm sorry. Did BancInsure request a title search? No.

Q. The last paragraph on page 291, there is information regarding the bank being contacted by a gentleman by the name of Stewart Robinson, another attorney in Pike County who was the attorney for Todd Phillips. At any point in time during BancInsure's investigation of Peoples Bank's claim, did anyone at BancInsure attempt to contact Mr. Robinson?

A. No.

Q. Page 291 at the bottom further references a meeting that was held and lists people that were present at that meeting on March 17th, 2006. We've already talked about Mr. Robinson and Mr. Phillips. Also present at that meeting, it says John Ward was present. Did anyone at BancInsure attempt to contact Mr. Ward in connection with its investigation of Peoples Bank's claim?

A.   No.

Q.   Did anyone at BancInsure attempt to contact Mark Wallace in connection with its investigation of Peoples Bank's claim?

A.   No.  There would be no need to.

Q.   On the page labeled 292, which is the third page of Mr. Hill's history provided to BancInsure, there's a reference to a deed of trust to Pike County National Bank in the second paragraph, third line. At any point during BancInsure's investigation of Peoples Bank's claim, did anyone at BancInsure contact anyone at Pike County National Bank?

A.   No.

Q.   Did anyone at BancInsure attempt to obtain any documents from Pike County National Bank?

A.   Again, no.  It would not be BancInsure's function to be requesting documents from Pike County National Bank.

Q.   In the last paragraph on that page there's a reference to do some cancellations of deeds of trust.  Did BancInsure do anything to determine whether those cancellations were forgeries or authorized signatures?

A.   I believe we received copies of at least some of those trust releases, release of trust deeds, and were informed by the bank that they were not signed by the people supposedly executing those documents.

Q.   And this information provided by the bank indicates that the forged cancellations had been notarized by Dawn M. Stinson, who worked for Dwayne  Deer and Todd Phillips. Did BancInsure put forth any effort to contact Ms. Stinson in connection with its investigation of Peoples Bank's claim?

A.   No.

Q.   Did BancInsure obtain any documents from the chancery clerk of Pike County in investigation of Peoples Bank's claim?

A.   No.

Q.   The last part of this paragraph references a deed of trust that was issued to American Bank and Trust Company.   During its investigation of Peoples Bank's claim, did BancInsure put forth any effort to obtain documents from American Bank and Trust Company?

A.   No.

Q.   Did BancInsure contact anyone at American Bank and Trust Company?

A.   No.

Q.   The last page 293, there's a reference to Mr. Honea, who we've already discussed, and a Mr. Craig Landrum of Watkins Ludlam Winter & Stennis.   During the investigation of Peoples Bank's claim, did anyone at BancInsure attempt to contact Mr. Landrum?

A.   I'm sorry.  Say that again.

> Q.     During the investigation of Peoples Bank's claim, did anyone at BancInsure attempt to contact Mr. Craig Landrum?
>
> A.     No.

*Id.* at 111-117, Ex. 8 thereto.  In sum, BancInsure admitted it did not perform any investigation of Peoples Bank's claim prior to its May 2006 denial.

Moreover, when BancInsure initially evaluated the claim it only evaluated coverage under Insuring Agreement (E).  In its deposition, BancInsure stated:

> Q.     Did Peoples Bank request that its claim be evaluated only under insuring agreement E?
>
> A.     No.
>
> Q.     Peoples Bank did not specify under which insuring agreement they were making its claim, correct?
>
> A.     Correct.
>
> Q.     And who made the determination that this should be characterized as a claim under insuring agreement E as opposed to insuring agreement A?
>
> A.     Based on the information that was provided by the bank relative to the potential loan loss that they might incur, the emphasis that was placed on the documents by the bank was that the title opinion was incorrect and that the bank had relied on that title opinion was incorrect and that the bank had relied on that title opinion in issuing the loan.  That to me triggers insuring agreement E as potentially a source of coverage if we're dealing with some kind of fraudulent or forged document.
>
>          Upon review of insuring agreement E, the determination was made that a title opinion did not fit in within the documents enumerated in insuring agreement E.
>
> Q.     Thank you Ms. Edwards.  It is your testimony that the determination to evaluate People Bank's claim under insuring agreement E was made by you?
>
> MR. TAYLOR:  Object to the form.  Go ahead.
>
> A.     It was made in conjunction then with this review from BancInsure, that there did not appear to be coverage under E.  There was no indication from the insured that they suspected any employee dishonesty.

*Id.* at pp. 131-33.  The information provided by Peoples Bank with its claim set forth in detail the cause of its loss including Deer's involvement.  *See* BancInsure Dep. Ex. 8.  If BancInsure had conducted a thorough investigation of the claim or even simply considered the information

20

provided by Peoples Bank, then it could not, in light of the arguments it makes with regard to exclusion (h), have only evaluated the claim under Insuring Agreement (E) in good faith. BancInsure's investigation of a claim under an Insuring Agreement which it now claims to excluded by Exclusion (h) further demonstrates BancInsure's bad faith handling of Peoples Bank's claim.

### b.      Re-Investigation.

BancInsure claims it re-investigated the claim after receiving a letter from the undersigned on December 22, 2008.[5]   *See* BancInsure Resp. at pp. 6-7.   BancInsure's re-evaluation consisted of only three activities.   First, it "reopened the claims file."   *Id.* at 6. Secondly, it "further evaluated coverage based on the ***new information*** supplied" by Peoples Bank.   *Id.* at 7.   Third, BancInsure wrote a letter denying coverage.   *See* BancInsure at p. 7**.**

First of all, Peoples Bank did not submit any new information to BancInsure in its December 22nd letter.   *See* BancInsure Dep. Ex. 10.   Rather, Peoples Bank requested a review of BancInsure's denial of Peoples Bank's claim pointing out that BancInsure has misinterpreted the language of its own Bond in light of the information provided by Peoples Bank.   *Id.* at 188**.**   In response, BancInsure merely reopened the file, reviewed the December 22, 2008 letter and simply responded by letter on January 12, 2009 reaffirming denial of the claim.   *Id.*   Even after the second denial, Peoples Bank sent BancInsure additional information on February 9, 2009 evidencing cash benefits Deer received from Phillips.   *Id.* at 189, Ex. 11 thereto.   In response, BancInsure did not conduct any interviews or review any documents.   *Id.* at 189-90.

---

[5]      Contrary to BancInsure's argument and as discussed in further detail *infra* at pp. 25-27, Peoples Bank did not passively wait 2 ½ years before contacting BancInsure again in 2008, but rather engaged in several efforts to mitigate its losses in an attempt to avoid litigation.

### c.  Post-Litigation "Investigation."

Finally, BancInsure describes its alleged post-litigation investigation which consist merely of litigation-related activities.  BancInsure asserts this "investigation" consisted of the following five activities: (1) sending written discovery; (2) attending criminal proceedings; (3) reviewing court records; (4) taking the 30(b)(6) deposition of Peoples Bank and (5) reviewing all documents received from Peoples Bank in discovery or pursuant to subpoena.  BancInsure Resp. at p. 8.  With regard to the investigation allegedly performed during litigation, BancInsure correctly maintains that a "fact is a fact whether it is learned through an informal claims review process or through the formalities of litigation."  *Id.*  However, BancInsure did nothing with the facts it obtained and continued to deny the claim in bad faith.

In sum, when asked directly what it did, *at any time*, to investigate Peoples Bank's claim, BancInsure testified:

> Q:    Okay.  Did BancInsure ever ask for any specific documents from Peoples Bank which were not provided?
> A:    No.
> Q:    Okay.  Did BancInsure ever obtain or request any documents from Dwayne Deer in the investigation of Peoples Bank's claim?
> A:    No.
> Q:    Did BancInsure ever request or obtain any documents from Todd Phillips in the investigation of Peoples Bank's claim?
> A:    No.
> Q:    Did BancInsure ever request or ever receive any documents from Todd Phillips Investments in the investigation of Peoples Bank's claim?
> A:    No.
> Q:    Did BancInsure ever request or receive any documents from Gary Honea in the investigation of Peoples Bank's claim?
> A:    Directly from Mr. Honea, no.  Copies of his title opinion, yes.
> Q:    And that title opinion came from Mr. Hill at Peoples Bank, correct?
> A:    Correct.
> Q:    Did BancInsure, during the investigation of Peoples Bank's claim, ever request any documents from any other banks?
> A:    In connection with the Peoples Bank's claim?
> Q:    Correct. Did –

A:      Is that the question?

Q:      That's the question.    Did BancInsure ever request any bank documents from Dwayne Deer's bank accounts.

A;      No.

Q:      Did BancInsure ever request any documents from any other banks other than Peoples Bank in investigating Peoples Bank's claim.

A:      We only requested documents from Peoples Bank since they were the insured and had the burden of proving their claim.

Q:      Were there interviews conducted of individuals other than Larry Hill in the investigation of Peoples Bank's claim?

A:      There were no other interviews.

Q:      So, Ms. Edwards, I want to make sure that – I think we are on the same page.    All of the information that BancInsure considered in evaluating and investigating Peoples Bank's claim was information that was provided to BancInsure by Peoples Bank?

A:      Correct.

BancInsure Dep. at 183-185. Further, BancInsure expressly admitted it has no written policies, procedures or guidelines for the investigation of claims nor does Kalchik, Pratt and Associates, the consulting firm BancInsure used for the investigation of its claims.  *See id.* at 11-12, 39-42, 50, Ex. 3 thereto.  BancInsure did little to nothing to actually investigate Peoples Bank's claim, followed no standards for the handling of Peoples Bank's claim and thus breached its duty to investigate, where a reasonable investigation would have easily adduced coverage.

Finally, BancInsure attempts to demonstrate that its investigation was adequate by distinguishing *Spansel* and *Stewart*.  BancInsure Resp. at pp. 33-34.  In *Spansel v. State Farm*, the insured brought a bad faith claim after their home was destroyed by Hurricane Katrina.  683 F. Supp. 2d 444, 447-48 (S.D. Miss. 2010).  The *Spansel* Court found that the insurer was not entitled to summary judgment since the insurer had denied coverage "before an adjustor had set foot on their property, reviewed photograph of the loss, or received any other data other than the property's location." *Id.* at 449.  Like the insurer in *Spansel*, BancInsure failed to do anything with the facts presented to it in investigation of the claim before denying Peoples Bank's claim. *See supra* pp. 9-11.  In *Stewart v. Gulf Gaur. Life Ins. Co.*, 846 So.2d 192, 194 (Miss. 2002), an

insured brought a claim against his insurer for, *inter alia*, bad faith for denial of a claim on grounds of a pre-existing condition.  846 So.2d at 194.  The *Stewart* Court explained that failing to investigate a claim and "attempting to shift the burden of submitting regarding the claim on to [the insured]"[6] may give rise to punitive damages for bad faith.  *Id.*  While the factual scenarios may be different, the analysis is the same – would an *adequate* investigation easily adduced coverage?  The overwhelming evidence in the instant case proves that Peoples Bank has proven a covered loss, has proven an inadequate investigation and is entitled to summary judgment as to its claims for breach of the duty to investigate and bad faith handling of Peoples Bank's claim.

### 3.   The Fact That Peoples Bank Waited 2 ½ Years After The Initial Denial To File This Lawsuit Has No Effect On Peoples Bank's Bad Faith Claim.

BancInsure repeatedly states that Peoples Bank waited 2 ½ years before filing the instant action.  However, this time period is inconsequential to the Court's analysis. For the Court's reference, Peoples Bank amended the timeline of events submitted by BancInsure with its Response to include to Peoples Bank's activities during the 2 ½ years between the initial denial and filing the instant action.  *See* Timeline of Events (attached hereto as Ex. H).  BancInsure points to *Sobley* to support an argument that the 2 ½ year break in communication between Peoples Bank and BancInsure bars the bad faith investigation claim.  BancInsure Resp. at pp. 32-33.  This portion of the *Sobley* holding is distinguishable from the facts in the case at bar.  In *Sobley*, the Fifth Circuit stated, "although an insured may argue there should have been a more complete investigation, 'there simply was no bad-faith breach of any duty to the insured who *passively accepted* the fact finding of the investigation."  302 F.3d at 339.  It can hardly be said that Peoples Bank *passively accepted* the investigation.

---

[6] *Stewart* again raises the issue that BancInsure is conflating Peoples Bank obligations to its insurer with its burden of proof at trial.

Rather, Peoples Bank spent over two years in engaging in stringent efforts to mitigate its loss and avoid litigation. The timeline submitted by BancInsure along with its Response wholly omits the actions that Peoples Bank took during that time to mitigate its damages and to avoid litigation. With regard to the 2 ½ year time between the initial denial of the claim and the filing of this lawsuit, Peoples Bank's President, Larry Hill testified:

> Q.  Fair enough.
> A:  You know, we paid those premiums to BancInsure now since 2002 in good faith, never had a claim, never wanted to have a claim. I'm not going to sit here and tell you that I have read that policy. I'm not an insurance person, I'm not a lawyer, but I know that I purchased it in good faith, and I know that in the last eight to nine years, we've probably paid your client 6, 7, $800,000. I know we've had exposure. **Again, I never wanted to be here.** But we filed that claim, I think in a timely manner. **We made every reasonable attempt to avoid today. We didn't want to file a claim. We just wanted to try to work this thing out ourselves. Well, it didn't work out for whatever reason.**

Peoples Bank's 6/16/10 Dep. at 122–23 (emphasis added) (relevant portions attached hereto as Ex. I).

> Q.  Okay. Is there any particular reason that the bank waited from – waited until 2009 to file this suit?
> A.  Yea. As I stated in my original letter demand to Van Butler, that there was a possible claim pending, that we were going to do everything within our power to keep that claim from happening—
> Q.  Un-huh (affirmative).
> A.  –and that led to all the sequence events that got us to here today, but, you know, we didn't feel like we could actually come back and file an actual suit until our claim—not pursue the claim, I guess, until, you know, we knew exactly what the bankruptcy was going—we were going to receive out of it, and that just really became finalized here recent, so…
> Q.  So you wanted to see what the ultimate amount of your loss was?
> A.  That's right.

*Id.* at 152–153.

> Q.  All right. Then we have appraisal fees paid to Ridge Point Consultants on additional collateral pledged. Does that

refer to the additional collateral pledged as described in that entry is the collateral that the bank got as in the Lincoln County transaction?

\* \* \* \*

A.    Yes.   You know, again, as I stated in the previous deposition, our intent was to never have to file a claim with BancInsure.   We were going to try to work it out, or he would give us collateral to replace what had been lost and his forged document, the release of the collateral and all that.   But, yeah, that appraisal had to do with, you know, getting values on the properties that had been offered as collateral in exchange for that McComb property.

Peoples Bank 7/28/10 Dep. at 43 (relevant portions attached hereto as Ex. J).

BancInsure's implication that Peoples Bank sat on its rights for over two years without any action is a gross mischaracterization of the facts.   Peoples Bank engaged in great efforts, including reworking the loan, filing suit against Phillips individually and filing a claim in the Phillips' bankruptcy action in order to mitigate its losses and avoid litigation.   Mississippi law imposes a duty on an insured to mitigate its losses because such action is clearly in the interest of the insurer.   *Papa v. Miss. Farm Bureau Cas. Ins. Co.*, 573 So.2d 761, 763-64 (Miss. 1990)("Unquestionably, mitigation of damages would be consistent with insurer's interests.").   The efforts that Peoples Bank engaged in during the 2 ½ years referenced by BancInsure were not only in satisfaction of its duty to mitigate, but also in effort to limit the claim on the Bond, and thus also consistent with BancInsure's interests.   More importantly, BancInsure had a continuing duty ***to actually evaluate*** the claim, which it failed to do even in light of the overwhelming evidence that the claim is covered under the Bond.

Even *assuming arguendo* that Peoples Bank had sat on its rights for 2 ½ years, it still filed the instant action well within the three-year statute of limitations.   Miss. Code Ann. § 15-1-49 prescribes a three year statute of limitations for "[a]ll actions for which no other period of

limitations is prescribed" including bad faith actions. *See also Harper v. Cal-Maine Foods, Inc.*, 2010 WL 2433090 (June 17, 2010). Peoples Bank filed its action within the statute of limitations and, thus the claim is not barred.

**C.      Peoples Bank is Entitled to Punitive Damages.**

Finally, Peoples Bank has established that it is entitled to punitive damages as a result of BancInsure's bad faith investigation and denial of its claim. In Mississippi, in order to award punitive damages for an insurer's failure to investigate requires a showing that the level of negligence in conducting the investigation was such that "a proper investigation by an insurer 'would easily adduce evidence showing [the insurer's] defenses to be without merit.'" *Spansel*, 683 F. Supp. 2d at 447-49; *Stewart v. Gulf Life Ins. Co.*, 846 So.2d 192, 204 (Miss. 2002); *Szumigala v. Nationwide Mut. Ins. Co.*, 853 F.2d 274, 281 (5th Cir. 1988). As demonstrated herein, punitive damages are warranted BancInsure denied Peoples Bank's claims in bad faith without an adequate investigation, where a proper investigation would have easily adduced coverage.

**III.**
**CONCLUSION**

Peoples Bank has shown that its claim is covered by Insuring Agreements (A), (E) and (Q) of the Bond and has provided BancInsure with overwhelming evidence demonstrating coverage. Faced with the insurmountable evidence, BancInsure denied (and continues to deny) the claim without an arguable basis and failed to conduct an adequate investigation where an adequate investigation would have easily adduced coverage. BancInsure's actions constitute breach of contract as well as a breach of its duties to Peoples Bank, demonstrating bad faith. BancInsure has failed to prove the existence of any valid defense to Peoples Bank's claims.

Thus, Peoples Bank requests that this Court grant its Motion for Partial Summary Judgment as to BancInsure's liability on Peoples Bank's claims.

THIS, the 23rd day of August, 2010.

Respectfully submitted,

PEOPLES BANK OF THE SOUTH

By Its Attorneys,
WATKINS LUDLAM WINTER & STENNIS, P.A.


/s/ April D. Reeves
APRIL D. REEVES

W. Whitaker Rayner (MSB #4666)
April D. Reeves (MSB # 100671)
Lindsay C. Thomas (MSB # 102873)
WATKINS LUDLAM WINTER & STENNIS, P.A.
190 East Capitol Street, Suite 800 (39201)
Post Office Box 427
Jackson, Mississippi 39205-0427
Ph.: (601) 949-4900
wrayner@watkinsludlam.com
areeves@watkinsludlam.com
lthomas@watkinsludlam.com

## CERTIFICATE OF SERVICE

I do hereby certify that on August 23, 2010 I electronically filed the foregoing with the Clerk of the court using the ECF system which sent notification of such filing to the following:

Ellie B. Word, Esq.
Alec M. Taylor
One Jackson Place, Suite 900
188 East Capitol Street
Jackson, MS 39201

/s/ April D. Reeves
APRIL D. REEVES