

# FINANCIAL INSTITUTION BOND

## (HEREIN CALLED THE COMPANY)

BancInsure, Inc.
5005 N. Lincoln Blvd.
Oklahoma City, OK 73105

BI-FIB-POL (102000)

D0149

EXHIBIT

A

BancInsure, Inc.
(A Stock Insurance Company)
Home Office: 5005 North Lincoln Blvd., Oklahoma City, OK 73105  (405) 290-5678

# BancInsure Financial Institution Bond

The Company, in consideration of an agreed premium and subject to the Declarations, Insuring Agreements, General Agreements, Conditions and Limitations and other terms of this Bond, agrees to indemnify the Insured for:

## INSURING AGREEMENTS

**(A)  DISHONESTY**

Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.

Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

    (a)    to cause the Insured to sustain such loss, or
    (b)    to obtain improper financial benefit for the Employee or another person or entity.

However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection with these transactions, an improper financial benefit.

As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

**(B)  ON PREMISES**

    (1)    Loss of Property resulting directly from:
        (a)    robbery, burglary, misplacement, mysterious unexplainable disappearance and damage or destruction of the Property, or
        (b)    theft, false pretenses, or common-law or statutory larceny committed by a person present in an office or on the premises of the Insured, while the Property is lodged or deposited within offices or premises located anywhere.

    (2)    Loss of Property while in the possession of any customer of the Insured or any representative of such customer resulting directly from:
        (a)    robbery, while such customer or representative is actually transacting business with the Insured at an outside window attended by an Employee of the Insured, at any of the Insured's offices covered under this Bond, or
        (a)    robbery during banking hours, while such customer or representative is in any building, or on any driveway, parking lot or similar facility maintained by the Insured as a convenience for such customers or representatives using motor vehicles if such customer or representative is present in such building or on such facility for the purpose of transacting banking business with the Insured,

    provided such loss, at the option of the Insured, is included in the Insured's proof of loss, but excluding in any event loss caused by such customer or any representative of such customer.

    (3)    Loss of or damage to:
        (a)    furnishings, fixtures, supplies or equipment within an office of the Insured covered under this Bond resulting directly from larceny or theft in, or by burglary or robbery of, such office, or any attempt at such conduct, or by vandalism or malicious mischief, or
        (b)    such office resulting from larceny or theft in, or by burglary or robbery of such office or attempt at such conduct, or to the interior of such office by vandalism or malicious mischief,

D0150

provided that the Insured is the owner of such furnishings, fixtures, supplies, equipment, or office or is liable for such loss or damage, and the loss is not caused by fire.

**(C)   IN TRANSIT**

Loss of Property resulting directly from robbery, common-law or statutory larceny, theft, misplacement, mysterious unexplainable disappearance, being lost or made away with, and damage or destruction of the Property, while the Property is in transit anywhere in the custody of

    (a)    a natural person acting as a messenger of the Insured (or another natural person acting as messenger or custodian during an emergency arising from the incapacity of the original messenger),

    (b)    a Transportation Company and being transported in an armored motor vehicle, or

    (c)    a Transportation Company and being transported in a conveyance other than an armored motor vehicle provided that covered Property transported in such manner is limited to:

        (i)    records, whether recorded in writing or electronically,

        (ii)    Certificated Securities issued in registered form and not endorsed, or with restrictive endorsements, and

        (iii)    Negotiable Instruments not payable to bearer, or not endorsed, or with restrictive endorsements.

Coverage under this Insuring Agreement (C) begins immediately upon the receipt of such Property by the natural person or Transportation Company and ends immediately upon delivery to the designated recipient or its agent.

**(D)   FORGERY OR ALTERATION**

Loss resulting directly from:

    (1)    forgery or alteration of, on, or in any Negotiable Instrument (except an Evidence of Debt), Acceptance, Withdrawal Order, receipt for the withdrawal of Property, Certificate of Deposit or Letter of Credit,

    (2)    transferring, paying or delivering any funds or Property or establishing any credit or giving any value on the faith of any written instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property, which instructions or advices purport to have been signed or endorsed by any customer of the Insured or by any financial institution but which instructions or advices either bear a signature which is a Forgery or have been altered without the knowledge and consent of such customer or financial institution. Telegraphic, cable or teletype instructions or advices, as aforesaid, exclusive of transmissions of electronic funds transfer systems, sent by a person other than the said customer or financial institution purporting to send such instructions or advices shall be deemed to bear a signature which is a Forgery,

    (3)    the Insured's acceptance of a Demand Draft which purports to have been authorized by the customer of the Insured upon which the Demand Draft is drawn, but which has been issued without the knowledge and consent of such customer. For the purposes of this Insuring Agreement(D)(3), the term "Demand Draft" means a writing not signed by the Insured's customer that is created by a third party under the purported authority of the Insured's customer for the purpose of charging the customer's checking account with the Insured. A Demand Draft shall contain the Insured's customer's checking account number and shall contain one or more of the following:

        (a)    the customer's printed or typewritten name;

        (b)    a notation that the customer authorized the draft.

    (4)    the receipt by the Insured, in good faith, of any Counterfeit Negotiable Instrument.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

**(E)   SECURITIES**

Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,

    (1)    acquired, sold or delivered, given value, extended credit or assumed liability on the faith of any original

BI-FIB-POL (102000)        2

D0151

(a)   Certificated Security,
(b)   Document of Title,
(c)   Deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,
(d)   Certificate of Origin or Title,
(e)   Evidence of Debt,
(f)   Corporate, partnership or personal Guarantee,
(g)   Security Agreement,
(h)   Instruction to a Federal Reserve Bank of the United States, or
(i)   Statement of Uncertificated Security, which
    (i)   bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a Forgery,
    (ii)   is altered, or
    (iii)   is lost or stolen,

(2)   guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, endorsement or any items listed in (1)(a) through (h) above. This includes loss resulting directly from a registered transfer agent accepting or instructions concerning transfer of securities by means of a medallion seal, stamp, or other equipment apparatus which identifies the Insured as guarantor, as used in connection with a Signature Guarantee Program, but such use or alleged use of said medallion seal, stamp, or other equipment apparatus was committed without the knowledge or consent of the Insured, and the Insured is legally liable for such loss,

(3)   acquired, sold or delivered, given value, extended credit or assumed liability on the faith of any item listed in (1)(a) through (d) above which is a Counterfeit.

Actual physical possession of the items listed in (1)(a) through (i) above by the Insured, its correspondent bank or other authorized representative is a condition precedent to the Insured's having relied on the faith of such items.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

**(F)   COUNTERFEIT CURRENCY**

Loss resulting directly from the receipt by the Insured, in good faith, of any Counterfeit Money of any country.

**(G)   SAFE DEPOSIT BOX**

(1)   Liability of Depository.  All sums which the Insured shall become legally obligated to pay by reason of liability for loss, damage or destruction of Customers' Property, as defined in this Insuring Agreement (G).
(2)   Loss of Customers' Property.  Loss from any cause to Customers' Property for damage to or destruction of Customers' Property, provided such loss is included in the Insured's proof of loss.
(3)   Combined total limit for Insuring Agreement (G) (1) and (2).  Coverage as provided under Insuring Agreement (G) (1) and (2), above, subject to the Single Loss Limit of Liability and Deductible Amount stated in the Declarations under Insuring Agreement (G) (3) which is the total limit of the Company's liability for any Single Loss under this Insuring Agreement (G).

The term "Customers' Property" as used in this Insuring Agreement (G) shall mean:

(a)   Money, except if excluded under this Insuring Agreement (G)(2), bonds, drafts, acceptances, other securities, valuable papers, valuable documents, jewelry, silverware and other property while in the customers' safe deposit boxes in vaults on the premises;
(b)   such items set forth in (a) above while stored in such vaults by or for customers, or temporarily stored elsewhere on the premises and in the course of deposit in or removal from such boxes or vaults, except (1) Certificated Securities verified and recorded by  the Insured and held by it in

BI-FIB-POL (102000)                3

any capacity and (2) Money segregated and identified as payroll or other funds for delivery to the Insured or a customer; and

(c)    as respects coverage under section (1) of this Insuring Agreement (G), such items as set forth in (a) above, while being transferred between offices of the Insured during the relocation of the Insured's safe deposit boxes.

Customers' Property may be owned by customers or held by them in any capacity, whether or not the customers are liable to others for loss of such property.

## (H)   COMPUTER SYSTEMS FRAUD

Loss resulting directly from a fraudulent
- (1)   entry of Electronic Data or Computer Program into, or
- (2)   change of Electronic Data or Computer Program within

any Computer System operated by the Insured, whether owned or leased, or any Computer System identified in the application for this Bond, or a Computer System first used by the Insured during the Bond Period, provided the entry or change causes

- (1)   property to be transferred, paid or delivered,
- (2)   an account of the Insured or of its customer to be added, deleted, debited or credited, or
- (3)   an unauthorized account or a fictitious account to be debited or credited.

In this Insuring Agreement (H), fraudulent entry or change shall include such entry or change made by an employee of the Insured acting in good faith

- (1)   on an instruction from a software contractor who has a written agreement with the Insured to design, implement or service programs for a Computer System covered by this Insuring Agreement (H), or
- (2)   on an instruction transmitted by Tested telex or similar means of Tested communication identified in the application for this Bond purportedly sent by a customer, financial institution, or automated clearing house.

## (I)   DATA PROCESSING SERVICE OPERATIONS

Loss sustained by a Client of the Insured resulting directly from a fraudulent

- (1)   entry of Electronic Data or a Computer Program into, or
- (2)   change of Electronic Data or a Computer Program within

a Computer System covered under the terms of Insuring Agreement (H) or entry or change of Electronic Data during electronic transmission or physical transit from the Insured to its Client, provided that the entry or change causes

- (1)   property to be transferred, paid or delivered,
- (2)   an account of the Client, or a customer of the Client, to be added, deleted, debited or credited, or
- (3)   an unauthorized account or a fictitious account to be debited or credited,

and for which loss the Insured is legally liable to the Client as a provider of data processing services for such Client.

In this Insuring Agreement (I), fraudulent entry or change shall include such entry or change made by an Employee of the Insured acting in good faith

- (1)   on an instruction from a software contractor who has a written agreement with the Insured to design, implement or service programs for a Computer System covered by this Insuring Agreement (I), or
- (2)   on an instruction transmitted by Tested telex or similar means of Tested communication identified in the application for this Bond purportedly sent by a customer, financial institution, or automated clearinghouse.

BI-FIB-POL (102000)          4

D0153

In this Insuring Agreement (I), Client means an entity for whom the Insured serves as data processor under the terms of a written agreement.

**(J)   VOICE INITIATED TRANSFER FRAUD**

Loss resulting directly from the Insured having, in good faith, transferred Funds from a Customer's account through a Computer System covered under the terms of Insuring Agreement (H) in reliance upon a fraudulent voice instruction transmitted by telephone which was purported to be from

    (1)  an officer, director, partner or employee of a Customer of the Insured who was authorized by the Customer to instruct the Insured to make such transfer,

    (2)  an individual person who is a Customer of the insured, or

    (3)  an employee of the Insured in another office of the Insured who was authorized by the Insured to instruct other employees of the Insured to transfer Funds,

and was received by an employee of the Insured specifically designated to receive and act upon such instructions, but the voice instruction was not from a person described in (1), (2) or (3) above, provided that

    (1)  required password(s) or code word(s) were given; and

    (2)  if the transfer was in excess of the amount shown on the Declarations as the verification call-back amount for this Insuring Agreement (J), the voice instruction was verified by a call-back according to a prearranged procedure.

As used in this Insuring Agreement (J), Customer means an entity or individual which has a written agreement with the Insured authorizing the Insured to rely on voice instructions to initiate transfers and has provided the Insured with the names of persons authorized to initiate such transfers, and with which the Insured has established an instruction verification mechanism.

**(K)   TELEFACSIMILE TRANSFER FRAUD**

Loss resulting directly from the Insured having, in good faith, transferred or delivered Funds, Certificated Securities or Uncertificated Securities through a Computer System covered under the terms of Insuring Agreement (H) in reliance upon a fraudulent instruction received through a Telefacsimile Device, and which instruction

    (1)  purports and reasonably appears to have originated from

        (a)  a Customer of the Insured,

        (b)  another financial institution, or

        (c)  another office of the Insured

but, in fact, was not originated by the Customer or entity whose identification it bears,

    (2)  contains a valid test code which proves to have been used by a person who was not authorized to make use of it, and

    (3)  contains the name of a person authorized to initiate such transfer,

provided that, if the transfer was in excess of the amount shown on the Declarations as the verification callback amount for this Insuring Agreement (K), the instruction was verified by a call-back according to a prearranged procedure.

As used in this Insuring Agreement (K), Customer means an entity or individual which has a written agreement with the Insured authorizing the Insured to rely on Telefacsimile Device instructions to initiate transfers and has provided the Insured with the names of persons authorized to initiate such transfers, and with which the Insured has established an instruction verification mechanism.

D0154

**(L)   DESTRUCTION OF DATA OR PROGRAMS BY HACKER**

Loss resulting directly from the malicious destruction of or damage to Electronic Data or Computer Programs owned by the Insured or for which the Insured is legally liable while stored within a Computer System covered under the terms of Insuring Agreement (H).

The liability of the Company shall be limited to the cost of duplication of such Electronic Data or Computer Programs from other Electronic Data or Computer Programs which shall have been furnished by the Insured.

In the event, however, that destroyed or damaged Computer Programs cannot be duplicated from other Computer Programs, the Company will pay the cost incurred for computer time, computer programmers, consultants or other technical specialists as is reasonably necessary to restore the Computer Programs to substantially the previous level of operational capability.

**(M)   DESTRUCTION OF DATA OR PROGRAMS BY VIRUS**

Loss resulting directly from the malicious destruction of or damage to Electronic Data or Computer Programs owned by the Insured or for which the Insured is legally liable while stored within a Computer System covered under the terms of Insuring Agreement (H) if such destruction or damage was caused by a computer program or similar instruction which was written or altered to incorporate a hidden instruction designed to destroy or damage Electronic Data or Computer Programs in the Computer System in which the computer program or instruction so written or so altered is used.

The liability of the Company shall be limited to the cost of duplication of such Electronic Data or Computer Programs from other Electronic Data or Computer Programs which shall have been furnished by the Insured.

In the event, however, that destroyed or damaged Computer Programs cannot be duplicated from other Computer Programs, the Company will pay the cost incurred for computer time, computer programmers, consultants or other technical specialists as is reasonably necessary to restore the Computer Programs to substantially the previous level of operational capability.

Under this Insuring Agreement (M), "Single Loss" for purposes of the Single Loss Limit of Liability shown in Item 3. of the Declarations means all covered costs incurred by the Insured between the time destruction or damage is discovered and the time the Computer System is restored to substantially the previous level of operational capability. Recurrence of destruction or damage after the Computer System is restored shall constitute a separate "Single Loss."

**(N)   TELEPHONE TOLL CALL FRAUD**

Loss resulting directly from charges for voice telephone long-distance toll calls which were incurred due to the fraudulent use or fraudulent manipulation of an Account Code or System Password required to obtain access to a Voice Computer System owned or leased by the Insured, installed on the Insured's premises, whose System Administration is performed and controlled by the Insured; provided, however, that the unauthorized access was not made possible by

> (1)   failure to incorporate a System Password feature or failure to change the System Password at least once every 30 days thereafter, or
>
> (2)   failure to have a call-disconnect feature in operation to automatically terminate a caller's access to the Voice Computer System after not more than three unsuccessful attempts to input an Account Code.

Under this Insuring Agreement (N), "Single Loss" for the purposes of the Single Loss Limit of Liability shown in Item 3. of the Declarations means loss resulting from toll call charges made only on telephone lines directly controlled by one Voice Computer System and only toll call charges occurring for a period of not more than 30 days inclusive of the date on which the first such toll call charge was made.

**(O)   UNAUTHORIZED HOME BANKING ELECTRONIC FUNDS TRANSFER**

Loss resulting directly from the Insured's liability to the Bank Customer for an Unauthorized Home Banking Electronic Funds Transfer.

D0155

For the purposes of this Insuring Agreement (O) only, the Definitions section of this Bond is amended by the on of the following items:

    (A)   "Account" means a demand deposit, checking, savings or other customer asset account (other than an occasional or incidental credit balance in a credit plan) maintained by the Insured and established by a Bank Customer primarily for personal, family or household purposes.

    (B)   "Bank Customer" means a natural person who establishes an Account with the Insured and for whom the Insured provides an Off Site Banking Communication Network service in connection with the Account.

    (C)   "Loss" means the liability of the Insured to a Bank Customer for an Unauthorized Home Banking Electronic Transfer from the Account.

    (D)   "Off Site Banking Communication Network" means any electronic system provided by the Insured for use by a Bank Customer under an agreement with the Bank Customer which system allows the Bank Customer by use of a System Password to send instructions, via a personal computer or telephone key pad operating through telephone or similar communication lines, to the Insured for the purpose of allowing the Bank Customer to transfer Money to or from an Account or to pay bills electronically from the Account.

    (E)   "Relative" means a spouse, a lineal descendant or a member of the immediate family of a Bank Customer or a person normally resident in the household of a Bank Customer.

    (F)   "System Password" means a confidential and protected set of characters or numbers which identifies or authenticates a Bank Customer and permits that Bank Customer to gain access to the Off Site Banking Communication Network or any portion thereof.

    (G)   "Unauthorized Home Banking Electronic Transfer" means the unauthorized use of a System Password by a person or persons or entity other than the Bank Customer to access an Off Site Banking Communication Network to transfer Money from an Account established by a Bank Customer or to debit an Account established by a Bank Customer, from which transfer or debit the Bank Customer receives no benefit.

    (H)   "Unauthorized Use" means the use of a System Password by a person or persons or entity other than the Bank Customer provided the Bank Customer did not authorize the use or is not otherwise bound by the use under the law of agency.

**(P)   UNAUTHORIZED SIGNATURES AND ENDORSEMENTS**

Loss resulting directly from the Insured having accepted, paid or cashed any check or Withdrawal Order made or drawn on a customer's deposit account maintained with the Insured which bears the signature or endorsement of one other than a person whose name and signature is on file with the Insured as a signatory on such account. It shall be a condition precedent to the Insured's right of recovery under this Insuring Agreement (P) that the Insured shall have on file signatures of all persons who are signatories on such account.

**(Q)   FRAUDULENT REAL PROPERTY MORTGAGES**

Loss resulting directly from the Insured's having, in good faith and in the ordinary course of business in connection with any loan, accepted or received or acted upon the faith of any real property mortgages, real property deeds of trust or like instruments pertaining to realty or assignments of such mortgages, deeds of trust or instruments which prove to have been defective by reason of the signature on such document of any person having been obtained through trick, artifice, fraud, duress or false pretenses or the signature on the recorded deed conveying such real property to the mortgagor or grantor of such mortgage or deed of trust having been obtained by or on behalf of such mortgagor or grantor through trick, artifice, fraud, duress or false pretenses.

**(R)   TRANSIT CASH LETTERS**

Loss resulting directly from the physical destruction or other loss of

    (1)   an item enclosed and listed in a Transit Cash Letter while in transit between any office of the Insured and any place in the United States of America or Canada during the course of collection, presentation or payment, provided that such item is still missing 21 days after the Insured learns that the item has not arrived at the destination, or

D0156

(2)    a cancelled check (or checks) drawn by a customer after such check (or checks) has been charged to the customer's account with the Insured and after a statement of the condition of the account with the Insured purporting to enclose such check (or checks) has been dispatched or delivered to the customer.

The Company will also indemnify the Insured for the wages paid to temporary employees and overtime wages paid to regular employees for necessary services rendered in identifying the depositors of lost items, and in assisting those depositors in obtaining duplicates of the lost items and also necessary costs incurred in the use of mechanical devices and materials in obtaining duplicates of the Transit Cash Letter item(s) where such devices and materials are not owned by the Insured.

The Insured agrees to photograph the front and back or otherwise make a descriptive record of each item enclosed in a Transit Cash Letter. A descriptive record of an item shall provide information identifying the financial institution upon which the item is drawn, the payee, the drawer or maker of the item, the amount payable, the date of the item and any other information necessary to reconstruct the item. However, if no photograph of the item can be produced because of equipment failure or error by an Employee, coverage shall not be denied for that reason.

**(S)**    **STOP PAYMENT ORDER OR REFUSAL TO PAY CHECK**

(1)    Loss resulting from the payment by the Insured of legally imposed damages in connection with any notice to stop payment of a check, note or draft payable by the Insured and drawn, made or accepted by any depositor of the Insured and arising out of
   (a)    compliance or failure to comply with such notice,
   (b)    improper refusal to pay, or
   (c)    failure to give proper notice of dishonor.

(2)    Loss resulting from the payment by the Insured of legally imposed damages caused by reason that the Insured wrongfully dishonored any check or draft made or drawn by the customer of the Insured or any authorized representative of such customer.

   The coverage afforded by this Insuring Agreement (S) does not apply
   (a)    to liability assumed by the Insured under any agreement to be responsible for loss; and
   (b)    under sub-paragraph (2) above, damages shall not include the amount of any check or draft in question, nor any amounts paid to the payee, endorser or accommodation party of such check or draft.

**(T)**    **CLAIMS EXPENSE**

Reasonable expenses necessarily incurred and paid by the Insured in preparing any valid claims for loss caused by any dishonest or fraudulent act or acts of any of the Insured's Employees, which loss exceeds the Single Loss Deductible Amount applicable to Insuring Agreement (A).

**(U)**    **CHECK KITING**

Loss resulting directly from Check Kiting. In this Insuring Agreement (U), Check Kiting means

(1)    a scheme whereby the Insured's depositor (the "Depositor") or another person or entity in collusion with the Depositor continuously writes a series of checks for deposit to an account maintained with the Insured (the "Account");

(2)    the checks deposited to the Account are drawn on uncollected funds in accounts maintained in one or more other depository institutions; and

(3)    each such check deposited to the Account provides provisional credit for checks drawn on the Account which are, in turn, deposited to accounts maintained with other depository institutions to provide credit for checks drawn on those accounts; and

(4)    the scheme is committed with intent to defraud the Insured; and

(5)    the Insured is, in fact, deceived by such scheme.

D0157

Except as defined above, Check Kiting does not include checks not paid by other depository institutions for
(1)   non-sufficient funds,
(2)   no account,
(3)   closed account, or
(4)   forgery.

Check Kiting does not include deposits or withdrawals effected by electronic transfer. The Company shall not be liable for any loss which is the result of the willful extension of credit by the Insured through the payment of checks drawn upon uncollected items.

As a condition precedent to the Insured's rights under this Insuring Agreement (U), it shall be the duty of the Insured to

(1)   conform to standard practices and procedures used in the banking industry for the detection and prevention of Check Kiting, and

(2)   stop payment of any check drawn on the Account immediately upon discovery of Check Kiting and return all such checks unpaid.

This Insuring Agreement (U) shall not provide coverage in the case of any loss involving any Depositor having been found by the Insured, prior to the effective date of this Insuring Agreement (U), to have been involved in Check Kiting.

The coverage provided by this Insuring Agreement (U) shall be deemed immediately terminated as to any future acts of the Depositor upon discovery of any Check Kiting by that Depositor whether or not the Insured sustained a loss.

(V)   SERVICING CONTRACTORS

(A)   Loss through any dishonest or fraudulent act committed by any Servicing Contractor, acting alone or in collusion with others.

Dishonest or fraudulent acts as used in this Insuring Agreement (V) shall mean any dishonest or fraudulent acts committed by such Servicing Contractor with the manifest intent

(a)   to cause the Insured to sustain such loss, and

(b)   to obtain improper financial benefit for the Servicing Contractor or for another person or entity.

As used in this Insuring Agreement (V), financial benefit does not include any benefits earned in the normal course of employment, or performance of the servicing contract, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

(B)   Loss of Money (including obligations of the United States of America) collected or received for the Insured by any such Servicing Contractor through the failure of such Servicing Contractor to pay to the Insured the Money so collected or received as is discovered to be due and payable while this Insuring Agreement (V) is in force, except, however, Money disbursed by such Servicing Contractor in accordance with instructions from the Insured.

(W)   UNATTENDED AUTOMATED MECHANICAL DEVICES

Loss of Money or Negotiable Instruments while such Money or Negotiable Instruments are located within any Unattended Automated Mechanical Device caused by burglary or robbery, and for the damage to or destruction of such Unattended Automated Mechanical Device caused by burglary or robbery or attempt at burglary or robbery, provided, however, that this Insuring Agreement (W) does not cover loss

(1)   as a result of damage to the interior of a building containing an Unattended Automated Mechanical Device to which the public has access, resulting from vandalism or malicious mischief, or

(2)   to any customer of the Insured or to any representative of such customer while such person is on any premises containing an Unattended Automated Mechanical Device.

BI-FIB-POL (102000)                                9

D0158

## GENERAL AGREEMENTS

**(A)  NOMINEES**

Loss sustained by any nominee organized by the Insured for the purpose of handling certain of its business transactions and composed exclusively of its Employees shall, for all the purposes of this Bond and whether or not any partner of such nominee is implicated in such loss, be deemed to be loss sustained by the Insured.

**(B)  ADDITIONAL OFFICES OR EMPLOYEES-CONSOLIDATION, MERGER OR PURCHASE OF ASSETS-NOTICE**

 (A)  If the Insured shall, while this Bond is in force, establish any additional offices, other than by consolidation or merger with, or purchase or acquisition of assets or assumption of liabilities of, another institution, such offices shall be automatically covered under this Bond from the date of such establishment without the requirement of notice to the Company or the payment of additional premium for the remainder of the premium period.

 If the Insured shall, while this Bond is in force, consolidate or merge with, or purchase or acquire assets or assume liabilities of, or purchase or acquire more than 50% voting stock ownership of, another institution (in this Bond referred to as "Transaction"), except as provided in (B) below, the Insured shall not have such coverage as is afforded under this Bond for loss which

  (a)  has occurred or will occur in offices or premises,
  (b)  has been caused or will be caused by an employee or employees of such institution, or
  (c)  has arisen or will arise out of the assets or liabilities

acquired by the Insured as a result of such consolidation, merger or purchase or acquisition of assets or assumption of liabilities unless the Insured shall

  (i)  give the Company  written notice of the proposed consolidation, merger or purchase or acquisition of assets or assumption of liabilities prior to the proposed effective date of such Transaction,
  (ii)  obtain the written consent of the Company to extend the coverage provided by this Bond to such additional offices or premises, employees and other exposures, and
  (iii)  upon obtaining such consent, pay to the Company an additional premium.

 (B)  If the Transaction involves assets and liabilities in an amount less then 25% of the consolidated assets and liabilities of the Insured on the day immediately preceding the Transaction and the Insured gives the Company written notice of the proposed Transaction prior to or within 90 days subsequent to the Transaction date, coverage of this Bond shall be afforded for loss which

  (a)  is discovered on or after the effective date of the Transaction, and
  (b)  for which the act giving rise to the loss occurs on or after the effective date of the Transaction provided the loss is a Single Loss, as defined in Section 4 of CONDITIONS AND LIMITATIONS, which was sustained in its entirety on or after the effective date of the Transaction.

 Unless waived under (C) below, this coverage shall terminate ninety (90) days after the Transaction date unless the Insured shall, 1.) obtain the written consent of the Company to extend such coverage beyond said ninety (90) days, and, 2.) upon obtaining such consent, pay to the Company an additional premium.

 (C)  Should the Transaction involve assets and liabilities in an amount less then 25% of the consolidated assets and liabilities of the Insured on the day immediately preceding the Transaction and the acquired institution is not subject to any disciplinary action or proceedings by any state or federal officials or any supervisory agencies as of the date of the Transaction, such consent of the Company and additional premium shall be deemed waived by the Company for the remainder of the Bond Period.

**(C)  CHANGE OF CONTROL - NOTICE**

D0159

The Insured shall notify the Company or a change in control at the earliest practical time, not to exceed sixty (60) .ys, after the Insured learns of the change in control. As used in this General Agreement (C), control means the power to determine the management or policy of a controlling holding company or the Insured by virtue of voting stock ownership. A change in ownership of voting stock which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of ten percent (10%) or more of such stock shall be presumed to result in a change of control for the purpose of the required notice. Failure to give the required notice shall result in termination of coverage for any loss that occurs after the date such party acquired control involving a stockholder or affiliated group of stockholders that acquire control.

(D)   REPRESENTATION OF INSURED

No statement made by or on behalf of the Insured, whether contained in the application or otherwise, shall be deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement.

Any intentional misrepresentation, omission, concealment or incorrect statement of a material fact, in the application or otherwise, shall be grounds for the rescission of this Bond.

(E)   JOINT INSURED

If two or more Insureds are covered under this Bond, the first named Insured shall act for all Insureds. Payment by the Company to the first named Insured of loss sustained by any Insured shall fully release the Company on account of such loss. If the first named Insured ceases to be covered under this Bond, the Insured next named shall thereafter be considered as the first named Insured. Knowledge possessed or discovery made by any Insured shall constitute knowledge or discovery by all Insureds for all purposes of this Bond. The liability of the Company for loss or losses sustained by all Insureds shall not exceed the amount for which the Company would have been liable had all such loss or losses been sustained by one Insured.

(F)   COURT COSTS AND ATTORNEYS' FEES - NOTICE OF LEGAL PROCEEDINGS AGAINST INSURED-ELECTION TO DEFEND

The Company shall indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending any suit or legal proceedings brought against the Insured to enforce the Insured's liability, or alleged liability, on account of any loss, claim or damage which, if established against the Insured, would constitute a collectible loss under this Bond in excess of any applicable Single Loss Deductible Amount.

The Insured shall notify the Company at the earliest practicable moment, not to exceed sixty (60) days after notice thereof, of any such suit or legal proceeding and at the request of the Company shall furnish it with copies of all pleadings and other papers therein.

At the Company's election the Insured shall permit the Company to conduct the defense of such suit or legal proceeding in the Insured's name through attorneys of the Company's selection. In such event, the Insured shall give all reasonable information and assistance, other than pecuniary, which the Company shall deem necessary to the defense of such suit or legal proceeding.

If the amount of the Insured's liability or alleged liability is greater than the amount recoverable under this Bond, or any applicable Single Loss Deductible Amount, or both, the liability of the Company under this General Agreement (F) is limited to the proportion of court costs and attorneys' fees incurred and paid by the Insured or by the Company that the amount recoverable under this Bond bears to the total of such amount plus the amount which is not so recoverable. Such indemnity shall be a part of the Single Loss Limit of Liability for the applicable Insuring Agreement or Coverage.

If the Company pays court costs and attorneys' fees in excess of its proportionate share of such costs and fees, the Insured shall promptly reimburse the Company for such excess.

(G)   REIMBURSEMENT FOR REWARD PAYMENTS

The Company agrees to indemnify the Insured up to an amount of $10,000.00 per event for any reward(s) paid by .e Insured for information leading to the capture or apprehension of any person(s) who, while this Bond is in effect,

BI-FIB-POL (102000)                    11

D0160

shall have robbed any of the Insured's messengers, or robbed or burglarized any of the Insured's offices or branches, or shall have made an attempt at any such robbery or burglary.

(H)   EMPLOYEE PENSION AND BENEFIT PLANS

With respect to the coverage afforded under Insuring Agreement (A) of this Bond it is agreed as that

(a)   Employee as used in this General Agreement (H) shall include any natural person who is a director or trustee of the Insured while such director or trustee is engaged in handling funds or other property of any employee welfare or pension benefit plan owned, controlled or operated by the Insured or any natural person who is a trustee, manager, officer or employee of any such plan.

(b)   The term Insured shall include any employee welfare or pension benefit plan established by the Insured for the benefit of its Employees.

(c)   The Deductible Amount applicable to loss sustained through acts or defaults committed by Employees shall not apply to loss sustained by an employee welfare or pension benefit plan covered through acts or defaults committed by any Employee of any such plan.

(d)   Nothing contained in this General Agreement (H) shall vary, waive or extend any of the terms, conditions, provisions, agreements or limitations of this Bond, other than as stated in this General Agreement (H).

BI-FIB-POL (102000)                    12

D0161

## CONDITIONS AND LIMITATIONS

SECTION 1.   DEFINITIONS

As used in this Bond

(a)    Acceptance means a draft which the drawee has, by signature written on the draft, engaged to honor as presented.

(b)    Account Code means a confidential and protected string of characters which identifies or authenticates a person and permits that person to gain access to a Voice Computer System for the purpose of making toll calls or utilizing voice mail box messaging capabilities or other similar functional features of the Voice Computer System.

(c)    Bond means this BancInsure Financial Institution Bond.

(d)    Bond Period means the bond period set forth in Item 2. of the Declarations.

(e)    Certificate of Deposit means an acknowledgment in writing by a financial institution of receipt of Money with an engagement to repay it.

(f)    Certificate of Origin or Title means a document issued by a manufacturer of personal property or a governmental agency evidencing the ownership of the personal property and by which ownership is transferred.

(g)    Certificated Security means a share, participation or other interest in property of, or an enterprise of, the issuer or an obligation of the issuer which is

    (1)    represented by an instrument issued in bearer or registered form,

    (2)    of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium  for investment, and

    (3)    either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

(h)    Computer Program means a set of related electronic instructions which direct the operations and functions of a computer or devices connected to it which enable the computer or devices to receive, process, store or send Electronic Data.

(i)    Computer System means

    (1)    computers with related peripheral components, including storage components wherever located,

    (2)    systems and applications software,

    (3)    terminal devices, and

    (4)    related communication networks

    by which Electronic Data are electronically collected, transmitted, processed, stored and retrieved.

(j)    Counterfeit means an imitation which is intended to deceive and to be taken as an original.

(k)    Document of Title means a bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers and must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

(l)    Electronic Data means facts or information converted to a form usable in a Computer System by Computer Programs and which is stored on magnetic tapes or disks, or optical storage disks or other bulk media.

(m)    Employee means

    (1)    an officer or other employee of the Insured, while employed in or at by any of the Insured's offices or premises covered under this Bond, and a guest student pursuing studies or duties in any of said offices or premises,

    (2)    an attorney retained by the Insured and an employee of such attorney while either is performing legal services for the Insured,

    (3)    a person provided by an employment contractor to perform employee duties for the Insured under the Insured's supervision at any of the Insured's offices or premises covered under this Bond,

    (4)    an employee of an organization merged or consolidated with the Insured prior to the effective date of this Bond;

D0162

(5)  each natural person or organization authorized by the Insured to perform services as data processor of checks or other accounting records of the Insured (not including preparation or modification of computer software or programs), herein called Processor. (Each such Processor, and the partners, officers and employees of such processor shall collectively be deemed to be one Employee for all the purposes of this Bond, excepting, however, the second paragraph of Section 12. A Federal Reserve Bank or clearinghouse shall not be construed to be a Processor.);

(6)  a consultant retained by the Insured and an employee of such consultant while either is performing consulting services for the Insured pursuant to a written contract, and

(7)  a director or trustee of the Insured other than one employed as a salaried, pensioned or elected official or an Employee of the Insured, when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured.

(n)  Evidence of Debt means an instrument, including a Negotiable Instrument, executed by a customer of the Insured and held by the Insured which in the regular course of business is treated as evidencing the customer's debt to the Insured.

(o)  Forgery means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(p)  Funds means Money on deposit in an account.

(q)  Guarantee means a written undertaking obligating the signer to pay the debt of another to the Insured or its assignee or to a financial institution from which the Insured has purchased a participation in the debt, if the debt is not paid in accordance with its terms.

(r)  Instruction means a written order to the issuer of an Uncertificated Security requesting that the transfer, pledge, or release from pledge of the Uncertificated Security specified be registered.

(s)  Letter of Credit means an engagement in writing by a financial institution or other person made at the request of a customer that the financial institution or other person will honor drafts or other demands for payment upon compliance with the conditions specified in the Letter of Credit.

(t)  Loan means all extensions of credit by the Insured and all transactions creating a creditor relationship in favor of the Insured and all transactions by which the Insured assumes an existing creditor relationship.

(u)  Money means a medium of exchange in current use authorized or adopted by a domestic or foreign government as a part of its currency.

(v)  Negotiable Instrument means any writing

(1)  signed by the maker or drawer, and

(2)  containing any unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer, and

(3)  is payable on demand or at a definite time, and

(4)  is payable to order or to bearer.

(w)  Property means Money, Certificated Securities, Uncertificated Securities, Negotiable Instruments, Certificates of Deposit, Documents of Title, Acceptances, Evidences of Debt, Security Agreements, Withdrawal Orders, Certificates of Origin or Title, Letters of Credit, insurance policies, abstracts of title, deeds and mortgages on real estate, revenue and other stamps including food stamps issued by the U.S. Government, tokens, unsold state lottery tickets, books of account and other records whether recorded in writing or electronically, gems, jewelry, precious metals of all kinds and tangible items of personal property which are not hereinbefore enumerated in which the Insured has an interest or has physical custody.

(x)  Security Agreement means an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation.

(y)  Servicing Contractor means a natural person or organization other than an officer or employee of the Insured, duly authorized by the Insured to perform any or all of the following

(1)  collect and record payments on real estate mortgage or home improvement loans made, held or assigned to the Insured, and establish tax and insurance escrow accounts,

(2)  manage real property owned by or under the supervision or control of the Insured,

(3)  perform other acts directly related to the above,

D0163

but only while such natural person or organization is actually performing such services within the United States of America, the Virgin Islands, Puerto Rico or Canada. In no event shall any activity described in (y) (1), (2) or (3) above include the sale of real property mortgages to the Insured by the Servicing Contractor or by any affiliate of the Servicing Contractor.

The term Servicing Contractor shall include the partners, officers and employees of such Servicing Contractors and each such Servicing Contractor and its partners, officers and employees shall collectively be deemed to be one person for all purposes of subsection (c) of Single Loss Defined in Section 4., SINGLE LOSS LIMIT OF LIABILITY-NON ACCUMULATION OF LIABILITY.

(z)    Signature Guarantee Program means the Signature Guarantee Program as defined in the provisions of Title 17, Chapter II of the Code of Federal Regulations further identified as Section 240.17Ad-15.

(aa)    Statement of Uncertificated Security means a written statement of the issuer of an Uncertificated Security containing

    (1)    a description of the issue of which the Uncertificated Security is a part,

    (2)    the number of shares or units

        (a)    transferred to the registered owner,

        (b)    pledged by the registered owner to the registered pledgee,

        (c)    released from pledge by the registered pledgee,

        (d)    registered in the name of the registered owner on the date of the statement, or

        (e)    subject to pledge on the date of the statement,

    (3)    the name and address of the registered owner and registered pledgee;

    (4)    a notation of any liens and restrictions of the issuer and any adverse claims to which the Uncertificated Security is or may be subject or a statement that there are none of those liens, restrictions or adverse claims, and

    (5)    the date

        (a)    the transfer of the shares or units to the new registered owner of the shares or units was registered,

        (b)    the pledge of the registered pledgee was registered, or

        (c)    of the statement, if it is a periodic or annual statement.

(bb)    System Administration means the performance of security functions including but not limited to defining authorized persons to access a Voice Computer System and adding, changing and deleting Account Codes or passwords in connection therewith; and invoking or revoking a Voice Computer System option which directs telephone call routing or which adds, moves or drops telephone lines or which performs any other similar activity allowed by a hardware or software-based Voice Computer System option that has been incorporated by a manufacturer or vendor into a Voice Computer System or any component thereof provided said Voice Computer System option is not intended for the sole use of such manufacturer or vendor.

(cc)    System Maintenance means the performance of hardware and software installation, diagnostics and corrections and similar activities that are performed in the usual custom and practice by a manufacturer or vendor to establish or maintain the basic operational functionality of a Voice Computer System or any component thereof.

(dd)    System Password means a confidential and protected string of characters which identifies or authenticates a person and permits that person to gain access to a Voice Computer System or any portion thereof for the purpose of performing System Administration or System Maintenance activities.

(ee)    Telefacsimile Device means a machine capable of sending or receiving a duplicate image of a document by means of electronic impulses transmitted through a telephone line and which reproduces the duplicate image on paper.

(ff)    Tested means a method of authenticating the contents of a communication by placing a valid test key on it which has been agreed upon by the Insured and a customer, automated clearing house, or another financial institution for the purpose of protecting the integrity of the communication in the ordinary course of business.

(gg)    Transit Cash Letter means any letter or package containing checks, drafts and similar items (itemized by separate amounts and accepted by the Insured for deposit, payment, collection or settlement) sent by the Insured to another office of the Insured, to a processing center, to a correspondent bank or to a Federal Reserve Bank for deposit, payment, collection or settlement.

(hh)  Transportation Company means any organization which provides its own or leased vehicles for transportation or which provides freight forwarding or air express services.

(ii)  Unattended Automated Mechanical Devices mean automated mechanical devices which, on behalf of the Insured, disburse Money, accept deposits, cash checks, drafts or similar written instruments, or make credit card loans and are not situated within or attached to or made a part of an office of the Insured which office is permanently staffed by an Employee whose duties are those usually assigned to a teller.

(jj)  Voice Computer System means a Computer System installed in one location which functions as a private branch exchange (PBX), voice mail processor, automated call attendant or provides a similar capability used for the direction or routing of telephone calls in a voice communications network.

(kk)  Uncertificated Security means a share, participation or other interest in property of, or an enterprise of, the issuer or an obligation of the issuer, which is

(1)  not represented by an instrument and the transfer of which is registered upon books maintained for that purpose by or on behalf of the issuer,

(2)  of a type commonly dealt in on securities exchanges or markets, and

(3)  either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

(ll)  Withdrawal Order means a non-negotiable instrument, other than an Instruction, signed by a customer of the Insured authorizing the Insured to debit the customer's account in the amount of funds stated therein.

## SECTION 2.    EXCLUSIONS

This Bond does not cover

(a)  loss resulting directly or indirectly from forgery or alteration, except when covered under Insuring Agreement (A), (D), (E) or (F);

(b)  loss due to riot or civil commotion outside the United States of America and Canada; or loss due to military, naval or usurped power, war or insurrection unless such loss occurs in transit in the circumstances recited in Insuring Agreement (C), and unless, when such transit was initiated, there was no knowledge of such riot, civil commotion, military, naval or usurped power, war or insurrection on the part of any person acting for the Insured in initiating such transit;

(c)  loss resulting directly or indirectly from the effects of nuclear fission or fusion or radioactivity; provided, however, that this exclusion shall not apply to loss resulting from industrial uses of nuclear energy;

(d)  loss resulting directly or indirectly from any acts of any director or trustee of the Insured other than one employed as a salaried, pensioned or elected official or an Employee of the Insured, except when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors or trustees of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured;

(e)  loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any Loan or transaction involving the Insured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such Loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreement (A), (D),(E),(P) or (Q);

(f)  loss of Property contained in customers' safe deposit boxes unless (1) the Insured is legally liable for the loss and the loss is covered under Insuring Agreement (A), or (2) the loss is covered under Insuring Agreement (G);

(g)  under Insuring Agreement (R), in addition to all of the other exclusions, loss resulting directly or indirectly from a dishonest or fraudulent act of an employee of a correspondent or drawee financial institution to which the Transit Cash Letter involved in the loss is transmitted or addressed, except when covered under Insuring Agreement (A);

D0165

(h)  loss caused by an Employee, except when covered under Insuring Agreement (A) or when covered under Insuring Agreement (B), (C) or (R) and resulting directly from misplacement, mysterious unexplainable disappearance or destruction of or damage to Property;

(i)  loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any Employee in connection with any account relating to such trading, indebtedness, or balance, except when covered under Insuring Agreement (D) or (E);

(j)  shortage in any teller's cash due to error, regardless of the amount of such shortage, and any shortage in any teller's cash which is not in excess of the normal shortage in the teller's cash in the office where such shortage shall occur shall be presumed to be due to error;

(k)  loss resulting directly or indirectly from the use or purported use of credit, debit, charge, access, convenience, identification or other cards
   (1)  in obtaining credit or funds,
   (2)  in gaining access to automated mechanical devices which, on behalf of the Insured, disburse Money, accept deposits, cash checks, drafts or similar written instruments or make credit card loans, or
   (3)  in gaining access to point of sale terminals, customer-bank communication terminals, or similar electronic terminals of electronic funds transfer systems, whether such cards were issued, or purport to have been issued, by the Insured or by anyone other than the Insured, except when covered under Insuring Agreement (A);

(l)  loss (including loss of Property) involving automated mechanical devices (whether or not unattended) which, on behalf of the Insured, disburse Money, accept deposits, cash checks, drafts or similar written instruments or make credit card loans, resulting from
   (1)  damage to such automated mechanical devices from vandalism or malicious mischief unless such vandalism or malicious mischief is perpetrated from within an office of the Insured, or
   (2)  the mechanical breakdown or failure of such automated mechanical devices to function properly, or
   (3)  misplacement or mysterious unexplainable disappearance while such Property is located within any such automated mechanical devices, except when covered under Insuring Agreement (A);

(m)  loss through the surrender of Property away from an office of the Insured as a result of a threat
   (1)  to do bodily harm to any person, except loss of Property in transit in the custody of any person acting as messenger provided that when such transit was initiated there was no knowledge by the Insured of any such threat, or
   (2)  to do damage to the premises or property of the Insured, except when covered under Insuring Agreement (A);

(n)  loss resulting directly or indirectly from payments made or withdrawals from a depositor's account involving erroneous credits to such account, unless such payments or withdrawals are physically received by such depositor or representative of such depositor who is within the office of the Insured at the time of such payment or withdrawal, or except when covered under Insuring Agreements (A) or (H);

(o)  loss resulting directly or indirectly from payments made or withdrawals from a depositor's account involving items of deposit which are not finally paid for any reason, including but not limited to Forgery or any other fraud, except when covered under Insuring Agreement (A), (H), (I) or (U), however, this exclusion does not apply to United States Government checks or drafts which are returned to the Insured by the United States Government for any reason after the funds for said checks or drafts have been remitted to the Insured or credited to the Insured's account;

(p)  loss resulting directly or indirectly from counterfeiting, except when covered under Insuring Agreement (A), (D), (E), or (F);

(q)  loss of any tangible item of personal property which is not specifically enumerated in the paragraph defining Property, if such property is specifically insured by other insurance of any kind and in any amount obtained by the Insured, and in any event, loss of such property occurring more than sixty (60) days after the Insured shall have become aware that it is liable for the safekeeping of such property, except when covered under Insuring Agreement (A) or (B)(3);

(r)  loss of Property while
   (1)  in the mail, or

D0166

    (2)    in the custody of any Transportation Company, unless covered under Insuring Agreement (C) except when covered under Insuring Agreement (A) or (R);

(s)    potential income, including but not limited to interest and dividends, not realized by the Insured (including for purposes of this exclusion portions of outstanding promissory notes payable to the Insured which represent payments of interest, fees and penalties in connection with prior promissory notes payable to the Insured);

(t)    damages of any type for which the Insured is legally liable, except compensatory damages, but not multiples thereof, arising directly from a loss covered under this Bond;

(u)    all fees, costs and expenses incurred by the Insured in establishing the existence of or amount of loss covered under this bond except when covered under Insuring Agreement (T);

(v)    indirect or consequential loss of any nature;

(w)    loss resulting from any violation by the Insured or by any Employee
    (1)    of law regulating
        (i)    the issuance, purchase or sale of securities,
        (ii)    securities transactions upon security exchanges or over the counter market,
        (iii)    investment companies, or
        (iv)    investment advisers, or
    (2)    of any rule or regulation made pursuant to any such law, unless it is established by the Insured that the act or acts which caused the loss involved fraudulent or dishonest conduct which would have caused a loss to the Insured in a similar amount in the absence of such laws, rules or regulations;

(x)    loss resulting directly or indirectly from the failure of a financial or depository institution, or its receiver or liquidator, to pay or deliver, on demand of the Insured, funds or Property of the Insured held by it in any capacity, except when covered under Insuring Agreement (A) or (B)(1)(a);

(y)    loss involving any Uncertificated Security except an Uncertificated Security of any Federal Reserve Bank of the United States or when covered under Insuring Agreement (A), (E) or (K);

(z)    damages resulting from any civil, criminal or other legal proceeding in which the Insured is alleged to have engaged in racketeering activity except when the Insured establishes that the act or acts giving rise to such damages were committed by an Employee under circumstances which result directly in a loss to the Insured covered by Insuring Agreement (A). For the purposes of this exclusion, "racketeering activity" is defined in 18 United States Code 1961 et seq., as amended;

(aa)    under Insuring Agreement (G), in addition to all of the other Exclusions
    (1)    loss of Customers' Property held by the Insured in trust for more than thirty days or as collateral,
    (2)    under coverage (1), loss for which the Insured is responsible under the terms of an agreement,
    (3)    under coverage (2), loss by moths, vermin, wear and tear, and gradual deterioration, and
    (4)    loss due to any nuclear incident or radioactive contamination;

(bb)    under Insuring Agreements (H), (I), (J), (K), (L), (M), (N) and (O), in addition to all of the other Exclusions
    (1)    loss resulting directly or indirectly from entry or change of Electronic Data or Computer Programs in a Computer System, unless covered under    Insuring Agreement (H),(I),(L),(M) or (O),
    (2)    loss resulting directly or indirectly from the Insured having transferred Funds in reliance on the validity of a voice instruction, unless covered under Insuring Agreement (H) or (J),
    (3)    loss resulting directly or indirectly by the Insured having transferred or delivered Funds, Certificated Securities or Uncertificated Securities in reliance on an instruction received through a Telefacsimile Device, unless covered under Insuring Agreement (K),
    (4)    loss resulting directly or indirectly from theft of confidential information,
    (5)    loss resulting directly or indirectly from the assumption of liability by the   Insured by contract unless the liability arises from a loss covered by this Bond and would be imposed on the Insured regardless of the existence of the contract,
    (6)    the cost of duplication of Electronic Data or Computer Programs, unless covered under Insuring Agreements (L) or (M),
    (7)    loss involving a Voice Computer System, unless covered under Insuring Agreement (N),
    (8)    loss involving automated mechanical devices which, on behalf of the Insured, disburse money, accept deposits, cash checks, drafts or similar written instruments or make credit card loans,
    (9)    loss resulting directly or indirectly from

D0167

    (a)    written instructions or advices, or

    (b)    telegraphic or cable instructions or advices, unless the instructions or advices are Tested and the loss is covered under Insuring Agreement (H) or (I),

(10)    loss resulting directly or indirectly from negotiable instruments, securities, documents or other written instruments which bear a forged signature, or are counterfeit, altered or otherwise fraudulent and which are used as source documentation in the preparation of Electronic Data or manually keyed into a data terminal,

(11)    loss resulting directly or indirectly from the fraudulent preparation, or fraudulent modification of Computer Programs unless covered under Insuring Agreement (H) or (I),

(12)    loss resulting directly or indirectly from

    (a)    mechanical failure, faulty construction, error in design, latent defect, fire, wear or tear, gradual deterioration, electrical disturbance or electrical surge which affects a Computer System,

    (b)    failure or breakdown of electronic data processing media, or

    (c)    error or omission in programming or processing,

(13)    loss as a result of a threat

    (a)    to do bodily harm to any person

    (b)    to do damage to the premises or property of the Insured, or

    (c)    to Computer System operations,

(14)    loss resulting directly or indirectly from the use of a telephone credit, debit, charge, identification or similar card to gain access to the Insured's Voice Computer System,

(15)    loss resulting directly or indirectly from the use or purported use of credit, debit, charge, access, convenience, customer identification or other cards,

(16)    loss resulting directly or indirectly from the input of Electronic Data into a Computer System terminal device either on the premises of a customer of the Insured or under the control of such customer by a person who had authorized access to the customer's authentification mechanism,

(17)    loss caused by a director or Employee of the Insured or by a person in collusion with any director or Employee of the Insured (collusion shall include the willful withholding of knowledge from the Insured by any director or Employee that a fraudulent act by a person not an employee has been or will be perpetrated against the Insured), except when loss is caused by an Employee and covered under Insuring Agreement (L) or (M);

(cc)    under Insuring Agreement (O), in addition to all of the other Exclusions

(1)    loss due to any fraudulent, dishonest or criminal act by any Bank Customer or any person acting in collusion with a Bank Customer, whether acting alone or in collusion with others,

(2)    loss resulting from a transfer from or debit to an Account which is initiated by an authorized representative or Relative of the Bank Customer,

(3)    loss resulting directly or indirectly from the voluntary surrendering by any Bank Customer of any System Password, in whole or in part, to any person or entity,

(4)    loss resulting from a transfer from or debit to any Account which is initiated by the Insured or any Employee thereof,

(5)    loss in connection with any preauthorized transfer from any Account to or for the benefit of the Insured, or any other Account of the Bank Customer or any Relative,

(6)    loss of potential income not realized by a Bank Customer or Insured; provided, however, that this exclusion shall not apply to interest income that would have been earned, in connection with the terms of a Bank Customer's Account, on Money lost as the direct result of an Unauthorized Home Banking Electronic Transfer, or

(7)    loss arising out of any actual or alleged violation of any Consumer Law by the Insured or any Employee of the Insured. "Consumer Law" means any federal, state or local law or regulation relating to electronic funds transfers to or from an Account or use of an Off Site Banking Communication Network, including, but not limited to, the Federal Electronic Funds Transfer Act and the Federal Truth-in-Savings Act;

It is understood and agreed that exclusions (1) through (7) above apply only to Insuring Agreement (O) and do not apply to any other Insuring Agreements unless included in those Insuring Agreements.

(dd)    under Insuring Agreement (V), in addition to all of the other Exclusions

(1)    loss resulting from the insolvency, bankruptcy or taking over by a receiver or other liquidator or by state or federal officials or supervisory agencies of any depository institution, unless such

depository institution is a Servicing Contractor covered under this Bond and unless such insolvency, bankruptcy or taking over results from fraud or dishonesty of officers or Employees of such depository institution,

(2)    under paragraph (B), loss through the failure of any Servicing Contractor covered under this Bond to collect or receive Money for the account of the Insured, any agreement between such Servicing Contractor and the Insured to the contrary notwithstanding,

(3)    under paragraph (B), loss of Money collected or received for the account of the Insured by any Servicing Contractor covered under this Bond unless such Servicing Contractor is legally liable to the Insured on account of the loss of such Money, or

(4)    loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any Loan made to a Servicing Contractor, including any such Loan established to provide funds for interim financing or "warehousing" of mortgage loans, whether procured in good faith or through fraud or false pretenses, or loss resulting directly or indirectly from the failure of the Servicing Contractor to pay over Property held as security for any such Loan;

It is understood and agreed that exclusions (1) through (4) above apply only to Insuring Agreement (V) and do not apply to any other Insuring Agreements unless included in those Insuring Agreements.

(ee)    loss involving any Unattended Automated Mechanical Devices, except when covered under Insuring Agreement (W).

## SECTION 3.    DISCOVERY

This Bond applies to loss discovered by the Insured during the Bond Period. Discovery occurs when a director, trustee, officer, branch manager or risk manager of the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this Bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when a director, trustee, officer, branch manager or risk manager of the Insured receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would constitute a loss under this Bond.

## SECTION 4.    SINGLE LOSS LIMIT OF LIABILITY - NON ACCUMULATION OF LIABILITY

The Company's liability for each Single Loss discovered during the Bond Period shall not exceed the applicable Single Loss Limit of Liability shown in Item 3. of the Declarations. If a Single Loss is covered under more than one Insuring Agreement or Coverage, the maximum payable shall not exceed the largest applicable Single Loss Limit of Liability.

**Single Loss Defined**

Single Loss means all covered loss, including court costs and attorneys' fees incurred by the Company under General Agreement (F), resulting from

(a)    any one act or series of related acts of burglary, robbery or attempted burglary or robbery, in which no Employee is implicated,

(b)    any one act or series of related unintentional or negligent acts or omissions on the part of any person (whether an Employee or not) resulting in damage to or destruction or misplacement of Property,

(c)    all acts or omissions other than those specified in (a) and (b) preceding, caused by any person (whether an Employee or not) or in which such person is implicated, or

(d)    any one casualty or event not specified in (a), (b) or (c) above.

**Non Accumulation of Liability**

The Single Loss Limit of Liability of the Company shall not be cumulative in amount from Bond Period to Bond Period regardless of the number of years this Bond shall be in force, the number of times this Bond may be renewed, and the number of premiums which shall be payable or paid.

D0169

**SECTION 5.   NOTICE / PROOF-LEGAL PROCEEDINGS AGAINST COMPANY**

(a)   At the earliest practicable moment, not to exceed sixty (60) days, after discovery of loss, the Insured shall give the Company notice of the loss.

(b)   Within 6 months after such discovery, the Insured shall furnish to the Company proof of loss, duly sworn to, with full particulars.

(c)   Lost Certificated Securities listed in a proof of loss shall be identified by certificate or bond numbers if such securities were issued with such numbers.

(d)   Proof of loss for claim under the Voice Initiated Transfer Fraud Insuring Agreement (J) must include the verification call-back, if such call-back was required.

(e)   Proof of loss for claim under the Telefacsimile Transfer Fraud Insuring Agreement (K) must include a copy of the document reproduced by the Telefacsimile Device.

(f)   Legal proceedings for the recovery of any loss under this Bond shall not be brought prior to the expiration of sixty (60) days after the original proof of loss is filed with the Company or after the expiration of 24 months from the discovery of such loss, except that any action or proceeding to recover under this Bond on account of any judgment against the Insured in any suit mentioned in General Agreement (F), or to recover attorneys' fees paid in any such suit, shall be brought within 24 months from the date upon which the judgment and such suit shall become final.

(g)   If any limitation embodied in this Bond is prohibited by any law controlling the construction of this Bond, such limitation shall be deemed to be amended so as to equal the minimum period of limitation provided by such law.

(h)   This Bond affords coverage only in favor of the Insured. No suit, action or legal proceedings shall be brought under this Bond by any one other than the Insured.

**SECTION 6.   VALUATION**

**Money**

Any loss of Money or loss payable in Money shall be paid, at the option of the Insured, in the Money of the country in which the loss was sustained or in the United States of America dollar equivalent thereof determined at the rate of exchange at the time of payment of such loss.

**Securities**

The Company shall settle in kind its liability under this Bond on account of a loss of any securities or, at the option of the Insured, shall pay to the Insured the cost of replacing such securities, determined by the market value of the securities either at the time of loss or at the time of such settlement, whichever is greater.  The Company also will pay the full premium for any lost securities bond purchased on account of a loss of any securities, regardless of any Deductible Amount, if the loss exceeds the Deductible Amount.  In case of a loss of subscription, conversion or redemption privileges through misplacement or loss of securities, the amount of such loss shall be the value of such privileges immediately preceding the expiration of such privileges.  If such securities cannot be replaced or have no quoted market value, or if such privileges have no quoted market value, their value shall be determined by agreement or arbitration.

If the applicable coverage of this Bond is subject to a Deductible Amount and/or it is not sufficient in the amount to indemnify the Insured in full for the loss of securities for which claim is made under this Bond, the liability of the Company under this Bond is limited to the payment for, or the duplication of, so much of such securities as has a value equal to the amount of such applicable coverage.

**Books of Account and Other Records**

In case of loss of, or damage to, any books of account or other records used by the Insured in its business, the Company shall be liable under this Bond only if such books or records are actually reproduced and then for not more than the cost of the blank books, blank pages or other materials plus the cost of labor for the actual transcription or copying of data which shall have been furnished by the Insured in order to reproduce such books and other records.

BI-FIB-POL (102000)                   21

**Property other than Money, Securities or Records**

In case of loss of or damage to any Property other than Money, securities, books of account or other records, or damage covered under Insuring Agreement (B)(3), the Company shall not be liable for more than the actual cash value of such Property, or of items covered under Insuring Agreement (B)(3). The Company may, at its election, pay the actual cash value of, replace or repair such property. Disagreement between the Company and the Insured as to the cash value or as to the adequacy of repair or replacement shall be resolved by arbitration.

**SECTION 7.   ASSIGNMENT-SUBROGATION-RECOVERY-COOPERATION**

(a)   In the event of payment under this Bond, the Insured shall deliver, if so requested by the Company, an assignment of such of the Insured's rights, title and interest and causes of action as it has against any person or entity to the extent of the loss payment.

(b)   In the event of payment under this Bond, the Company shall be subrogated to all of the Insured's rights of recovery therefor against any person or entity to the extent of such payment.

(c)   Recoveries, whether effected by the Company or by the Insured, shall be applied net of the expense of such recovery first to the satisfaction of the Insured's loss which would otherwise have been paid but for the fact that it is in excess of the Single Limit of Liability, secondly, to the Company as reimbursement of amounts paid in settlement of the Insured's claim, and thirdly, to the Insured in satisfaction of any Deductible Amount. Recovery on account of loss of securities as set forth in the second paragraph of Section 6. above or recovery from reinsurance and/or indemnity of the Company shall not be deemed a recovery as used in this Section 7.

(d)   Upon the Company's request and at reasonable times and places designated by the Company the Insured shall

(1)   submit to examination by the Company and subscribe to the same under oath,

(2)   produce for the Company's examination all pertinent records, and

(3)   cooperate with the Company in all matters pertaining to the loss.

(e)   The Insured shall execute all papers and render assistance to secure to the Company the rights and causes of action provided for in this Section 7. The Insured shall do nothing after discovery of loss to prejudice such rights or causes of action.

**SECTION 8.   LIMIT OF LIABILITY UNDER THIS BOND AND PRIOR INSURANCE**

With respect to any loss set forth in subsection (c) of Single Loss Defined within Section 4. of this Bond, above, which is recoverable or recovered in whole or in part under any other bonds or policies issued by the Company to the Insured or to any predecessor in interest of the Insured and terminated or canceled or allowed to expire and in which the period for discovery has not expired at the time any such loss under such other bonds or policies is discovered, the total liability of the Company under this Bond and under such other bonds or policies shall not exceed, in the aggregate, the amount carried under this Bond on such loss or the amount available to the Insured under such other bonds or policies, as limited by the terms and conditions of such other bonds or policies, for any such loss if the latter amount be the larger.

If the coverage of this Bond supersedes in whole or in part the coverage of any other bond or policy of insurance issued by an insurer other than the Company and terminated, canceled or allowed to expire, the Company, with respect to any loss sustained prior to such termination, cancellation or expiration and discovered within the period permitted under such other bond or policy for the discovery of loss under such other bond or policy, shall be liable under this Bond only for that part of such loss covered by this Bond as is in excess of the amount recoverable or recovered on account of such loss under such other bond or policy, anything to the contrary in such other bond or policy notwithstanding.

**SECTION 9.   OTHER INSURANCE OR INDEMNITY**

Coverage afforded under this Bond shall apply only as excess over any valid and collectible insurance or indemnity obtained by the Insured, by one other than the Insured on Property subject to Exclusion (q) of this Bond, above, by a Transportation Company, or by another entity on whose premises the loss occurred or which employed the person causing the loss or the messenger conveying the property involved.

D0171

### SECTION 10.   OWNERSHIP

This Bond shall apply to loss of Property (a) owned by the Insured, (b) held by the Insured in any capacity, or (c) for which the Insured is legally liable. This Bond shall be for the sole use and benefit of the Insured named in the Declarations.

### SECTION 11.   DEDUCTIBLE AMOUNT

The Company shall be liable under this Bond only for the amount by which any Single Loss, as defined in Section 4. of this bond, above, exceeds the Single Loss Deductible Amount for the Insuring Agreement or Coverage applicable to such loss, subject to the applicable Single Loss Limit of Liability.

The Insured shall, in the time and in the manner prescribed in this Bond, give the Company notice of any loss of the kind covered by the terms of this Bond that exceeds 10% of the Deductible Amount applicable to such loss, whether or not the Company is liable for the loss, and upon the request of the Company shall file with it a brief statement giving the particulars concerning such loss.

### SECTION 12.   TERMINATION OR CANCELATION

This Bond terminates in its entirety upon occurrence of any of the following: (a) 90 days after the receipt by the Insured of a written notice from the Company of its intention to cancel this Bond, provided, however, if the reason for cancellation is failure of the Insured to pay any premium when due, cancellation shall be effective 10 days after the receipt by the Insured of a written notice from the Company of the notice of cancellation for non-payment of the premium; (b) immediately upon the receipt by the Company of a written notice from the Insured of its intention to cancel this Bond; (c) immediately upon the taking over of the Insured by a receiver or other liquidator or by any state or federal officials or supervisory agencies; (d) immediately upon the taking over of the Insured by another institution; or (e) immediately upon expiration of the Bond Period as set forth in Item 2. of the Declarations.

This Bond terminates as to any Employee or any partner, officer or employee of any Processor or Servicing Contractor

      (a)   as soon as any director, trustee, officer, branch manager or risk manager of the Insured not in collusion with such person, learns of any dishonest or fraudulent act committed by such person at any time, whether in the employment of the Insured or otherwise, whether or not of the typecovered under Insuring Agreement (A), against the Insured or any other person or entity, without prejudice to the loss of any Property then in transit in the custody of such person, or

      (b)   fifteen (15) days after the receipt by the Insured of a written notice from the Company of its intention to cancel this Bond as to such person.

Termination as to any Employee shall not apply if the dishonest or fraudulent act occurred prior to employment with the Insured, was a non employment related act and involved less than Five Thousand Dollars ($5,000).

The Bond shall be deemed canceled as to any Servicing Contractor (a) immediately upon discovery by the Insured of any dishonest or fraudulent act on the part of such Servicing Contractor unless within five days after discovery of such act, the Insured shall give the Company written notice of the dishonest or fraudulent act and in such event this Bond shall be deemed canceled as to such Servicing Contractor at the expiration of thirty days after such discovery of such act, or (b) at 12:01 a.m., as aforesaid, upon the effective date specified in a written notice served upon the Insured or sent by mail. Such date, if the notice be served, shall be not less than thirty days after such service, or if sent by mail, not less than thirty-five days after the date of mailing. The mailing by the Company of notice, as aforesaid, to the Insured at its Principal Address shown in Item 1. of the Declarations shall be sufficient proof of notice.

Termination of this Bond as to any Insured terminates liability for any loss sustained by such Insured which is discovered after the effective date of such termination.

### SECTION 13.   RIGHTS AFTER TERMINATION OR CANCELLATION

At any time prior to the termination or cancellation of this Bond in its entirety, whether by the Insured or the Company, the Insured may give to the Company written notice that it desires under this Bond an additional period of

D0172

12 months within which to discover loss sustained by the Insured prior to the effective date of such termination or cancellation and shall pay an additional premium for the additional period.

Upon receipt of such notice and additional premium from the Insured, the Company shall give its written consent to the additional period; provided, however, that such an additional period of time shall terminate immediately

    (a)   on the effective date of any other insurance obtained by the Insured, its successor in business or any other party, replacing in whole or in part the insurance afforded by this Bond whether or not such other insurance provides coverage for loss sustained prior to its effective date, or

    (b)   upon any takeover of the Insured's business by any State or Federal official or agency, or by any receiver or liquidator acting or appointed for this purpose, without the necessity of the Company giving notice of such termination.

In the event that such additional period of time is terminated as provided above the Company shall refund on a pro-rata basis unearned premium.

The right to purchase such additional period for the discovery of loss may not be exercised by any state or federal official or supervisory agency, or by any receiver or liquidator, acting or appointed to take over the Insured's business for the operation or for the liquidation thereof or for any other purpose.

In witness whereof, the Company has caused this Bond to be executed on the Declarations page.

JOHN W. JOHNSON, Secretary              WILLIAM J. HAALAND, President

BI-FIB-POL (102000)            24

D0173