UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


PEOPLES BANK OF THE SOUTH
f/k/a PEOPLES BANK OF FRANKLIN COUNTY                    PLAINTIFF


VS.                          CIVIL ACTION NO. 3:09CV217TSL-FKB


BANCINSURE, INC.                                        DEFENDANT

                    MEMORANDUM OPINION AND ORDER

     This cause is before the court on separate motions for
partial summary judgment filed by plaintiff Peoples Bank of the
South (Peoples Bank, or the Bank) and by defendant BancInsure,
Inc. (BancInsure).  Each party has responded to the other's motion
and the court, having considered the memoranda of authorities,
together with attachments, submitted by the parties, concludes
that both motions should be granted in part and denied in part, as
set forth herein.

     Peoples Bank filed the present action demanding contractual
and extra-contractual damages of $833,893, together with punitive
damages, arising from BancInsure's denial of the Bank's claim on a
Financial Institution Bond issued by BancInsure to Peoples Bank.
The Bank alleges that losses it has incurred as a result of
certain dishonest, collusive conduct of attorney Dwayne G. Deer
and Peoples Bank borrower Todd Phillips are covered under the
plain terms of the bond and yet BancInsure has continuously
refused to provide coverage for these losses.  In its motion, the

Bank contends it is entitled to summary judgment as to BancInsure's *liability* on the contract, and for extra-contractual and punitive damages.  For its part, BancInsure takes the position that while there are genuine issues of material fact on the question whether its bond provides coverage for any of Peoples Bank's claimed losses, there are certain categories of damages sought by the Bank, collectively totaling around $500,000, which clearly are not recoverable under the terms of the bond or otherwise, and it maintains that it is entitled to summary judgment as to these categories of damages.  BancInsure further contends that these same claimed losses are not recoverable as extra-contractual damages since the undisputed facts of record demonstrate clearly that the Bank has no viable claim for extra-contractual damages, and certainly not for punitive damages.

Facts:

The following facts are undisputed.  In late 2004, Todd Phillips Investments, Inc. (TPI), through its president, Todd Phillips, applied for a loan in the amount of $502,625 from Peoples Bank, which was to be secured by a first lien on five acres of commercial property in Pike County, Mississippi with an appraised value of $1,235,000.  In December 2004, the Bank requested attorney Dwayne G. Deer to provide a title opinion on the property that was being offered as collateral for the loan.  On December 8, 2004, Deer delivered to the Bank a preliminary

2

title opinion which indicated that TPI owned the property free and clear of any liens.  The loan was funded and closed on December 23, 2004, with Phillips, on behalf of TPI, executing a deed of trust on the property in favor of Peoples Bank in the amount of $500,000, which was recorded in the land records on January 4, 2005.  Deer delivered a final title opinion to Peoples Bank on April 14, 2005, which reflected that Peoples Bank held the only lien on the property.

In fact, however, as Peoples Bank later learned, at the time the Bank made the loan to TPI, there were already two liens on the property.  In 2006, in discussions with the president of the Bank of Franklin County, Peoples Bank's president Larry Hill learned that Phillips had used the same property as collateral for a $500,000 loan from Bank of Franklin.  Hill then learned that on December 8, 2004, the same day Deer had provided his preliminary title opinion to Peoples Bank showing no liens on the property, Deer had provided a similar preliminary title opinion to Bank of Franklin which showed that the same five acres of commercial property that secured the Bank's loan was owned by James A. Phillips, Jr., Todd Phillips' father, and that there were no existing liens on the property.  Hill also learned that on December 10, 2004, James A. Phillips, Jr. had executed a deed of trust to Bank of Franklin on the property which was recorded in the Pike County land records.  In addition, after hiring an

3

attorney, Gary Honea, to determine the Bank's lien position, Hill
learned that in May 2004, Todd Phillips, as president of TPI, had
executed a deed of trust on the five acres to Pike County National
Bank as security for an $800,000 loan, which deed of trust was
recorded in the land records on May 25, 2005 (a week before Deer
delivered his final title opinion to Peoples Bank showing the Bank
held the only lien on the property).  Honea's title opinion also
disclosed that on April 8, 2005, a forged cancellation of Peoples
Bank's deed of trust was recorded in the Pike County land records.
The Bank eventually learned that the cancellation was notarized by
a former employee of Deer, Dawn Stinson.  Honea's title opinion
also disclosed that on April 11, 2005, three days before Deer
delivered his final title opinion, TPI borrowed $700,000 from
American Bank secured by the five acres, with Deer acting as
trustee on behalf of American Bank.  As a result, contrary to
Deer's title opinion, Peoples Bank did not have lien priority, and
was effectively unsecured on the loan to TPI.  Consequently, when
TPI failed to pay the Peoples Bank loan as agreed, the Bank
incurred a loss of principal and accrued interest on the loan to
TPI.

On March 28, 2006, Hill notified BancInsure by phone of the
Bank's possible claim on the bond, which he followed up with a
letter to BancInsure setting forth the foregoing history of events
leading up to the Bank's possible claim.  BancInsure responded the

4

following day that it had opened a file, and had referred the matter to Kalchick, Pratt and Associates, LLC (KPA), a consulting group that specializes in reviewing Financial Institution Bond claims for insurers.  Subsequently, Judy Edwards, a KPA senior claims attorney assigned to the claim, reviewed the claim, and after contacting Hill to discuss the background of the claim and reviewing pertinent documents she had requested from the Bank, concluded there was no coverage.  Edwards assisted BancInsure in drafting the carrier's position letter to the Bank providing its reasons for declining coverage.

As BancInsure explains, since the Bank did not assert coverage under any particular coverage provision of the bond, it initially evaluated the Bank's claim under all potentially applicable insuring agreements, taking into account that because the Bank's claim involved loan loss, exclusion (e) would apply and bar coverage unless the Bank could show coverage under Insuring Agreements (A), (D), (E), (P) or (Q).[1]  In a May 3, 2006 position letter to the Bank, BancInsure advised of the reasons for its determination that there was no coverage under any of the referenced insuring agreements.  According to BancInsure, as it was apparent there was no arguable coverage for the loss under

---

[1]     Exclusion (e) excludes coverage for "loss resulting directly or indirectly from the complete or partial nonpayment of, or default upon, any Loan ... except when covered under Insuring Agreement (A), (D), (E), (P) or (Q)."

5

Insuring Agreement (D), (P) or (Q), it analyzed the claim under Insuring Agreements (A) and (E). As to Insuring Agreement (A), BancInsure explained to the Bank that since there was nothing to indicate that a employee of the Bank was involved in causing the claimed loss, then there was no coverage under Insuring Agreement (A), which requires BancInsure to indemnify Peoples Bank for "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or with others."[2] BancInsure further concluded that Insuring Agreement (E) was inapplicable. Insuring Agreement (E) covers "loss resulting directly from [Peoples Bank] having, in good faith ... extended credit ... on the faith of any original ... mortgage or other

---

[2]   Insuring Agreement (A) indemnifies the Insured for: Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.

Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent;
(a) to cause the Insured to sustain such a loss, or
(b) to obtain improper financial benefit for the Employee or another person or entity.

However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection with these transactions, an improper financial benefit.

As used throughout this insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

instrument conveying title to, or creating or discharging a lien on, real property, ... [or] Evidence of Debt...."  BancInsure concluded that since the Bank's loss was "the result of the Bank's reliance upon Deer's title opinions which contained inaccurate information as to the lien status of the property involved," Insuring Agreement (E) did not cover the loss, as "title opinions do not transfer title of the property and are not considered Securities as defined by Insuring Agreement (E)."

After receiving BancInsure's initial position letter, the Bank did not pursue its claim further (and in fact, had no contact with BancInsure regarding its claim) until more than two-and-a-half years later, when in December 2008, an attorney retained by the Bank wrote to BancInsure, requesting that it reconsider its denial decision.  At that time, the Bank, through counsel, informed BancInsure (for the first time) that Deer had been retained by the Bank to provide the title opinion for the TPI loan and thus was an employee of the bank under the terms of the bond, which defined "employee" to include "an attorney retained by [Peoples Bank]...."  On this basis, the Bank claimed the bond provided coverage and demanded payment for its claimed losses.[3]

---

[3]     The court notes that approximately six months earlier, in May and June 2008, respectively, Phillips and Deer had been charged in a federal information and pled guilty to a charge of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1334 relating to fraudulent title opinions provided to various banks I order to obtain loans.  Both men were awaiting sentencing at the time the Bank resumed communication with BancInsure in December

BancInsure responded that even though Deer may have been an "employee," under the terms of Insuring Agreement (A), if some or all of a claimed loss "result[ed] directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was acting in collusion with one or more parties to the transactions and has received, in connection with these transactions, an improper financial benefit."[4]  Thus, because the Bank's claimed loss resulted directly from a loan, then as BancInsure explained, there would be coverage under Insuring Agreement (A) only if Deer had received an improper financial benefit in connection with the loan, and yet nothing had been presented by the Bank to suggest that this had occurred.

The Bank sent a reply, asserting that the fee Deer received from the Bank for his title opinion was an improper financial benefit, and further suggesting that evidence of certain cash withdrawals by Deer from his trust account demonstrated that he had received an improper financial benefit.  However, in its response letter dated February 11, 2009, BancInsure declined coverage, explaining that the fees paid to Deer for his title opinion could not constitute an improper financial benefit under

---

2008 regarding the subject claim.  In January 2010, a year-and-a-half after entering his guilty plea, Deer was sentenced to 37 months' imprisonment with three years' supervised release, and was ordered to pay restitution.  Phillips was sentenced in February 2010 to 51 months' imprisonment, with three years supervised release, and was ordered to pay restitution.

[4]     See supra note 2.

Insuring Agreement (A) because the fee was earned in the "normal course of" Deer's employment with the Bank, and the policy definition of "financial benefit" clearly provided that this term did not include fees earned in the normal course of employment. BancInsure asserted further that the proof offered by the Bank of Deer's mishandling of trust account funds in an unrelated matter did not show that he received an improper financial benefit "in connection with" the title opinion he supplied the Bank on the TPI loan, as required for coverage under Insuring Agreement (A).

A month after receiving this letter, the Bank filed the present lawsuit, complaining that BancInsure, in derogation of its duties under the contract and under the law, wrongfully and in bad faith denied the Bank's claim without conducting any investigation of the Bank's claim and in the face of overwhelming evidence provided by the Bank which established a covered loss, entitling the Bank to contractual, extra-contractual and punitive damages.

<u>The Coverage Issues</u>

The Bank maintains that as a matter of law, based on the undisputed facts of record, its loss falls within the scope of the Insuring Agreements (A), (E) and (Q) of the bond and that it is therefore entitled to summary judgment on its claim for coverage under the bond.  BancInsure maintains that coverage under Insuring Agreements (E) and (Q) is excluded by virtue of exclusion (h), and

9

contends that genuine issues of material fact preclude the Bank's request for summary judgment as to Insuring Agreement (A).

The Bank asserts coverage under Insuring Agreement (E) because it "extended credit" to TPI in reliance on the deed of trust, i.e., a "security agreement," which created a lien on real property.[5]  It claims its loss is also covered by Insuring Agreement (Q) because Peoples Bank's signature on the TPI note was procured through Deer's and Phillips' fraud regarding the lien status of the property being offered as collateral for the loan and that TPI thus obtained the $500,000 loan under false pretenses that it was providing Peoples Bank with a first lien to the property.[6]  However, BancInsure asserts that since the Bank claims

---

[5]   Insuring Agreement (E) provides coverage for "loss resulting directly from [Peoples Bank] having, in good faith, for its own account or for the account others, ... extended credit ... on the faith of any original ... mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,... [or] Evidence of Debt...."  "Evidence of Debt" is defined as an instrument, including a Negotiable Instrument, executed by a customer of [Peoples Bank] and held by [Peoples Bank] which in the regular course of business is treated as evidencing the customer's debt to [Peoples Bank]."

[6]   Insuring Agreement (Q) provides coverage for loss resulting directly from [the Bank] having, in good faith and in the ordinary course of business in connection with any loan, accepted or received or acted upon the faith of any real property mortgages, real property deeds of trust or like instruments pertaining to realty ... which prove to have been defective by reason of the signature on such document of any person having been obtained through trick, artifice, fraud, ... false pretenses or the signature on the ... deed of trust having been obtained by or on behalf of such mortgagor or grantor through trick, artifice, fraud, or

its loss was caused by an employee, then any potential coverage
under Insuring Agreements  (E) and (Q) is excluded by Exclusion
(h), which excludes coverage for all losses caused "directly or
indirectly" by an employee of the Bank, "unless such losses are
covered under Insuring Agreement (A) or (other provisions not
applicable in this matter]."

     The Bank has contended throughout this cause that its losses
were caused by the fraudulent title opinion supplied by Deer, its
"employee."  In fact, that is necessarily the basis for the Bank's
claim for coverage under Insuring Agreement (A).  Exclusion (h)
excludes coverage for loss caused by a Bank employee, unless the
loss is covered under Insuring Agreement (A).  Yet the Bank
submits that because BancInsure's 30(b)(6) witness testified that
Deer's dishonesty was *part* of the basis for the Bank's loss, and
that another basis for the loss was Todd Phillips' failure to pay
off the loan, then Deer's misconduct was not the *sole* cause for
the Bank's loss and exclusion (h) therefore does not apply.  The
court rejects the Bank's position.  "There is no support in the
bond language for the theory that [a bank employee's] act must be
the only cause of the loss" for exclusion (h) to apply.  Empire
Bank v. Fidelity & Deposit Co. of Md., 27 F.3d 333, 336 (8th Cir.

_____

          false pretenses or the signature on the ... deed of
          trust having been obtained by or on behalf of such
          mortgagor or grantor through trick, artifice, fraud, ...
          or false pretenses."

1994) (rejecting argument that exclusion (h) can apply only to losses caused solely by a bank employee or of which a bank employee was the proximate cause); cf. First Nat. Bank of Louisville v. Lustig, 961 F.2d 1162, 1167-1168 (5th Cir 1992) (rejecting narrow reading of requirement in Insuring Agreement (A) that loss be directly caused by dishonest or fraudulent act of employee, reasoning that "[s]uch a reading would ... all but eliminate coverage for loans made because of dishonest or fraudulent acts [since] [t]here will always be some intervening cause for the failure of these loans to be repaid; otherwise the bank would suffer no loss").  Neither party herein disputes that Deer's dishonest or fraudulent acts caused, or at least substantially contributed to the Bank's claimed losses. Accordingly, exclusion (h) applies, so there is no coverage under the bond unless the loss is covered by Insuring Agreement (A).

To recover under the terms of Insuring Agreement (A), the Bank is required to prove that (1) it sustained a loss resulting directly from dishonest or fraudulent acts committed by an employee; (2) the employee committed the dishonest or fraudulent acts in question with the manifest intent to cause the Bank to sustain a loss or to obtain an improper financial benefit for the employee or for another person or entity; (3) the employee was in collusion with one or more parties to the transaction; and

12

(4) the employee has received an improper financial benefit in connection with the transaction.  BancInsure does not deny that the Bank has demonstrated each of elements (1) through (3), but it maintains that there is a genuine issue of material fact as to whether the Bank has shown that Deer received an improper financial benefit *in connection with* the TPI loan.  The Bank, on the other hand, insists that it has demonstrated beyond question that Deer received an improper financial benefit in connection with the TPI transaction and that therefore, it is entitled to summary judgment on the issue of BancInsure's *liability* under the bond.

Regarding this issue, the Bank asserts that in his deposition, Todd Phillips testified that he provided Deer with free office space, sold Deer two different houses below appraised value, loaned Deer hundreds of thousands of dollars (which was never repaid), kited checks with Deer to assist Deer's cash flow, gave Deer free storage facilities, paid Deer's secretarial staff, allowed Deer's daughter to live in one of his condos at a reduced rate, and allowed Deer to use his duck camp, all in exchange for Deer providing false title opinions to various banks for several different loans, including the loan to Peoples Bank.  For its part, BancInsure argues that while Deer may have enjoyed financial benefits from his personal and business relationship with Phillips, the evidence does not establish that

13

Deer received any specific benefit in connection with the Peoples Bank loan, or that certain financial benefits were improper.  In this regard, BancInsure argues that the question whether Deer received improper financial benefit in connection with the subject loan must be considered in the context of Deer's and Phillips' relationship.  The two men were long-time friends who developed an ongoing business relationship beginning around 2000 and continuing through 2006, during which time Deer handled hundreds of real estate transactions for Phillips and his various real estate development companies.  BancInsure notes that according to Phillips's testimony, the vast majority of these were legitimate business transactions; of Phillips' multi-million dollar portfolio, only approximately two percent were fraudulent. BancInsure submits that in light of their ongoing business relationship, Deer's rent-free use of Phillips' office space for the duration of their business relationship is not tinged with impropriety and has no apparent specific connection to the Bank's loan to TPI.  The same is true, it says, of the storage unit that Deer was allowed to use free of charge, which use both pre- and post-dated the subject loan.  BancInsure notes further, that the two houses Phillips allegedly built for Deer "much cheaper than appraisal" (though how much cheaper Phillips was unable to say) were purchased by Deer in 2000 and 2003, long before the subject loan transaction was even contemplated.  And Deer's daughter did

14

rent an apartment from Phillips at a reduced rate; but that did not occur until well after the loan was made. BancInsure acknowledges Deer and his family did spend time at Phillips' duck camp, but it points out this occurred sporadically over Phillips' ownership of the property from 1999 to 2006, is easily explained by the men's friendship and had no apparent connection to the subject loan. BancInsure also notes that whereas it was suggested that Dawn Stinson, an employee of Phillips, provided secretarial/notarial services to Deer at no charge, Stinson began working for Phillips and Deer well before the subject loan and continued such work after the loan was made. Finally, BancInsure argues that the monetary transfers between Phillips and Deer over the years are consistent with their six-year business relationship and friendship.

In the court's view, the cited facts do not suggest that the financial benefit received by Deer from Phillips was necessarily for his fraudulent title opinions and could be explained in the manner suggested by BancInsure – as perks of Phillips' and Deer's friendship and long-term business relationship – were it not for Phillips' categorical testimony that Deer provided false title opinions to banks for several different loans Phillips obtained, and that in exchange for providing those false title opinions, including the false title opinion to Peoples Bank, Deer received

15

items of value from Phillips, including rent and loans.[7]   The
court is certainly aware of BancInsure's contention that Phillips'
testimony should be viewed skeptically; but BancInsure has offered
no evidence to contradict or undermine Phillips' testimony, which
thus stands unrefuted and hence establishes that Deer did, in
fact, receive financial benefit for the fraudulent title opinions
provided to various banks, including to Peoples Bank for the TPI
loan.

BancInsure argues, though, that notwithstanding Phillips'
testimony in this regard, the Bank has failed to sustain its
burden to prove an improper financial benefit "in connection with"
the Bank's loan to TPI since the Bank cannot link any specific
financial benefit to Deer to the specific loan at issue.  That is,
it contends that Phillips' testimony, even if accepted as true,
still does not establish that Deer received an improper financial
benefit from Phillips "in connection with" the Peoples Bank loan
since Phillips was not able to tie any specific financial benefit
to the specific loan at issue.  Indeed, in his deposition
testimony, Phillips repeatedly emphasized that he could not say

---

[7]     The court notes, too, that Phillips testified that Deer
had done the title work on all his real estate transactions in the
earlier years of their relationship, but that during the last
couple of years of their relationship – which was when the subject
loan was made – Deer had done only the fraudulent transactions.
And it is undisputed that during that time frame, Phillips loaned
Deer substantial sums and kited checks with Deer to assist his
cash flow.

16

that any particular benefit "was tied specifically to any one deed of trust."  And he stated explicitly that the financial benefits Deer received were for all the loans and were "not specifically tied" to the Peoples Bank loan.  Instead, the two operated under "just kind of an open understanding" that was part of an "ongoing scheme" to defraud various banks.

The court rejects BancInsure's position.  The policy requires only that there be a "connection" between the improper financial benefit and the loan transaction, a standard that is satisfied based on Phillips' testimony.  The court, therefore, concludes that Peoples Bank is entitled to summary judgment on the issue of coverage under the bond.

The Bad Faith Claim

The Bank argues that BancInsure breached its duty to investigate the Bank's claim, and that it denied the claim in bad faith.  The court concludes that the Bank's claim for bad faith, which is the basis for its claims for extra-contractual and

17

punitive damages,[8] fails as a matter of law on the undisputed

facts of record.

The Fifth Circuit has summarized the applicable principles of

Mississippi bad faith law, as follows:

> Under Mississippi law, insurers have a duty "to perform
> a prompt and adequate investigation and make a
> reasonable, good faith decision based on that
> investigation" and may be liable for punitive damages
> for denying a claim in bad faith.  The [insured] bear[s]
> the burden of proving that [the insurer] acted in bad
> faith when it denied [the] insurance claim.
>
> Section 11-1-65(1)(a) of the Mississippi Code
> Annotated states that "[p]unitive damages may not be
> awarded if the claimant does not prove by clear and
> convincing evidence that the defendant against whom
> punitive damages are sought acted with actual malice,
> gross negligence which evidences a willful, wanton or
> reckless disregard for the safety of others, or
> committed actual fraud."  Mississippi law does not
> permit parties to recover punitive damages unless they
> first prove that they are entitled to compensatory
> damages.  Miss. Code Ann. § 11-1-65(1)(b)(c).
>
> To recover punitive damages for bad faith denial of
> [its] insurance claim, the [insured] "must show that the
> insurer denied the claim (1) without an arguable or
> legitimate basis, either in fact or law, and (2) with
> malice or gross negligence in disregard of the insured's
> rights."  [The insurer], on the other hand, "need only
> show that it had reasonable justifications, either in

---

[8]     The Bank seeks to recover extra-contractual damages for
BancInsure's alleged bad faith denial of its claim, including fees
and expenses incurred in connection with its lawsuit against TPI
to recover on the note; fees and expenses incurred in reworking
the TPI loan; accrued interest on the reworked loan; fees and
expenses incurred in attempts to recover money from Phillips'
bankruptcy; fees incurred in connection with efforts to raise
capital by the issuance of debentures; interest accrued on the
debentures; fees and expenses incurred in the Bank's efforts to
have BancInsure pay the subject claim and prosecuting this
lawsuit; and increased FDIC premium.

fact or in law, to deny payment." The question of whether [the insurer] had an arguable basis for denying the [insured's] claim "is an issue of law for the court." Insurers who are not liable for punitive damages may nonetheless be liable for "consequential or extra-contractual damages ( e.g., reasonable attorney fees, court costs, and other economic losses)" where their decision to deny the insured's claim is without "a reasonably arguable basis" but does not otherwise rise to the level of an independent tort.

Broussard v. State Farm Fire and Cas. Co., 523 F.3d 618, 628 (5th Cir. 2008) (citations omitted); see also Paracelsus Health Care Corp. v. Willard, 754 So. 2d 437, 442 (Miss. 1999) (emphasizing that "[p]unitive damages are only appropriate in the most egregious cases so as to discourage similar conduct and should only be awarded in cases where the actions are extreme"); Ross-King-Walker, Inc. v. Henson, 672 So. 2d 1188, 1191 (Miss. 1996) (stating that "[t]he totality of the circumstances and the aggregate conduct of the defendant must be examined before punitive damages are appropriate") (quoting Wise v. Valley Bank, 861 So. 2d 1029 (Miss. 2003)).

It is manifest from the record that BancInsure cannot be liable for punitive damages for its initial denial of the Bank's claim in May 2006. There appears to be no dispute that when the Bank first advised BancInsure of its potential claim under the bond, the Bank did not inform BancInsure that Deer had been retained by the Bank to perform legal services relating to the TPI loan transaction. Bank president Larry Hill did not explain this to BancInsure when he submitted his written explanation of what

19

had occurred or when he was interviewed by KPA's claims attorney Judy Edwards.  Thus, in their original evaluation of the claim, Edwards and BancInsure correctly analyzed the coverage issues on the basis of the facts, as they understood them.  Obviously, they were unaware of all the relevant facts.

The Bank contends that BancInsure was unaware of the relevant facts because it failed to conduct an adequate investigation, as is its obligation under the law.  See Broussard, 523 F.3d at 628 (describing insurers duty "to perform a prompt and adequate investigation").  However, not only was the Bank's investigation adequate to that point,[9] but the Bank undeniably knew from the time it received BancInsure's May 3, 2006 position letter that BancInsure was unaware that the Bank had hired Deer to perform the title work and yet the Bank made no effort to provide this information.[10]  It was clear from BancInsure's preliminary analysis

---

[9]    The court must look to the entire investigation to determine whether BancInsure's conduct was so outrageous as to allow punitive damages, which here involves considering BancInsure's investigation in several different time periods.  See Pilate v. American Federated Ins. Co., 865 So. 2d 387, 395 (Miss. Ct. App. 2004).

[10]    Although Judy Edwards, the claims analyst assigned the Bank's claim, reviewed the claim submitted by Bank President Larry Hill, discussed the claim with Hill and requested and reviewed pertinent documents submitted by the Bank, the Bank complains that BancInsure breached its duty to investigate because Edwards "took no steps to follow up on the information provided."  The court finds no merit in the Bank's position, particularly since the Bank knew the carrier lacked pertinent information and failed to follow up on BancInsure's request that the Bank provide any additional information which might be relevant to the carrier's analysis of

of the claim––which it prefaced by stating that "[a]ny
inaccuracies or mischaracterizations in the following factual
recitation may alter our analysis"– that BancInsure did not know
that Deer had been hired by the Bank to do the title work on the
TPI loan.[11]   Thus, in its analysis of potential coverage,
BancInsure wrote, "There is no indication that an Employee of Bank
was in any way involved with the causation of the Loss."   In
closing, BancInsure stated, "If you have any additional
information or documentation which you believe would alter the
opinions expressed herein, please forward that information to our
claims consultant ... as soon as possible."   Yet for more than
two-and-a-half years after receiving BancInsure's letter, Peoples
Bank did not pursue its claim, much less provide additional
information relating to the claim, including the fact that it had
hired Deer to perform the title work on the loan.   BancInsure did
not learn of this fact until December 2008, when the Bank's
retained attorney wrote requesting  reconsideration of the denial
decision.   Only then did the Bank finally explain that Deer had

_____

the claim.

[11]   For example, the letter recited that after the Bank
discovered that Deer had provided title opinions to both it and
the Bank of Franklin indicating that both banks' deeds of trust
held the first position lien on the subject property, "Bank
proceeded to retain *its own attorney* to conduct a title search of
the property."

been hired by the Bank and thus was a Bank "employee" under the terms of the policy.

Relative to BancInsure's initial denial decision, there are no issues of material fact in dispute, and the court readily concludes that the undisputed facts do not support any reasonable conclusion that BancInsure lacked a legitimate or arguable reason for its decision based on the facts revealed by its investigation, or to suggest that its actions were willful, intentional, maliciously wrong or in reckless disregard of the Bank's rights.

Moreover, when the Bank contacted BancInsure in December 2008 requesting that it reconsider its decision, it explained only that Deer had been hired by the Bank to do the TPI title work and hence was an "employee." The Bank did not purport to address the further requirements for coverage under Insuring Agreement (A) or to assert that these requirements had been met. Thus, by way of response, BancInsure properly advised that since the loss claimed was in connection with a loan, then for Insuring Agreement (A) to afford coverage, Deer must have received an improper financial benefit in connection with the transaction. Certainly, BancInsure was not required to merely assume that Deer had received an improper financial benefit in the absence of even a suggestion or assertion by its insured that this had occurred.

In its subsequent reply, the Bank took the position that Deer had received an improper financial benefit within the coverage of

22

the policy "by being paid a fee to provide a service which was not performed."  But BancInsure correctly responded that Deer's fee did not qualify as a "financial benefit" under the bond.  The bond unambiguously states that "financial benefit does not include any employee benefits earned in the normal course of employment, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions."[12]  As further evidence of improper financial benefit to Deer, the Bank pointed to an opinion of the bankruptcy court in an adversary proceeding brought in Deer's bankruptcy case involving Deer's alleged mishandling of certain funds in his attorney trust account.  Yet BancInsure also correctly pointed out that since Deer's cash withdrawals from this trust account (which was used at times to handle monies relating to Phillips' transactions) had no connection to the TPI loan transaction, this was not an improper financial benefit that could support a finding of coverage under Insuring Agreement (A).  The Bank does not presently contend otherwise, and implicitly acknowledges that BancInsure's assessment of this claim was correct.

Obviously, given that BancInsure's responses to the Bank's allegations of improper financial benefit received by Deer were manifestly correct, there is no merit to the Bank's charge that

---

[12]   Notably, the Bank no longer asserts and thus implicitly acknowledges that BancInsure's analysis of that issue was correct.

BancInsure is liable for bad faith because after receiving this information from the Bank, it "did not conduct any interviews or review any documents."  To prevail on a bad faith claim predicated on a failure to investigate, the insured must demonstrate that "a proper investigation by the insurer 'would easily adduce evidence showing its defenses to be without merit ...'"  Murphree v. Federal Ins. Co., 707 So. 2d 523, 531 (Miss. 1997) (quoting Szumigala v. Nationwide Mut. Ins. Co., 853 F.2d 274, 280 (5th Cir. 1988)).  BancInsure's defenses to the Bank's assertions were meritorious.  Thus, in the court's opinion, at the time the Bank's suit was filed a month later, the facts that had developed to that point did not support the Bank's charge that BancInsure had breached its duty to investigate or denied the claim in bad faith.

The Bank notes that in September 2009, it sent copies of the transcripts of Deer's and Phillips' guilty pleas to BancInsure, and on November 9, 2009, it sent a letter to BancInsure enclosing Deer's guilty plea transcript along with copies of twenty-three checks from Phillips to Deer between January 4, 2004 and May 2, 2005, which the Bank asserted established that Deer received an improper financial benefit in connection with the loan.  The Bank also advised BancInsure that Deer had been using office space owned by Phillips rent free.  BancInsure responded that there was nothing in the fact of the checks or the free rent (if there even was free rent) to establish a connection to the Peoples Bank loan,

24

and that the checks could have been for legitimate business transactions.  The insurer wrote:

> We cannot know the purpose of these checks until Mr.
> Deer is deposed and asked. ... We would propose that,
> once Mr. Deer has been sentenced and his documents can
> be released to us, we take Mr. Deer's deposition and ask
> him these very questions.  At that time, BancInsure will
> more than likely be in a better position to reevaluate
> Peoples Bank's claim.  Please understand that BancInsure
> cannot just blindly pay claims when there is no proof
> that the provisions of the Bond have been fulfilled.

In the court's opinion, BancInsure acted reasonably – and certainly not in bad faith – in taking the position that it was not required to pay the Bank's claim on the basis of unexplained checks from Phillips to Deer and the possibility that Deer had been the beneficiary of free office space, without an opportunity to depose the participants in the fraud to determine whether there was, in fact, an improper financial benefit in connection with Deer's title work on the Peoples Bank loan.  As BancInsure's letter indicated, the only individuals who could explain the meaning of the checks and free rent, and the myriad other benefits allegedly received by Deer from Phillips, were Phillips and Deer themselves; and since Deer and Phillips had entered guilty pleas and were awaiting sentencing so that neither was available to be deposed, any investigation was essentially on hold until one or the other (or both) participants in the fraud could be deposed. Thus, while the facts known to BancInsure suggested the *possibility* of coverage, the existence of coverage could not be

definitively determined until Phillips and/or Deer was deposed.
Thus, the facts known to, or reasonably knowable by BancInsure
prior to the time Phillips was finally deposed, do not support a
reasonable finding that BancInsure lacked a legitimate or arguable
reason for its position, or that it had breached its duty to
conduct a reasonable investigation.

Of course, the court has now concluded, supra, based on
Phillips' testimony, that there is coverage for at least some of
the Bank's claimed loss under Insuring Agreement (A).  However,
the facts supporting that conclusion were not developed until
Phillips' deposition in June 2010, which was taken just over a
month before the parties filed their present motions.  BancInsure
submits in its motion for partial summary judgment that the Bank
has no viable basis for its claim for punitive damages, or for
extra-contractual damages, because even after Phillips'
deposition, it had a legitimate or arguable basis for continuing
to deny coverage in that Insuring Agreement (A) could be
reasonably interpreted to provide coverage only if it is shown
that the bank employee received a specific financial benefit tied
to the specific loan transaction, which proof Phillips did not
provide.

The court concludes without hesitation that the facts
established by the record do not support the imposition of
punitive damages.  Moreover, while the court has determined there

26

is coverage, the court is persuaded that the Bank had an arguable basis for its decision to continue to deny coverage once Phillips had testified.[13]

Covered Losses

In addition to seeking to recover under the policy for the unpaid principal balance and accrued interest on the TPI loan, the Bank seeks to recover the fees paid to Deer for the fraudulent title opinion, fees paid to Gary Honea for the title opinion the Bank requested once it discovered that Deer's title opinion was false, and attorneys' fees and expenses incurred in connection with pursuing its claim against BancInsure through the present litigation. BancInsure has moved for partial summary judgment as to the Bank's claim for attorneys' fees and expenses incurred in the Bank's efforts to have its claim paid by BancInsure and in prosecuting this lawsuit against BancInsure, contending such fees and expenses fall within one or both of two policy exclusions. Specifically, it submits these damages fall within exclusion (v),

---

[13]    The court notes that even had it concluded that BancInsure lacked a legitimate or arguable basis for refusing to reconsider its denial in the face of Phillips' testimony, that alone would not support an award of punitive damages; and any conseqential/extra-contractual damages the Bank would have sustained as a result of the denial decision at that point would be de minimis, at best. Even if the Bank had admitted coverage at that point, this litigation had already been brought and pending for more than a year, and a different coverage decision in June 2010 would not have avoided the present motions, which raise issues not only as to coverage, but also, significantly, as to the damages recoverable.

which excludes coverage for "indirect or consequential loss of any nature," and exclusion (u), which excludes coverage for "all fees, costs and expenses incurred" by the Bank in "establishing the existence or of amount of loss" covered under the bond," including the costs of any "investigations necessary to establish a loss so that a claim can be made under the bond, except as covered by Insuring Agreement (T)."  BancInsure argued in its motion that "based on the information supplied thus far by the Bank, a portion of the Bank's claims for attorneys' fees and fees for title opinions would be excluded under this provision."  However, in response to BancInsure's motion, the Bank maintains that the attorneys' fees it has incurred in this lawsuit are covered under Insuring Agreement (T), which provides coverage for

> [r]easonable expenses incurred and paid by the Insured
> in preparing any valid claim for loss caused by any
> dishonest or fraudulent act or acts of any of the
> Insured's Employees, which loss exceeds the Single Loss
> Deductible Amount applicable to Insuring Agreement (T).

While BancInsure denies applicability of Insuring Agreement (T), it does not purport to seek summary judgment on all of the Bank's claims for attorneys' fees and expenses, but only a portion of those fees and expenses.  Based on the parties' submissions to date, the court is not persuaded that summary judgment is warranted on any of these claimed losses.

28

Conclusion

Based on the foregoing, it is ordered that the Bank's motion for partial summary judgment as to liability is granted as to coverage under Insuring Agreement (A), but is otherwise denied, and it is further ordered that BancInsure's motion for partial summary judgment is granted as to Peoples Bank's claim for bad faith, and is denied as to the Bank's claim for attorneys' fees and expenses in establishing its claim.

SO ORDERED this 1st day of November, 2010.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE